IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

THOMAS DUNN, DENNY ROBINSON,        )
and LEONARD KIMBLE, on behalf of    )        JUDGE GETTLEMAN
themselves and a class of others    )
similarly situated,                 )        **04C  6804**
                                    )
          Plaintiffs,               )    NO:_____
                                    )
          v.                        )    MAGISTRATE SIDNEY I. SCHENKIER
                                    )
CITY OF CHICAGO,                    )    **DOCKETED**
                                    )
          Defendant.                )    JURY TRIAL DEMANDED OCT 2 2 2004

COMPLAINT

NOW COME Plaintiffs THOMAS DUNN, DENNY ROBINSON,
and LEONARD KIMBLE, on behalf of themselves and a class of others
similarly situated, through their attorneys Loevy & Loevy, and
for their complaint against Defendant CITY OF CHICAGO, state as
follows:

Introduction

1.   This is a class action pursuant to 42 U.S.C Section
1983 challenging the Chicago Police Department's ("CPD" or
"Department") inhumane and unlawful system for detaining persons
under the Department's control.

2.   As is explained in detail below, the CPD has
engaged, for decades, in a repeated pattern of detaining citizens
*incommunicado* within its police departments, holding them for
unconstitutional lengths of time and subjecting them to torture
in order to accomplish unjust ends.  Plaintiffs bring this case

in order to finally put an end to this institutionalized system of police torture in Chicago.

3. The CPD's detention system routinely violates several fundamental constitutional protections guaranteed to all Americans. One such protection is the right to prompt judicial review of the Department's justification for detaining a citizen in the first place. This requirement serves to ensure that citizens are not arrested unless the police have a proper justification for interfering in their liberties and to prevent overreaching while the citizen is detained behind closed station house doors.

4. As explained below, however, the Department routinely flouts this requirement for prompt judicial review by keeping citizens secreted inside its police departments while it attempts to develop grounds that would "justify" detaining them after the fact.

5. Another stunning example concerns the failure to provide counsel for those being interrogated during these detentions. It is a bedrock principal of American criminal procedure that police may not interrogate a suspect in their custody if that suspect requests to have an attorney present, unless and until an attorney has been provided. Although this constitutional mandate is absolutely clear, the CPD literally maintains no policy or directive for obtaining a lawyer if a

detainee requests one, leaving its officers no choice but to ignore the requests.

6.    This monumental failure by Department policymakers results in consistent violations of the Fifth Amendment during custodial interrogations of CPD detainees and communicates to CPD officers that they may violate the constitution in order to obtain a confession.  The result is that numerous confessions obtained by the CPD in the course of such detentions have been subsequently proven to be false.  In the meantime, the damage is done to those who have been coerced to confess and the true criminals have been left at large to strike again.

7.    Further, detentions under the CPD's system often last many days during which the detainees' basic human needs for food, sleep and access to sanitation and hygiene are ignored. Indeed, the system exploits these needs in a manner consistent with tactics of "soft torture" used to extract involuntary confessions in other parts of the world.

8.    Charles Gruber, a former president of the International Association of the Chiefs of Police who consults with the United States Department of Justice in its investigations of police forces, evaluated the unlawful detentions and the conditions of confinement complained of herein and concluded in an expert opinion as follows:

> In my 35 years of policing and visiting police
> departments around the country, I have not seen a more
> blatant failure to promptly process and humanely care
> for arrested individuals. . . .  So outrageous is the

conduct on the part of the Chicago Police Department in
constructing unlawful, unconstitutional, and inhumane
policies and practices for extended detentions . . .
that it manifests deliberate indifference.

9.  Supervisors and policymakers at the highest level
have known of these inhumane conditions and illegal detentions
for many years but they shrink from changing this system because
it is an entrenched means of doing business in the CPD.

### Jurisdiction and Venue

10.  This Court has jurisdiction of the action pursuant
to 28 U.S.C. § 1331.  Venue is proper under 28 U.S.C. § 1391(b).
Defendant, City of Chicago, is a municipality physically situated
in this judicial district, and the events giving rise to the
claims in this case all occurred here.

### Interrogation Room Detentions:
### The Use of "Soft" Torture In Chicago's Detective Divisions

11.  Many persons who are detained by the CPD for
extended periods are held in Detective Division interrogation
rooms -- small, bare rooms, approximately ten feet in length and
eight feet in width.

12.  The rooms contain only a four foot by ten inch
metal bench.  There is no place to sleep or to relieve oneself
and no access to running water.  Because the rooms are wholly
inadequate to meet the detainee's basic needs, it is inhumane and
cruel to hold a detainee in these rooms for extended periods of
time.  Illinois law recognizes this fact by placing an eight hour
cap on detentions in such rooms.

13. The CPD, however, maintains no policies regarding the length of time a detainee may be held in these rooms. It is not uncommon for a detainee to be kept in such rooms for several days while CPD detectives interrogate them and attempt to extract a confession.

14. Exacerbating the torturous conditions, CPD policies and procedures require that all suspects held in an interrogation room be shackled -- arm to a ring on the wall or to a bar on the bench, for the entire time they are detained in the room.

15. During these detentions, the very officers who are charged with building a case against the detainees and attempting to obtain a confession from them have absolute control over their access to food, water, and a restroom. The investigating detectives control all circumstances of the detainees' detention, even whether the light in the room is turned off at night allowing them to attempt to rest.

16. If a suspect needs food or water, he/she can only get it if the detectives bring some. There is no scheduled food service for persons detained in these rooms. If a person needs to use the bathroom, they are at the whim of the detectives to unshackle them, let them out of the room and escort them to a restroom. It is not uncommon for persons detained in the

5

interrogations rooms for extended periods to urinate or defecate on themselves or on the floor.

17.   These interrogation room detentions are not only physically torturous, they are psychologically disorienting in a manner that can lead to increased suggestibility for the suspect being interrogated and, ultimately, to false confessions.  These very conditions are recognized world-wide as a means of psychological torture to overcome a human being's reason and will.

### Excessive Detentions Under The CPD'S System

18.   The CPD detention practices challenged herein directly contravene additional, well-established rights and safeguards inherent in the United States Constitution.

19.   First, CPD policy and practice allows its officers to hold citizens in its police stations (both interrogation rooms and lock-up cells) without the benefit of judicial review for unconstitutional periods of time.

20.   This practice directly contravenes the Fourth Amendment which requires either an arrest warrant or prompt review by a judge of the CPD's supposed justification for depriving an arrestee of his/her liberty.  However, the CPD does not honor this right to judicial review.

21.   Rather, the CPD allows its officers to hold arrestees for extended periods of time in order to forestall this

very judicial scrutiny while they attempt to develop grounds to justify the arrest. CPD officers can and routinely do rely on the extended detentions as a tool which allows them to make arrests for unconstitutional reasons, such as mere hunches or even animus, and then justify them after the fact by developing sufficient supposed evidence during the period of illegal detention. All too often the "justifications" CPD officers develop during these illegal detentions consist of fabricated evidence and coerced confessions.

22. This very practice was documented forty-five years ago in a publication by the American Civil Liberties Union, entitled Secret Detention by the Chicago Police. That report, as well as multitudinous criminal and civil cases over the years and more recent media attention have all put the policymakers of the City of Chicago on notice of these routine violations. However, the policymakers have not remedied the system.

Other Inhumane Conditions Inflicted By The CPD's System

23. In addition to the above, the CPD's system fails to accommodate for the basic human needs of those who are being detained.

24. The Department has an obligation to ensure, at a minimum, that detainees' basic needs for sustenance, hygiene and sleep are met while they are in the Department's charge. However, many of the hundreds of thousands of citizens arrested

7

in the City of Chicago each year are systematically deprived of
these basic needs.  As a general and widespread practice and
policy:

    a.    The CPD holds detainees in oppressive
conditions;

    b.    The CPD furnishes no mattress or other
bedding for overnight detentions.  Despite the fact that
overnight detentions are foreseeable and multi-day detentions are
commonplace, the CPD maintains no bedding in its facilities and
has no policies requiring that its employees furnish appropriate
means of sleep to those who are subjected to extended detentions;

    c.    The CPD provides wholly inadequate access to
restrooms and means of personal hygiene; and

    d.    The CPD furnishes detainees little if any
food or drink during extended detentions.  Even when the CPD does
furnish food to those in its custody, it is always limited to a
pork bologna sandwich, which, as the final policymakers of the
CPD well know, violates the religious beliefs of many of its
detainees, and is inedible to them.

    25.  These failures violate well-established
constitutional and state law requirements to provide for the
basic human needs of those in custody.  Indeed, the CPD has been
cited by the Illinois Department Of Corrections for its
widespread failure to provide proper bedding, nutrition and

access to sanitation for those in its custody.  However, the final policymakers of the CPD consistently treat these serious problems with callous indifference.

26.  Although there is absolutely no legitimate law enforcement purpose for the foregoing policies and practices, the CPD has refused, and continues to refuse, to change.

<u>Facts Concerning The Named Plaintiffs</u>

27.  At approximately noon on February 24, 2004, Named Plaintiff Leonard Kimble came to the CPD police station after being told that police wanted to learn if he had information about an unspecified crime.

28.  Immediately upon arrival, Mr. Kimble was stripped of his shoestrings, searched, and imprisoned in an interrogation room.  His wrist was shackled to a ring on the wall.

29.  Chicago police detectives began questioning him about a murder that had occurred in March 2003.  Mr. Kimble had no knowledge of the victim or the circumstances of his death and communicated this fact to the officers.

30.  Nevertheless, the detectives continued to question Mr. Kimble about the crime.

31.  The detectives detained Mr. Kimble's in the interrogation room for approximately 65 hours, from noon on February 24 to the early morning of February 27.  The only times Mr. Kimble was allowed out of the interrogation room was to take

a lie detector test on the first day of his detention, to appear
in a line-up on the third day, and one time to use the bathroom.

32.   At no time during this entire period did Mr.
Kimble receive any judicial determination of probable cause or
bail.  He was not allowed to use the telephone.  He was not given
any food to eat.  The only liquids he received were from the
faucet on the sink during his lone trip to the bathroom.  He
could not sleep properly as he was sitting upright on the small
metal bench with his wrist chained to the wall.

33.   On October 20, 2000, at approximately 9 a.m.,
Named Plaintiff Denny Robinson was at work as a mail carrier for
the United States Postal Service.  While he was sorting mail in
an area closed to the public, Mr. Robinson was approached by a
Chicago Police Officer, Detective Downs.

34.   Detective Downs told him that he had an arrest
warrant out for him, but Downs never showed him a warrant or
indicated on his arrest report that he was arrested pursuant to a
warrant.  On information and belief there was no such warrant.

35.   Downs handcuffed Mr. Robinson but did not tell Mr.
Robinson why he was being arrested.  Thereafter, Mr. Robinson was
transported to the police station, placed in a small
interrogation room, and chained to a ring on the wall.

36.   Mr. Robinson was held in the room for three days and two nights and was interrogated during this time.  The room contained only a small metal bench.

37.   Mr. Robinson could not sleep properly due to his arm being suspended above him and chained to the wall.  He was furnished no mattress, blanket nor pillow.  In addition, the bare lightbulb illuminating the room remained on all night and Plaintiff could not switch it off.

38.   On the third day of his captivity, Mr. Robinson was taken from the interrogation room, booked, and placed in a lock-up cell where he was held until the following day.  The holding cell was slightly bigger than the interrogation room, but also contained no accommodations for sleeping.

39.   During his entire four-day detention, the only food provided to Mr. Robinson was three baloney sandwiches, one on each of the first three days of his confinement.  He was often thirsty while locked in the interrogation room.  When he asked for something to drink, detectives told him to "be patient," or words to that effect, rather than bring him water.  Mr. Robinson was not able to sleep properly during the three nights he spent in police custody.

40.   At no time during this four day ordeal did Mr. Robinson receive a judicial hearing to determine whether there

was probable cause to detain him or to set a bail for his release.

41.   Mr. Robinson was finally transferred to the Cook County Jail on October 23, 2000, and was ultimately acquitted of all charges pending against him.

42.   On July 29, 2003, Named Plaintiff Thomas Dunn was arrested by CPD officers for a crime he did not commit.

43.   The officers placed Mr. Dunn in a CPD holding cell where he spent the next three nights.

44.   During his detention, Mr. Dunn was not provided with any sheets, blankets, or pillows and was not able to obtain adequate sleep during this detention.

45.   The only food Mr. Dunn received were pork bologna sandwiches.  The only fluids he had to drink were from the tap of the sink in his cell.

46.   On the morning following his third night in the cell, Mr. Dunn was finally transferred to court for a probable cause and bail hearing.

47.   Each of the foregoing actions and failures to act by CPD employees affecting the Named Plaintiffs were taken pursuant to policies, customs and longstanding widespread practices of the CPD of which the Department's policy makers were aware.

## Class Allegations

48.   The Named Plaintiffs seek to pursue claims both for themselves and for a class of others similarly situated. Named Plaintiffs believe that the class should be organized into three subclasses as follows.

49.   Named Plaintiffs Kimble and Robinson seek to represent Class I.  Class I consists of:

> All persons detained in a CPD interrogation room for more than eight hours in a 24 hour period at any time form March 15, 1999 to the date of the order granting certification in this case.

50.   The individuals in the Class I are so numerous that joinder of all members is impractical.  Named Plaintiffs Kimble and Robinson estimate that Class I numbers in at least the thousands.

a.   On information and belief, at least 200,000 persons have been arrested by the CPD each year since 1999;

b.   The CPD maintains no policy, directive or procedure limiting the amount of time that an arrestee may be kept in an interrogation room.  Indeed, Chicago police personnel, testifying as representatives of the Chicago Police Department and the CITY OF CHICAGO, have stated under oath that there is no policy or practice of the CPD which limits the length of time an arrestee can be held in an interview room, making it likely that this unconstitutional condition of detention occurs again and again; and

13

c.    Chicago police personnel, testifying as representatives of the Chicago Police Department and the CITY OF CHICAGO, have stated under oath that it is not uncommon for arrestees to be held in interrogation rooms for up to 72 hours or more.

51.    There are questions of law and fact common to the claims of Class I.  Among these common questions are:

a.    Whether it is unconstitutional to hold detainees in an interrogation for extended periods of time;

b.    Whether it is unconstitutional to shackle persons to a wall in an interrogation room for extended periods of time;

c.    Whether the conditions of confinement in the interrogation rooms deprive detainees of acceptable means of sleep in an unconstitutional manner;

d.    Whether CPD policy allows the misuse of interrogations rooms for extended detentions in the manner alleged herein;

e.    Whether there is a custom or practice within the CPD of misusing interrogation rooms in the manner alleged herein;

f.    Whether CPD final policymakers have condoned or been deliberately indifferent to the misuse of interrogations rooms for extended detentions in the manner alleged herein; and

g.    Whether extended detentions in the interrogation rooms violate detainees' rights under state law.

52.  Plaintiffs' claims are typical of the claims of Class I.  Both Mr. Kimble and Mr. Robinson were detained in CPD interrogation rooms in excess of eight hours in a twenty-four hour period, each of them was shackled to the wall in the interrogation room, each of them was deprived of meaningful sleep, and each of them seeks to prove that the deprivations he suffered were inflicted as a result of CPD policy, custom, practice and/or the deliberate indifference of CPD policy makers.

53.  Plaintiffs Kimble and Robinson will fairly and adequately represent the interests of the Class I.  Plaintiffs have retained skilled counsel with experience in constitutional and class action litigation to represent the Class.

54.  The questions of law and fact common to the Class I, as described in paragraph 43 above, predominate over any individual issues.

55.  Named Plaintiffs Dunn, Kimble, and Robinson seek to represent Class II.  Class II consists of:

> All persons detained in a CPD lock-up or detective division facility between the hours of 10 p.m. and 6 a.m. at any time form March 15, 1999 to the date of the order granting certification in this case.

56.  The individuals in the Class II are so numerous that joinder of all members is impractical.  Named Plaintiffs Dunn, Kimble and Robinson estimate that Class II numbers in at least the thousands.

a.    On information and belief, at least 200,000 persons have been arrested by the CPD each year since 1999.  A sizeable percentage of these persons are detained between the hours of 10 p.m. and 6 a.m. as persons arrested by the CPD in the afternoon are rarely if ever taken to court until the following morning;

b.    The CPD maintains no policy, directive or procedure requiring the provision of minimally appropriate sleeping accommodations to those in its custody, including the provision of a mattress, blanket or pillow.  The CPD in fact maintains no such bedding;

c.    CPD employees testifying as official representatives of the City of Chicago testified that the CPD has never maintained any such policies or facilities to the best of their knowledge.  One of these representatives testified that detainees are expected to sleep on the floor or on the four foot by ten inch metal bench, and that this expectation applies even to those who are detained by the CPD for several days; and

d.    The CPD has been cited multiple times by Illinois state officials for failing to maintain any bedding for detainees.

57.    There are questions of law and fact common to the claims of Class II.  Among these common questions are:

16

a.    Whether it is unconstitutional to hold detainees overnight without furnishing them sleeping facilities such as a mattress, blanket or pillow;

b.    Whether it is a violation of state law to hold detainees overnight without furnishing them sleeping facilities such as a mattress, blanket or pillow;

c.    Whether CPD policy allows and/or encourages the alleged constitutional deprivations;

d.    Whether there is a custom or practice within the CPD that allows and/or encourages the alleged constitutional deprivations;

e.    Whether CPD final policymakers have condoned or been deliberately indifferent to the alleged constitutional deprivations; and

f.    Whether CPD final policymakers have been deliberately indifferent in failing to maintain minimally adequate sleeping accommodations for overnight detainees.

58.    Plaintiffs' claims are typical of the claims of Class II.  Mr. Dunn was detained over several nights in a CPD lock-up cell.  During that entire time he received no accommodations for sleeping, no mattress, blanket or pillow. Messrs. Kimble and Robinson were each detained in CPD interrogation rooms over several nights and neither received any accommodations for sleeping, nor any mattress, blanket or pillow.

17

Each of the Named Plaintiffs seeks to prove that the deprivations he suffered were inflicted as a result of CPD policy, custom, practice and/or the deliberate indifference of CPD policy makers.

59. The Named Plaintiffs will fairly and adequately represent the interests of Class II. Plaintiffs have retained skilled counsel with experience in constitutional and class action litigation to represent the Class.

60. The questions of law and fact common to Class II predominate over any individual issues.

61. Named Plaintiffs Dunn, Kimble, and Robinson seek to represent Class III. Class III consists of:

> All persons arrested without an arrest warrant and detained by the CPD in excess of 48 hours without a judicial determination of probable cause at anytime from March 15, 1999 until the date of the order granting certification in this case.

62. The individuals in Class III are so numerous that joinder of all members is impractical. Named Plaintiffs Dunn, Kimble and Robinson estimate that Class III numbers in at least the thousands.

a. On information and belief, at least 200,000 persons have been arrested by the CPD each year since 1999. A sizeable percentage of these persons were detained in excess of 48 hours without any judicial determination of probable cause;

b. The CPD maintains or maintained a policy, custom and/or widespread practice permitting officers to detain suspects

18

in excess of 48 hours without obtaining a judicial determination
of probable cause and for reasons which do not amount to exigent
circumstances;

c.    The CPD has a long history of detaining persons in
excess of 48 hours without a judicial probable cause
determination.  Most or a substantial portion of CPD officers
believe that they may detain a suspect for 72 hours or longer
without obtaining judicial approval;

d.    Numerous individual and class action civil rights
cases as well as criminal cases dating back to 1986 and before
have challenged that the CPD fails to obtain probable cause
determinations within 48 hours of arrest;

e.    The CPD did not adopt a policy even purporting to
ban detentions in excess of 48 hours without judicial approval
until August of 2003.  Moreover, on information and belief, based
on the fact that detentions in excess of 48 hours are an
ingrained and long standing CPD practice, and based on the fact
that Mr. Dunn was detained for 56 hours without a judicial
determination of probable cause in 2004, the new policy has not
been properly implemented;

f.    CPD employees testifying as representatives of the
City of Chicago testified that during the class period it was not
uncommon for arrestees to be held for 72 hours or more without a
judicial determination of probable cause; and

19

g.   An analysis of data obtained from the Cook County States Attorneys Office and the Cook County Circuit Court indicates that at least approximately 1400 people were detained in excess of 48 hours by the CPD without a judicial determination of probable cause from March 15, 1999 through May of 2004.

63.   There are questions of law and fact common to the claims of Class II.  Among these common questions are:

a.   Whether it violates the constitution to detain warrantless arrestees in excess of 48 hours without obtaining judicial approval of probable cause for the detention;

b.   Whether it violates state law to detain warrantless arrestees in excess of 48 hours without obtaining judicial approval of probable cause for the detention;

c.   Whether the CPD maintained a policy, custom and/or widespread practice allowing the detention of warrantless arrestees in excess of 48 hours without obtaining a judicial determination of probable cause for the detention;

d.   Whether the CPD maintains a custom and/or widespread practice allowing the detention of warrantless arrestees in excess of 48 hours without obtaining a judicial determination of probable cause for the detention; and

e.   Whether CPD officials have been deliberately indifferent to the need for training, enforcement, discipline, and/or policy changes regarding the length of detention of

arrestees in the absence of a judicial determination of probable cause.

64.   Plaintiffs' claims are typical of the claims of Class III.  Each of the Named Plaintiffs was detained by the CPD in excess of 48 hours without receiving a judicial determination of probable cause.  Each of the Named Plaintiffs seeks to prove that the deprivations he suffered were inflicted as a result of CPD policy, custom, practice and/or the deliberate indifference of CPD policy makers.

65.   The Named Plaintiffs will fairly and adequately represent the interests of Class III.  Plaintiffs have retained skilled counsel with experience in constitutional and class action litigation to represent the Class.

The Robinson and Lopez Cases

66.   The CPD's policy of permitting extended detentions of arrestees in the absence of a judicial determination of probable cause has been challenged in at least two class actions.

67.   In the case of Robinson v. Chicago, 638 F.Supp. 186 (N.D. Ill. 1986), rev'd 868 F.2d 959 (7th Cir. 1989), the trial court determined that the practice of holding detainees for excessive periods without obtaining judicial approval violated the Fourth Amendment, and the court awarded an injunction against the practice.  In appealing that decision, Defendant City of Chicago essentially conceded the Fourth Amendment violation but

represented to the Seventh Circuit that it had abolished the policy allowing such detentions. The Seventh Circuit reversed the award of the injunction on standing grounds.

68. However, the CPD completely failed to enact any policies forbidding the challenged detentions or to take other appropriate steps to cease the detentions.

69. As a result, extended detentions without judicial approval remained the widespread norm in the CPD for the next 15 years. CPD final policymakers were deliberately indifferent to these detentions.

70. In June of 2002, representatives testifying on behalf of the City of Chicago admitted under oath that the CPD continues to allow detentions in excess of 48 hours without judicial approval of probable cause. On the basis of these admissions another class action was pursued against the CPD, styled Lopez v. City of Chicago.

71. Lopez was brought by a named plaintiff who was detained for five days in an interrogation room under the circumstances identified above. Like Robinson, Lopez challenged CPD polices and procedures allowing the detention of arrestees in excess of 48 hours without a judicial probable cause review. Lopez also gave the City of Chicago notice that a large class of people were being subjected to unconstitutional conditions while detained in CPD police departments including being detained in

torturous interrogation room conditions, deprived of accommodations for sleeping, adequate nutrition and adequate access to sanitation.

72.   In direct response to the challenge in Lopez, the CPD modified its directive for processing arrestees to forbid detentions in excess of 48 hours in the absence of judicial approval or extraordinary circumstances.

73.   The modification was enacted by the CPD's final policymaker or makers.  The modification became effective in August of 2003.

74.   The final policymakers of the CPD remain deliberately indifferent despite their having adopted the modification.  Ignoring the allegations in Lopez of torturous conditions of confinement during CPD detentions, the final policymakers enacted no directive or modification to limit the amount of time a detainee may be held in an interrogation room other than the 48 hour general limitation on all detentions. Neither was a directive modified or adopted to require adequate accommodations for sleeping or adequate provision of nutrition or sanitation.

75.   The modification was adopted solely as a litigation response to the pressure of the Lopez suit.

76.   The modification was not implemented in a genuine manner that would actually change the CPD's widespread practice

23

of unlawful detentions.  The modification has not been subject of adequate dissemination, training and/or enforcement, and violations of the 48 hour requirement have not been adequately investigated and disciplined.

77.  Rather, the final policymakers of the City of Chicago have been and remain deliberately indifferent to the widespread practice of detaining arrestees in excess of 48 hours without judicial approval.  As a result, such detentions remain widespread practice in the CPD.

78.  The court in Lopez approved a class limitations period beginning on March 15, 1999 based on the fact that the suit, filed as an individual action on March 15, 2001, provided notice of the widespread violations contained of herein.

79.  The class representative in Lopez withdrew his request for class certification on March 20, 2004.  All claims asserted herein were tolled at least until that time by virtue of the Lopez case.  Additional tolling is provided under Illinois's single re-filing rule.

80.  Based on the CPD's representations in Robinson that the policy allowing extended detention without judicial approval had been revoked and the fact that the CPD thereafter allowed the detentions through a widespread practice with which private citizens had no reason to be familiar, the Named Plaintiffs did not learn and could not have learned through

24

reasonable diligence that the CPD maintained a policy, custom and/or widespread practice allowing detentions in excess of 48 hours without judicial approval until they learned of this through the <u>Lopez</u> case.

81. Mr. Robinson learned of this fact in or about August of 2003. Messrs. Dunn and Kimble learned of this fact in or about June of 2004.

82. As private citizens, Named Plaintiffs have no reason to be familiar with the policies, failures of policy, widespread practices and/or customs of the CPD with regard to detentions in interrogation rooms. Named Plaintiffs did not learn and could not have learned through the exercise of reasonable diligence that the CPD permits unconstitutionally extended detentions in interrogation rooms as a matter of custom, widespread practice and/or the deliberate indifference of CPD final policymakers.

83. Mr. Robinson learned of this fact in or about August of 2003. Messrs. Dunn and Kimble learned of this fact in or about June of 2004.

84. As private citizens, Named Plaintiffs have no reason to be familiar with the policies, failures of policy, widespread practices and/or customs of the CPD with regard to providing constitutionally adequate sleeping accommodations to overnight detainees. Named Plaintiffs did not learn and could

not have learned through the exercise of reasonable diligence that the CPD permits unconstitutional conditions of confinement regarding sleep as a matter of custom, widespread practice and/or the deliberate indifference of CPD final policymakers.

85.   Mr. Robinson learned of this fact in or about August of 2003.   Messrs. Dunn and Kimble learned of this fact in or about June of 2004.

### COUNT I - 42 U.S.C. § 1983 Claim for Unlawful Interrogation Room Detentions

86.   Plaintiffs reallege each of the forgoing paragraphs as if fully stated herein.

87.   As described more fully above, Named Plaintiffs Kimble and Robinson and the members of the Class I have been detained in CPD interrogation rooms for unconstitutional lengths of time and have been damaged as a direct and proximate result.

88.   The City of Chicago caused this deprivation of rights and is liable for Plaintiffs' and the Class Members' damages, *inter alia*, because the City of Chicago maintains unconstitutional policies, customs and widespread practices that caused these violations.   Moreover, the City of Chicago fails to adequately train and discipline its officers in a manner that causes such violations.   Further, the City of Chicago has been deliberately indifferent to the need for different policies, training and discipline.   Also, the City of Chicago has failed to act to remedy the patterns of misconduct described in the

preceding paragraphs, despite actual knowledge of the same, thereby causing the types of injuries alleged here.

COUNT II - 42 U.S.C. § 1983 Claim For
Deprivation of Adequate Accommodations For Sleep

89.   Plaintiffs reallege each of the forgoing paragraphs as if fully stated herein.

90.   As described more fully above, Named Plaintiffs Dunn, Kimble and Robinson and the members of the Class II have been detained in CPD facilities overnight and have not been furnished minimally adequate accommodations for sleeping all in a manner that violated the constitution.

91.   The City of Chicago caused this deprivation of rights and is liable for Plaintiffs' and the Class Members' damages, *inter alia*, because the City of Chicago maintains unconstitutional policies, customs and widespread practices that caused these violations.   Moreover, the City of Chicago fails to adequately train and discipline its officers in a manner that causes such violations.   Further, the City of Chicago has been deliberately indifferent to the need for different policies, training and discipline.   Also, the City of Chicago has failed to act to remedy the patterns of misconduct described in the preceding paragraphs, despite actual knowledge of the same, thereby causing the types of injuries alleged here.

COUNT III - 42 U.S.C. § 1983 Claim For Excessive Detention

92.   Plaintiffs reallege each of the forgoing paragraphs as if fully stated herein.

93.   As described more fully above, Named Plaintiffs Dunn, Kimble and Robinson and the members of the Class III have been detained in CPD facilities for over 48 hours following arrest without a judicial determination of probable cause.

94.   The City of Chicago caused this deprivation of rights and is liable for Plaintiffs' and the Class Members' damages, *inter alia*, because the City of Chicago maintains unconstitutional policies, customs and widespread practices that caused these violations.  Moreover, the City of Chicago fails to adequately train and discipline its officers in a manner that causes such violations.  Further, the City of Chicago has been deliberately indifferent to the need for different policies, training and discipline.  Also, the City of Chicago has failed to act to remedy the patterns of misconduct described in the preceding paragraphs, despite actual knowledge of the same, thereby causing the types of injuries alleged here.

COUNT IV - *Respondeat* Superior

95. Plaintiffs reallege each of the forgoing paragraphs as if fully stated herein

96. By all of the above employees of the City of Chicago subjected Named Plaintiffs Dunn, Kimble and Robinson and the members of the Classes I-III to excessive detentions and unlawful conditions of confinement in a manner which violates Illinois law.

97. These employee's actions and omissions were taken within the scope of their employment for the CPD.

98. Named Plaintiffs and the members of Classes I-III have suffered damages as a result.

WHEREFORE, PLAINTIFFS DUNN, ROBINSON and KIMBLE, on behalf of themselves and a class of others similarly situated, demand judgment against the CITY OF CHICAGO awarding their actual damages, costs and a reasonable attorneys fee, together with any other relief that may be just; and further demand that a common fund be established to compensate them and their attorneys and to reimburse all expenses in connection with obtaining this relief.

JURY DEMAND

Named Plaintiffs, on behalf of themselves and the
class, hereby demand a trial by jury on all issues so triable.


RESPECTFULLY SUBMITTED,


_____
Attorneys for Plaintiffs


Arthur Loevy
Michael Kanovitz
Jon Loevy
Russell Ainsworth
LOEVY & LOEVY
312 North May St.
Suite 100
Chicago, IL 60607
(312) 243-5900


30



### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet

**DOCKETED**

**OCT 2 2 2004**

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

**Plaintiff(s): Thomas Dunn, Denny Robinson, and Leonard Kimble, on behalf of themselves and a class of others similarly situated**

County of Residence: Cook

Plaintiffs Atty:   Loevy & Loevy
312 N. May St., Suite 100
Chicago, IL 60607
(312) 243-5900

**Defendant(s):City of Chicago**

County of Residence:

Defendant's Atty:

**JUDGE GETTLEMAN**

**04C 6804**

**MAGISTRATE SIDNEY I. SCHENKIER**

II. Basis of Jurisdiction:   **3. Federal Question (U.S. not a party)**

III. Citizenship of Principal Parties
**(Diversity Cases Only)**

Plaintiff:- **N/A**
Defendant:- **N/A**

IV. Origin :   **1. Original Proceeding**

V. Nature of Suit:   **440 Other Civil Rights**

VI.Cause of Action:   **42 U.S.C. Section 1983**

VII. Requested in Complaint
Class Action: Yes
Dollar Demand:
Jury Demand: **Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature:

Date:   10/21/04

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.** Revised: 06/28/00

**FILED-FDA**

**2004 OCT 21 PM 4: 18**

**U.S. DISTRICT COURT CLERK**

1-2

**DOCKETED**

OCT 2 2 2004

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

In the Matter of

EASTERN DIVISION

JUDGE GETTLEMAN

Thomas Dunn, Denny Robinson, and Leonard Kimble, on
behalf of themselves and a class of others similarly situated
v.
City of Chicago

Case Number **04C 6804**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

MAGISTRATE SIDNEY I. SCHENKIER

Plaintiffs

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME  Arthur Loevy | NAME  Jon Loevy |
| FIRM  Loevy & Loevy | FIRM  Same |
| STREET ADDRESS  312 N. May St., Suite 100 | STREET ADDRESS |
| CITY/STATE/ZIP  Chicago, IL  60607 | CITY/STATE/ZIP |
| TELEPHONE NUMBER  (312) 243-5900   FAX NUMBER  (312) 243-5902 | TELEPHONE NUMBER   FAX NUMBER |
| E-MAIL ADDRESS | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)  1682479 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)  02618254 |
| MEMBER OF TRIAL BAR?  YES ☑  NO ☐ | MEMBER OF TRIAL BAR?  YES ☑  NO ☐ |
| TRIAL ATTORNEY?  YES ☑  NO ☐ | TRIAL ATTORNEY?  YES ☑  NO ☐ |
|  | DESIGNATED AS LOCAL COUNSEL?  YES ☐  NO ☐ |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME  Mike Kanovitz | NAME  Russell Ainsworth |
| FIRM  Same | FIRM  Same |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER   FAX NUMBER | TELEPHONE NUMBER   FAX NUMBER |
| E-MAIL ADDRESS | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)  6275233 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)  6280777 |
| MEMBER OF TRIAL BAR?  YES ☑  NO ☐ | MEMBER OF TRIAL BAR?  YES ☐  NO ☑ |
| TRIAL ATTORNEY?  YES ☑  NO ☐ | TRIAL ATTORNEY?  YES ☐  NO ☑ |
| DESIGNATED AS LOCAL COUNSEL?  YES ☐  NO ☐ | DESIGNATED AS LOCAL COUNSEL?  YES ☐  NO ☐ |

FILED - ERA
2004 OCT 21  PM 4: 18
U.S. CLERK
DISTRICT COURT

1-3