IN 'THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

THOMAS DUNN, DENNY ROBINSON, )
and LEONARD KIMBLE, on behalf of )
themselves and a class of others )
similarly situated, )
                                )    04 C 6804
                                )
          Plaintiffs, )    JUDGE GETTLEMAN
                                )
         v. )
                                )
CITY OF CHICAGO, )
                                )
         Defendant. )    JURY TRIAL DEMANDED

## NOTICE OF FILING

TO:

        Mike Dolesh
        Sara Ellis
        Caroline Sheerin
        City of Chicago
        Department of Law
        30 North LaSalle Street
        Room 900
        Chicago, Illinois 60602

        Please take notice that on August 8, 2005, I filed the
attached Reply Memorandum in Support of Motion for Class
Certification with the Clerk of the United States District Court
for the Northern District of Illinois.

LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

        I, Russell Ainsworth, an attorney, certify that on
August 5, 2005, I sent by Facsimile and U.S. Mail a copy of the
attached Motion and Memorandum to the above-named counsel of
record.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THOMAS DUNN, DENNY ROBINSON and | ) | |
| LEONARD KIMBLE, on behalf of themselves and | ) | 04-C-6804 |
| a class of others similarly situated, | ) | |
| | ) | Judge Gettleman |
| Plaintiffs, | ) | |
| | ) | Magistrate Judge Schenkier |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION**

Arthur Loevy
Michael Kanovitz
Jon Loevy
Russell Ainsworth
312 N. May St.
Suite 100
Chicago, Il 60607
(312) 243-5900

## INTRODUCTION

Chicago concedes that Class II, which brings relatively palatable claims about denial of bedding, is properly certified, but it challenges certification of the classes that accuse it of a pattern of torture and *incognito* detentions. Each of these classes should be certified because each is a cohesive grouping of claimants who were harmed as a result of precisely the same policies and practices. Chicago attempts to confuse the issue by focusing on purported variations in the effects of these practices, ignoring the reality that wherever the claims of a group of people are joined together in a class there will always be some variations. Under the law, however, that consideration simply does not undercut the substantial judicial economy of resolution by class action and the preference to resolve claims rather than leave them unremedied. Class treatment here will serve a very desirable purpose not only by compensating those who have been victimized by Chicago's entrenched practices but of finally bringing about much needed change.

## ARGUMENT

### I.    The Claims Presented by Each Member of Class I Are Appropriate for Certification

Class I presents a cohesive and common claim brought by persons who were kept in the CPD's detective division interrogation rooms for far longer than was reasonable or appropriate. Each class member alleges that s/he was kept in the room for over 16 hours – which is twice the allowable maximum – and should have been taken to a lock-up cell to rest. As a result, each class member was deprived of a bunk to sleep on, ready access to a toilet and washbasin in each cell, and regularly scheduled food service from disinterested jailers. Instead, each class member undisputedly had to sleep on the floor of the interrogation room (or just not sleep) and had to rely on their interrogators to meet their basic human needs. This combination of conditions violates well-accepted law enforcement standards for the treatment of prisoners and the prevention of coercion as well as clear administrative rules of the State of Illinois. In other words, there was no legitimate police purpose for treating the class members this way. The class accordingly claims that the interrogation room detentions were unreasonable and violated the Fourth Amendment.

Many of the class members suffered additional deprivations when the detectives starved or shackled them during the detention (indeed, Chicago advances this fact as if it were favorable to its defense of this Motion). However, the fact that some class members were tortured more

1

severely than others during these detentions does not prevent class certification. These differences go only to the issue of damages, and do not undermine the fact that each class member shares a core of common injuries and indignities that give rise to a right to relief.

## A. Commonality

Chicago lumps its attack on commonality in with its challenge to typicality and predominance, and it never explains its reasoning why Plaintiffs supposedly have not satisfied the commonality prong. Nevertheless, by raising the argument, Chicago necessarily asserts that Plaintiffs fail to demonstrate even one question of law or fact which the class members share in common. See Portis v. City of Chicago, 2003 WL 22078279, *2 (N.D. Ill. 2003) ("Commonality generally requires the presence of a question of law or fact common to the class"); Rahim v. Sheahan, 2001 WL 1263493, *12 (N.D. Ill. 2001) ("A plaintiff may ordinarily satisfy the commonality requirement by showing that 'there is at least one question of law or fact common to the class'"); Nat'l Org. for Women, Inc. v. Scheidler, 172 F.R.D. 351, 360 (N.D.Ill.1997) (same). However, there are multiple such questions that Chicago alternatively mischaracterizes or ignores.

First, each class member suffered a cognizable constitutional violation by being kept in the interrogation room past the point when any person would be expected to need rest (16 hours out of a 24-hour day) despite the fact that there was no place to sleep but the brick floor. It is undisputed that there is no sleeping area in the interrogation rooms, because they are intended for only relatively brief stints of interrogation, while the lock-up has a bunk and is intended for detainees to be able to rest. This is a common fact for each member of Class I,[1] and it raises a genuine common question as to whether the deprivation violated their constitutional rights. See Thompson v. City of Los Angeles, 885 F.2d 1439, 1448 (9th Cir. 1989) (pretrial detainee stated claim for violation of Fourteenth Amendment by alleging that he was needlessly forced to sleep on a floor for two nights without a mattress); Anela v. City of Wildwood, 790 F.2d 1063 (3rd Cir. 1986) (same, plaintiffs were forced to sleep on a floor without a mattress for one night).

---

[1] Not surprisingly, none of the declarants report being able to obtain meaningful sleep under these conditions. See Declarations, Group Exhibits O, and Depositions, Group Exhibit W, Bryant Dep. 56:22-58:5; Lofton Dep. 25:14-16, 45:10-12, 35:18-24; J. Perez Dep. 26:4-7; M Perez Dep. 109:21-24; Robinson Dep. 61:13-20; Solomon Dep. 37:2-7, 50:14-22, 75:8-16.

Chicago essentially acknowledges in footnote 1 of its brief that this is a common question for Class I, but it argues, without examination, that the question devolves into an issue of bedding which it calls redundant of Class II's claims. That position is incorrect. There are clear dignitary and physical differences between being forced to sleep on a floor and being provided a bunk with or without bedding. Id.; see also People v. McKinney, 661 N.E.2d 408 (1 Dist. 1996) (level of intrusion associated with forcing witness to sleep on the floor of the interrogation room turned purportedly voluntary encounter into a Fourth Amendment seizure). The constitution protects both of these interests, meaning that Class I's claims for being needlessly forced to sleep on the floor are different than, and additional to, Class II's claims for a lack of bedding. Id., see also Schmerber v. California, 384 U.S. 757, 767 (1966) ("The overriding function of the Fourth Amendment is to protect personal . . . dignity against unwarranted intrusion by the State").

Second, and relatedly, there is an additional set of indignities which are undisputedly common to each class member. Because they were forced to remain in a room that is clearly not designed to meet their human needs, they had to rely on their interrogators to provide food and toilet access for their entire detention. That is substantively different and more discomforting than the situation in the lock-up where each cell contains its own toilet and washbasin and there is food regular service provided by disinterested jailers. Chicago's chart summarizing how often each class member ate or used the bathroom tries to whitewash these differences. For example, the chart's recitation that Mr. Robinson was taken to the bathroom twice on his first day in custody seriously under plays his testimony, sanitizing a very humiliating picture:

> Q: Did he let you go to the washroom by yourself?
>
> A: What do you mean?
>
> Q: Did he go into the washroom with you?
>
> A: Yes.
>
> Q: Were you handcuffed?
>
> A: My left arm.
>
>                * * *
>
> Q: When you needed to use the washroom, how did you let the detective know?
>
> A: I had to yell or stretch across the room and kick the door.

3

Q:      When you did that, did someone respond?

A:      Occasionally.

Q:      When you say occasionally, what do you mean?

A:      Sometimes they did; sometimes they didn't.

Robinson Dep. at 58, D's Exhibit 9. See also Declarations, Group Exhibits O, and Depositions, Group Exhibit W, Bryant Dep. 52:21-53:4; Lofton Dep. 32:12-20, 61:6-16, 63:16-21; JPerez Dep. 24:23-25:6; M Perez Sep. 53:13-54:8; Solomon Dep. 52:5-15 (each describing having to scream and bang on the interrogation room door to obtain bathroom access).[2]

Recognizing the impropriety of inflicting such indignities, national policing standards and Illinois law prohibit keeping arrestees interrogations rooms for more than eight hours. See Gruber Report at 8 (national practices require that arrestees may be held in an interrogation room for *no more than eight hours* and then must be taken to the lock-up for eight hours of rest before interrogation may resume), Ps' Exhibit J; see also 20 Ill. Admin. Code § 720.50 (for detentions of *eight hours or less* arrestee must be provided a bench and access to a washbasin and toilet as needed, but *after eight hours* an arrestee must be placed in a cell containing its own bunk, wash basin and a toilet). That is because there is no legitimate police purpose for such detentions and they can serve only the improper purposes of adding a coercive element to the interrogation. Thus, even assuming that the detectives actually did supply food and bathroom access to the detainees (which they often did not), there is nonetheless a common question as to whether it was unreasonable to keep the detainees out of the more humane environs of the lock-up.

Third, there is a common question of fact on whether the policies and/or widespread practices of the City of Chicago caused the class members to be detained for so long in an interrogation room instead of being taken to the lock-up. This is a common question because each class member must demonstrate a basis for municipal liability in order to recover. As Plaintiffs explained in their opening brief, questions of policy or practice are a well-accepted

---

[2] The chart also *omits Declarant Tim Finwall* who tried to get the detectives to take him to the restroom but eventually had to urinate on the floor. See Chicago's Chart at 4 (skipping from Karvis Carter to Leonard Lofton); Declaration of Tim Finwall, Ps' Exhibit O ¶7 ("I was not allowed to leave the room to use the bathroom and was forced to urinate in the corner"). See also Report of former Assistant Cook County State's Attorney Peter Faraci at 3 (noting that the rooms often smelled of urine), Ps' Exhibit Q.

basis for a finding of commonality. See P's Brief at 11; see also Portis, 2003 WL 22078279 at *2; Thompson v. City of Chicago, 2002 WL 1303138, *4 (N.D. Ill. 2002) ("[A] suit challenging the constitutionality of a police department's standard policy satisfies the prerequisite of commonality, even if there exists individual issues regarding the application of that policy.").

## B.    Typicality

As with the commonality prong, Chicago never articulates why it asserts that Plaintiff Robinson's claims are not typical of the class claims. As Chicago's own chart reveals, Mr. Robinson was detained in the interrogation room for three days. See Chicago's Exh. 1.[3] This fact alone is enough to satisfy the typicality requirement because it shows that Mr. Robinson was, at a minimum, deprived of a bunk and subjected to the other indignities identified above just like every other class member. See Keele v. Wexler, 149 F.3d 589, 595 (7th Cir.1998) ("Typicality is satisfied when the plaintiff's claim arises from the same event or practice or course of conduct that gives rise to the claims of other class members and the plaintiff's claim is based on the same legal theory") (citations and internal quotations omitted). Moreover, Mr. Robinson seeks recovery under the same Fourth Amendment legal theory as the rest of the class. Fuente v. Stokely-Van Camp, Inc., 713 F.2d 225, 232 (7th Cir.1983) ("Similarity of legal theory is more important than factual similarity, so the presence of factual differences between the claims of the members of the proposed class is not fatal to a finding of typicality").[4]

---

[3] Moreover, Mr. Robinson experienced other deprivations that many of the class members suffered, including being shackled throughout each of these three days; receiving only a single bologna sandwich as his food for days two and three (he faired better on day one only because he happened to have his lunch with him when he was arrested); and, having sporadic and unreliable access to the bathroom. Id.

[4] Chicago correctly states in footnote 6 of its Brief that the Fourth Amendment's reasonableness standard governs the conditions for warrantless arrestees while the Fourteenth Amendment governs for those arrested pursuant to a warrant. As applied, however, there is no substantive difference in how the CPD can treat the two types of arrestees because there was no legitimate purpose for keeping the class members from the lock-up. Compare United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985) ("The permissibility of a particular law enforcement practice is judged by 'balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests'") with Bell v. Wolfish, 441 U.S. 520, 539 (1979) ("[I]f a restriction or condition is not reasonably related to a legitimate goal . . . a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees"). Nevertheless, at this juncture, Plaintiffs ask that the Court define Class 1 to include only warrantless arrestees, without prejudice to adding a named plaintiff and moving to certify a warrant subclass at that time.

## C.    Adequacy

Chicago argues that Mr. Robinson is an inadequate representative, supposedly because his claims for the prolonged interrogation room detention are time-barred.[5] Given that Judge Darrah clearly ruled that all of the claims in the Lopez class action related back to the initial filing of the case, see Lopez v. City of Chicago, 2002 WL 31415767, *3 (N.D. Ill. 2002), Chicago attempts to support its argument by asserting that the interrogation room detention claims were not part of the Lopez class action suit. The statement is simply wrong, and Chicago has omitted from its Exhibit 3 the portions of the complaint that show it. Attached as Exhibit T[6] hereto is a complete copy of the Lopez complaint, showing the following allegations about this claim:

- Class members are held for days in interrogation rooms which are not designed for housing arrestees,¶17;

- Mr. Lopez was held in an interrogation room for five days and shackled to a wall; ¶40

- Class Count II: "As described more fully above, Plaintiff and the members of the Class have been subjected to torturous conditions of confinement while being held in the custody of the CPD," ¶61;

- Class Count II: "The City of Chicago . . . maintains [no] policies regarding the maximum duration for which an arrestee may be kept in an interview room. The failure to maintain such policies is [so] likely to result in the unconstitutional use of such rooms to house arrestees that it manifests deliberate indifference," ¶ 62.b.

Because the interrogation room detention claims were a part of the Lopez case, Mr. Robinson's claims are timely. See Crown, Cork & Seal Co. v. Parker, 462 U.S. 345 (1983) (limitations on class members' claims are tolled during the pendency of a class action).

## D.    Predominance/The *Heck* Exclusion

Plaintiffs argued in their opening brief that the common questions going to Chicago's municipal liability for the interrogation room detentions predominate over any individual issues

---

[5] Chicago also claims that Mr. Dunn is inadequate because he spent only a few hours in the interrogation room. That is true, but Chicago seems to have missed the fact that Mr. Dunn never alleged that he was a member of Class I and has not moved to be its representative. See Complaint ¶ 49 (Dunn not listed as a Class I); P's Brief at 3 ("Mr. Robinson seeks to be the class representative for this class").

[6] For ease of reference, the exhibits attached to this Reply begin at the point in the letter series where Plaintiffs' opening brief's exhibits left off.

on these claims, which are, primarily, issues of damages. See Ps' Brief at 14; see also See Calvin v. Sheriff of Will County, 2004 WL 1125922, *4 (N.D. Ill. 2004) ("'[W]hen the class is challenging a uniform policy, the validity of that policy predominates over individual issues and class certification is appropriate'") citing Blihovde v. St. Croix County, Wis., 219 F.R.D. 607, 620 (W.D.Wis. 2003). Chicago does not address this point directly (or even mention it), but, instead raises three arguments claiming that individualized inquiries will be needed on each class members' claims, presumably defeating predominance.

First, Chicago makes an undeveloped argument that "whether certain conditions of confinement violate a constitutional standard can only be determined on an individual, case-by-case basis." City's Brief at 4. There are two fatal flaws. First and foremost Chicago misapplies the relevant legal rule. While the legality of a condition of confinement must be determined on a "case-by-case" basis (i.e. a specific condition like sleeping on the floor without a mattress must be analyzed against constitutional standards) that does not mean that an individual determination is required for each class member. Chicago is arguing that a jury could find a condition unconstitutional when suffered by class member but constitutional as to another. That is not the law, as is demonstrated by the fact that class actions are routinely brought over conditions of confinement. E.g. Rhodes v. Chapman, 452 U.S. 337 (1985); Davenport v. DeRobertis, 844 F.2d 1310 (7th Cir.1988) (class challenge to conditions of confinement); Shelby County Jail Inmates v. Westlake, 798 F.2d 1085 (7th Cir. 1986) (same); Rahim, 2001 WL 1263493 (class challenge to shackling policy); Lewis v. Washington, 197 F.R.D. 611 (N.D. Ill. 2000) (class challenge to prison conditions including lack of hot food). The second problem is that the argument relies on a punishment analysis under the Eighth/Fourteenth Amendments, which is not a showing Class I needs to make. They need only prove unreasonableness under the Fourth Amendment.

Chicago next argues that the Court must conduct individualized inquiries because some class members experienced more torturous conditions in the rooms than others. See Ds' Brief at 3-7. Chicago is half right. Some class members clearly had a worse time in the interrogation room than others and not all of them experienced every type of deprivation Plaintiffs have identified nor to the same degree. However, that is not unusual in a large class and it does not cause individual issues to *predominate*, among other reasons, because such differences go only to

7

the issue of damages, not to the right to recover.[7] As explained in Section I.A., above, each member of Class I establishes a right to relief by showing that they were subjected to a prolonged interrogation room detention rather than being taken to the more humane lock-up. In the course of those detentions, each class member undisputedly had no option but to sleep on the floor and had to endure the other needless indignities which the lock-up conditions are designed to prevent.

Because these facts alone establish the unreasonableness of each class members' detention, differences in the additional deprivations like shackling and feeding do not prevent common questions from predominating. Rather, there is a diversity of ways for the Court to address these differences while preserving the benefits of a common liability determination. See Carnegie v. Household Intern., Inc., 376 F.3d 656, 661 (7th Cir. 2004) ("Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues. Those solutions include '(1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class.'"). See also Hilao v. Estate of Marcos, 103 F.3d 767 (9th Cir. 1996) (using special master and sampling method to determine class' members' damages from being subjected to various types of torture in a human rights class action under the Alien Tort Claims Act); Dellums v. Powell, 566 F.2d 167 (D.C. Cir.1977) (upholding certification of a class seeking damages, *inter alia*, for unlawful conditions of confinement following arrest).

Although the foregoing is dispositive of Chicago's argument, and the Court thus need not perform individual shackling and/or feeding inquiries, Plaintiffs do wish to note for the record that Chicago is exaggerating the differences in the class members' experiences of these deprivations in its argument. As its own chart reveals, not a single person who was detained in

---

[7]See Portis, 2003 WL 22078279 at *4 ("the possibility of individualized damage inquiries does not defeat class certification even if individual hearings ultimately may be required") (citations omitted); Rahim, 2001 WL 1263493 (N.D. Ill. 2001) (Schenkier, J.) (same); Gary v. Sheehan, 1999 WL 281347 *2 (N.D. Ill. 1999) (Coar, J.) ("[I]t is common for Rule 23(b)(3) class actions to involve different levels of injury and damages for different class members; however, that does not mean that certifying a class under Rule 23(b)(3) is incorrect").

8

the interrogation room reports being fed more than once a day, while some report being fed even less frequently; and, only one of them, Mr. Lofton, reports not being shackled.[8]  See D's Exhibit 1. See also Declarations, Ps' Group Exhibit O; Depositions, Group Exhibit W, Bryant Dep. 29:17-19, 48:7-9, 54:20-23, 62:7-11; Lofton Dep. at 44:3-15; J. Perez 19:14-19, 49:19-22, M Perez 41:20-22; Robinson Dep. 38:9-23, 41:19-24, 56:5-10, 68:24-69:5.; Solomon Dep. 35:14-19, 50:24-51:3, 76:6-8, 79:22-80:13.

Finally, Chicago argues that the Class I exclusion of persons who may arguably be subject to a defense under Heck v. Humphrey, 512 U.S. 477 (1994), also requires an individualized determination which causes individualized issues to predominate.  To be clear, Chicago does not appear to take issue with the sufficiency of the definition to exclude all Class I claims that are arguably subject to *Heck*;[9] rather, its concern is that factual determinations are necessary to decide if a class member fits within the exclusion.  That concern is easily addressed.

All of the questions needed to make this determination can be answered with a few keystrokes using electronic data which is readily available from the Cook County Circuit Court and the Illinois Department of Corrections ("IDOC").[10]  Moreover, even if the determination had

---

[8] Chicago tries to back away from its shackling policy by claiming that it is enforced only on a discretionary basis.  The claim is dubious given that so many class members report being shackled and the policy clearly is worded in absolute terms: applying categorically to every detainee.  Moreover, it instructs supervisors that the policy is to be "strictly enforced" and that they should administer discipline "when the provisions of this directive are violated in any manner."  See Shackling Policy, Ps' Exhibit Q, § III.C.1,3.

[9] Chicago does ask in footnote 17 why the exclusion applies only to Class I and not Class III.  The answer is that the Fifth Amendment provides a potential suppression remedy for the types of torture alleged by Class I.  However, there is no suppression remedy for violations of the 48 hour rule.  See People v. Willis, 215 N.E. 2d 517 (Ill. 2005) (collecting cases and holding that there is no suppression remedy for violations of the 48-hour rule).  Because there is no suppression remedy for a 48-hour rule violation, the claims of Class III do not imply the invalidity of any conviction.

[10] At most, the information needed to determine if the exclusion applies to any given class member is as follows: (1) was the class member convicted?; (2) was the conviction based on a trial, or on a guilty plea?; (3) did the class member move to suppress a confession pretrial?; (4) if so was it granted or denied?; (5) has the sentence been discharged?; (6) has the conviction been overturned on appeal?; (7) has the conviction been invalidated in a habeas action?  Questions 1-6 are all contained in the electronic docket sheets maintained by the Cook County Circuit Court.  An example printout from the Court's computer is attached hereto as Group Exhibit U and highlighted to show the relevant fields.  Similarly, the example IDOC inmate status sheet shows that Question 7 can be answered by reference IDOC data showing if a convicted person is still in custody and can be cross referenced to the Cook County Circuit Court database using the Cook County case number.  See Id.

to be made by reference to paper documents rather than electronically, it is still not one which requires a determination by the trier of fact. Rather, it is a purely ministerial issue which can be determined pretrial from reliable court records. Such determinations do not predominate even if they are individualized. See Wells v. McDonough, 188 F.R.D. 277, 279 (N.D. Ill. 1999) (Marovich, J.) (ministerial question which determined whether each class member had viable claim could be resolved outside of trial and did not predominate); Avila v. Van Ru Credit Corp., 1995 WL 22866, *7 (N.D. Ill. 1995) ("The existence of individual questions that are ministerial in nature or otherwise easy to resolve does not defeat a certification petition"); see also Christakos v. Intercounty Title Co., 196 F.R.D. 496, 501 (N.D. Ill. 2000) (individualized issue does not predominate where issue is "not complicated, or one which will require much time or resources so as to detract from the class").

## II. Class III is Appropriately Certified

### A. Chicago's Periodic Changes In Its Written Detention Policies Do Not Defeat Certification Nor Restrict the Class Period

Chicago posits that Class III is not sufficiently cohesive because Chicago has changed its written policies with regard to detention over time, in fact, twice during the class period. It is true that Chicago did make these changes and that the changes have some bearing on its municipal liability for post-August 2003 detentions.[11] However, Chicago's written policies are hardly the sum total of Plaintiffs' proof on their Monell claims. Rather, Plaintiffs chiefly rely on the existence of an entrenched and widespread practice within the CPD of using illegally-long detentions as a matter of routine practice that has persisted for decades. See Complaint ¶¶ 2-4 (citing a decades long practice of illegal detentions), ¶¶ 66-85 (recounting the persistence of the detention practice over the course of 20 years from the filing of Robinson v. Chicago, through Lopez v. Chicago, to the case before your honor).

Indeed, much of Plaintiffs' evidence centers on the fact that the widespread practice remains *despite the fact* that Chicago implemented policy changes in the past, a persistence that Plaintiffs attribute to the policymakers' unwillingness to investigate and discipline violations of the rule. Id. ¶¶ 67, 76. For example, Mr. Robinson was detained for over three days in the

---

[11] The August 15, 2003 amendment to 02-03 is the first time that Chicago implemented a written policy stating that the felony review process cannot be permitted to cause detentions in excess of 48 hours.

October 2000, while 92-05 was in effect, id. ¶¶ 33-36, Mr. Dunn was held for approximately the same period of time in July 2003, under the first version of 02-03, id. ¶¶ 42-43; and Mr. Kimble, Mr. Hicks and Mr. Ford were each held for approximately 60 hours in 2004 and 2005, well after the most recent version of 02-03 was put in place). Id. ¶¶ 27-32, Hicks and Ford Complaint ¶¶ 3-10, Exhibit V, hereto. Poignantly, Chicago relies on Deputy Chief Kobel's testimony that he has not heard of any detentions past 48 hours since the policy change in August 2003, City's Brief at 8, which shows he did not even know about Mr. Kimble's allegations in the very action he was testifying in about nor what had happened to Mr. Hicks and Mr. Ford just two weeks before his deposition. Id. Thus, while it is undisputed that Chicago has made changes in its written policies during the class period, there is also evidence that those policy changes have been ineffectual at ending the actual, entrenched practice.

Chicago's theory is that the policy changes render Mr. Dunn's and Robinson's claims not typical of Class III's claims and that Plaintiffs therefore need to add a named representative for the period August 15, 2003 to the present. See Chicago's Brief at 8.[12] However, the facts proving the named representatives' claims need not be exactly the same as the claims of each member of the class to satisfy typicality. Some factual variation is unavoidable. Rather, the real issue is whether there is sufficient similarity to give the representative an incentive to prove the absent class members' claims. Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584, 596-97 (7th Cir. 1993) ("[T]he typicality requirement primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large"); De La Fuente v. Stokely-Van Camp, Inc., 713 F.2d 225, 232 (7th Cir.1983) ("The typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members. Thus, similarity of legal theory may control even in the face of differences of fact").

It is certainly possible to have a fine written policy but be deliberately indifferent to its violation. Thus, by alleging that decades-long practice persists because the policymakers are not willing to investigate and discipline violations and do the hard work of implementing genuine

---

[12] Mr. Robinson was detained during 92-05 and Mr. Dunn was detained during the pre-amendment 02-03, so the only potential gap is for detentions after August 15, 2003 when 02-03 was amended.

11

change, Plaintiffs Dunn and Robinson plainly present the same, viable legal theory as each of the class member. Also, at this stage, the evidence demonstrates that the practice remained despite numerous policy changes since 1986, which demonstrates that simply writing new policies does not remedy this problem. If the course of discovery shows that the policymakers have substantively changed their efforts for tackling the problem (other than by enacting serial ineffective policies), then it may be necessary to add a post-August 2003 class representative and subclass the 48 hour claims by written policy period. But, the present state of the evidence does not show such a need. Therefore, Mr. Robinson and Mr. Dunn can represent the entire class.

**B.** **The 48-Hour Rule Exception for *Bona Fide* Emergencies/Extraordinary Circumstances Does Not Prevent Certification Of This Class**

Chicago argues that the 48-hour rule exception for bona fide emergencies or extraordinary circumstances prevents class certification supposedly because each detention would have to be examined for the presence of such circumstances which supposedly would make the trial unmanageable. However, it is not uncommon for individualized questions to be present in a (b)(3) class action, what is required is that such questions not *predominate* over common ones. See e.g. Redd v. Arrow Financial Services, LLC, 2004 WL 1117844, *5 (N.D.Ill. 2004) (common issues arising out of defendants' uniform use of deceptive solicitation letter predominated despite a necessary individual question of reliance for each member of the class); Portis v. City of Chicago, 2004 WL 1284010, *2 (N.D. Ill. 2004) ("Individual affirmative defenses do not preclude class treatment"); Ringswald v. County of DuPage, 196 F.R.D. 509 (N.D. Ill. 2000) (potentially available defenses of Younger abstention, collateral estoppel, and lack of standing did not predominate over common questions); Pinkett v. Moolah Loan Corp.,1999 WL 1080596, *4 (N.D.Ill 1999) ("[I]t is well established that individual counterclaims or defenses do not render a case unsuitable for class certification."). The facts here show that the potential defense as to some of the detentions does not predominate and will not render the trial of Class III's claims unmanageable.

First, the defense should arise seldomly if at all because, by definition, the circumstances which justify detaining someone without judicial review for more than 48 hours are well outside the ordinary. Further, the *legitimate* circumstances for delaying such review are particularly rare in Cook County because the court system provides for holding probable cause hearings *ex parte* in the event "a detained person is alleged to be incapable of appearing in court due to . . . exigent

12

circumstances." See Cook County Circuit Court First Municipal District General Order 86-1, Ps' Exhibit I. It is hard to imagine any extraordinary circumstance that would prevent a probable cause determination within 48 hours under that procedure, and Chicago does not offer the Court *even one example* in its Response. Whatever rare bird might prevent an *ex parte* probable cause determination within 48 hours of arrest (perhaps a snow storm closing the courts) would hardly cause individual issues to predominate over common questions affecting the entire class.

Relatedly, Chicago's reasons for detaining arrestees without judicial approval are documented on the Hold Form checklist, Ps' Exhibit D, as well as on a CPD document called a Detention Report, see D.S.O. 79-40, attached as Exhibit X hereto ("The Detention Report provides . . . a written explanation of why an arrestee was detained past the morning court call"). This documentation affords a ministerial method to determine prior to trial if a detention really presents any extraordinary circumstances issue. If discovery shows that there are a significant number of such detentions then it may be necessary to create a subclass and bifurcate resolution of the claim and the defense for manageability purposes. Otherwise, it is perfectly manageable for Chicago to try a relatively small number of extraordinary circumstances defenses in connection with the liability or damages phase of class members' claims.

Third, putting aside circumstances like hospitalization of an arrestee, which can be readily ascertained from the documents, the evidence shows that the bulk of the detentions here were due to Chicago's CI procedure which allows the detentions to continue without a judicial hearing until the State's Attorney approves charges. Whether delays due to felony review qualify as an emergency or extraordinary circumstance is a common question, but of course, one which must be resolved against Chicago. See County of Riverside v. McLaughlin, 500 U.S. 44, 57 (1991); see also Kyle v. Patterson, 957 F. Supp. 1031, 1034 (N.D. Ill. 1997) (waiting for a prosecutor to approve charges is not an emergency or extraordinary circumstance as a matter of law), affirmed 196 F.3d 695 (7th Cir.1999); People v. Willis, 215 Ill.2d 517, --- N.E.2d ----, 2005 WL 1340002, *11 (Ill. 2005) (same).

Further, Chicago's reliance on Robinson v. Gillespie, 219 F.R.D. 179 (D. Kan 2003) is misplaced, and it clearly miscites the holding when it asserts that that court held 48-hour claims must be decided on an individual-by-individual basis. In fact, the court was dealing with a class which included both pre- and post-48 hour detentions and which was defined by reference to

13

whether the detention was "prompt." Id. at 183.

The court held that the use of the term "prompt" rendered the class definition untenable because "[t]he decision whether a probable cause determination is or is not 'prompt,' within the meaning of that term as used in the relevant cases . . . is not an objective one which can be measured solely by reference to hours and minutes." Id. That is not a problem for Class III's definition because it does use an objective measure of 48 hours. Moreover, the Gillespie court took issue with the movants' failure to adequately address a host of other class certification issues before it. But the court certainly never said that a properly supported 48-hour class could not qualify for certification, and it never analyzed any of the points Plaintiffs raise (and support) here.

Finally, Plaintiffs wish to address Chicago's footnote citation to the recent opinion in Lopez v. City of Chicago, 2005 WL 711986, *2 (N.D. Ill. 2005), where the district court took Mr. Lopez' claim away from the jury by holding that the provision of false alibis justified his five-day detention without judicial approval. Chicago is wise to keep that cite in the small print of its brief because it is a highly flawed decision which is currently on appeal. By way of background, this Court should understand that the Lopez court resolved factual disputes on the supposed false alibi; the detectives claimed Mr. Lopez gave false alibis but Mr. Lopez testified unequivocally that he had been truthful, and the witnesses the detectives relied upon came to trials and backed Mr. Lopez' account. Id. This Court should also be aware that the Lopez court took the case away from the jury based on the astonishing conclusion that an undisputedly false murder confession, which Mr. Lopez testified was coerced from him after two sleepless days and nights of constant shackling and starvation in the interrogation room,[13] justified holding him an additional three days without consulting a judge. Id. ("Lopez made statements admitting that he was the shooter, but his statements turned out to be false, and he subsequently recanted. [His] actions . . . in admitting to being the killer and providing false information relating to such admission, and in subsequently recanting his latest lie required the allocation of police resources, and the continuation of the investigation of this murder. It is unclear what Lopez's motives were

---

[13] Relatedly, plaintiff testified that he was shackled for five days in the interrogation room and fed only once. The district court took these claim away from the jury by ruling that the police were at most *negligent* in how they treated Mr. Lopez and by ruling that the police officers are entitled to qualified immunity for such conduct. Id. at *4.

14

. . . . [but i]t appears that Lopez was trying to 'outsmart' the police officers and trying to 'play games.'").

But, what is relevant for present purposes, is that the Court got the law wrong when it held that the need to supposedly investigate false alibis is an extraordinary circumstance for delaying judicial review of an arrest past 48 hours. In reaching that conclusion, the district court misconstrued McLaughlin's language about the need for "a substantial degree of flexibility" in evaluating a delay, ignoring the fact that the Court was there discussing delays of under 48-hours and went on in the very next paragraph to differentiate that situation from a delay past 48 hours. See McLaughlin, 500 U.S. at 56-57 ("Where an arrested individual does not receive a probable cause determination within 48 hours, the calculus changes"). Accordingly, the result the district court reached in the Lopez trial should hold no sway over this Court's certification decision.

**III.    The Class Period for Classes I-III is Proper**

Chicago makes several arguments for paring the class period down from the March 15, 1999 date alleged in the Complaint and approved by Judge Darrah in Lopez. First, as to Class I, Chicago argues that it is not entitled to extend back more than two years from the filing of this case because Class I's claims supposedly were not asserted in Lopez. However, as was demonstrated in Section I.C., above, this contention is flatly wrong. The case included a count for the interrogation room detentions. Thus, Class I is subject to the exact same class period as Classes II and III, which Chicago admits relate back. See Chicago's Brief at 15, n. 25.

Second, Chicago argues that the class period should extend no further than two years before the filing of the Lopez class action complaint rather than relating back to the initial complaint. Chicago claims prejudice supposedly because Mr. Lopez withdrew the class claims (five months before this case was filed) but it identifies no actual prejudice from that fact, and, moreover, its position makes no sense. Even if there were prejudice from the withdrawal of the motion, it is a complete mystery why that prejudice would be alleviated if this class nevertheless related back to the filing of the Lopez class action complaint but not the initial complaint.

Finally, Chicago argues that the Court should at least lop off the five months between the withdrawal of the Lopez class certification and the filing of this case. The argument overlooks Illinois' savings statute, 735 ILCS 5/13-217, which tolls limitations for one year following a voluntary dismissal. Pettiford v. Sheahan, 2004 WL 626151, *13 (N.D. Ill. 2004). Pursuant to

that statute, even those class members whose claim might otherwise have expired in the intervening five months had a year to file their claims. See Chardon v. Fumero Soto, 462 U.S. 650, 661 (1983) ("After class certification is denied, [the federal tolling interest espoused in *American Pipe*] is vindicated as long as each unnamed plaintiff is given as much time to intervene or file a separate action as he would have under a state savings statute applicable to a party whose action has been dismissed for reasons unrelated to the merits"). Accordingly, for all of these reasons, the class period of March 15, 1999 to the present is proper.

## CONCLUSION

For the forgoing reasons, Plaintiffs' Motion for Class Certification should be granted in its entirety with the modification that Class I should be limited to persons arrested without a warrant.

RESPECTFULLY SUBMITTED,


One of Counsel for Plaintiffs

Arthur Loevy
Michael Kanovitz
Jon Loevy
Russell Ainsworth
312 N. May St., Suite 100
Chicago, Il 60607
(312) 243-5900

16

**FILED**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION NOV 1 2 2002 *rq*

| | | |
|---|---|---|
| JOSEPH LOPEZ, on behalf of himself and a class of others similarly situated, | ) ) ) | **MICHAEL W. DOBBINS**<br>**CLERK, U.S. DISTRICT COURT** |
| Plaintiffs, | ) ) | |
| v. | ) ) | Judge Darrah **DOCKETED** |
| CITY OF CHICAGO, DETECTIVE JAMES DELAFONT, DETECTIVE JENNIFER DeLUCIA, DETECTIVE HECTOR VERGARA, OFFICER JOSE GOMEZ, OFFICER DANIEL JACOBS and OFFICER ROBERT MYERS, | ) ) ) ) ) ) | 01 C 1823 **NOV 13 2002** |
| Defendants. | ) | JURY TRIAL DEMANDED |

## SECOND AMENDED COMPLAINT

NOW COMES Plaintiff, JOSEPH LOPEZ, on behalf of himself and a class of others similarly situated (the putative "Class"), by counsel, and complaining of Defendants DETECTIVE JAMES DELAFONT, DETECTIVE JENNIFER DeLUCIA, DETECTIVE HECTOR VERGARA, OFFICER JOSE GOMEZ, OFFICER DANIEL JACOBS, OFFICER ROBERT MYERS (collectively, "Defendant Police Officers") and CITY OF CHICAGO, states as follows:

### Introduction

1. This is an action pursuant to 42 U.S.C. Section 1983 and Fed. R. Civ. P. 23(b)(3). Plaintiff brings this action on behalf of himself and the Class to reform an unconstitutional police procedure known as the "hold past court call" procedure. This procedure allows police to continue investigating and interrogating recent arrestees without taking them before a judicial official for a determination of probable cause. Plaintiff and the members of the Class are all persons who have

**EXHIBIT**
*1*

been detained at CPD police stations in excess of 48 hours under this procedure while the CPD continued its investigation of the crime for which they were arrested.

2. In addition to causing unlawful detentions in violation of the Fourth Amendment, the "hold" procedure as implemented by the CPD also violates arrestees' Fourteenth Amendment rights to minimally appropriate conditions of confinement. During the "hold" period, arrestees are forced to (attempt to) sleep on the floor of small interrogation rooms where they are held or on the standard four foot by ten inch metal benches within.

3. The CPD furnishes them no sleeping facility during this time (not even a mattress, blanket or pillow). The CPD maintains no such facilities to offer them because the investigatory hold, itself, is an exception to the standard CPD practice of releasing arrestees to the Cook County Department of Corrections, which entity takes them to the probable cause hearing and houses them in its jail facility.

4. As a result, arrestees detained under the hold past court call procedure are kept from disinterested judicial officials and are isolated for days in interrogation rooms and deprived of necessary sleep while police continue to interrogate them and build evidence against them; all raising the specter of torture, false confessions, and unlawful convictions.

2

5.   Plaintiff and the Class seek a judgment which will remedy their injuries and reform this unconstitutional procedure.

### Relevant CPD Procedures

6.   In felony arrests, CPD practice and procedure prohibits the arrestee from being taken to court for a probable cause hearing until the State's Attorney's Office ("SAO") approves the charges being sought by the CPD.  The CPD refers to this as the "felony review process".

7.   In cases where the evidence known to the CPD at the time of the arrest is insufficient in the SAO's opinion to decide whether charges should be approved or denied, the arrestee is neither taken to court nor released.  Rather, CPD officers are permitted to continue their investigation to develop more evidence to support the charges.

8.   Normal CPD procedure is that recent arrestees are automatically transferred out of the various CPD police station "lock-ups" (bare cells with no accommodations for extended detentions) to the custody of the Cook County Department of Corrections ("Cook County") either immediately prior to or at the time of the arrestee's probable cause hearing.

9.   Thus, in the normal course, Cook County would either transport the arrestee directly from CPD custody to the scheduled court call or would receive the arrestee from the CPD at that hearing.  If probable cause is found, Cook County then takes the prisoner for housing at its jail facility.

3

10. To prevent this series of events from automatically taking place, when a police officer or detective is unable to obtain felony approval from the SAO, the officer can place a written "hold" on the arrestee. This is known as the hold past court call procedure. The hold procedure prevents the arrestee from being taken to court or transferred to the custody of Cook County.

11. The hold is required by CPD policy that the arrestee may not be taken for a probable cause hearing until felony charges are approved. During the period of the hold, the officers or detectives continue gathering evidence to support the charges sought, as by interrogating the arrestee, interviewing witnesses and conducting line-ups.

12. The hold is continued until the investigating officers or detectives have developed sufficient evidence to obtain approval of charges from the SAO or until the SAO exercises its discretion to refuse to charge. In most cases, when the SAO finally states that charges are being denied, the Assistant Deputy Superintendent may override and approve charges. Otherwise, the arrestee must be released. In homicide cases, no override may be exercised.

13. Only after felony approval is obtained will an arrestee held under the procedure finally be taken to court for a probable cause hearing, where evidence developed during the hold

4

period is presented. Such investigatory holds routinely last in excess of 48 hours.

14. The hold past court call procedure violates Fourth Amendment requirements for a prompt post-arrest judicial determination of whether there is probable cause to detain the arrestee. The Supreme Court has held that police may not unreasonably delay presenting an arrestee for a probable cause hearing following a warrantless arrest, that it is unreasonable to delay for purposes of continuing to develop evidence after the arrest, and that a delay which exceeds 48 hours is presumptively unreasonable regardless of the purpose for the delay.

15. This very CPD procedure has already been declared unconstitutional as violating the Fourth Amendment in the case of Robinson v. Chicago, 638 F.Supp. 186 (N.D.Ill. 1986), rev'd on other grounds, 868 F.2d 959 (7th Cir. 1989). In appealing, that decision, the CPD represented to the Seventh Circuit that it had abolished the hold past court call procedure. However, the procedure is alive and well and still in use throughout the CPD.

16. As implemented by the CPD, the hold past court Call procedure also violates arrestees' rights under the Fourteenth Amendment to be free of torture. The CPD does not maintain any facilities designed to house arrestees in its custody and in particular it does not provide them even minimally appropriate facilities for sleeping.

5

17.   Rather, during the duration of the investigatory
"hold," usually amounting to more than 48 hours and often days
longer, the arrestee is kept in a small interrogation room (an
"interview room" in CPD parlance) which is not designed for
housing prisoners and which furnishes them no facility for
sleeping.

18.   The CPD maintains no sleeping facilities because,
absent a "hold," arrestees are routinely transferred to the
custody of the Cook County Department of Corrections which
maintains a jail for housing prisoners, including bunks for
sleeping.

19.   By contrast, the interrogation rooms contain no
amenities.   The sole furnishing is a small metal bench four feet
in length and ten inches in width.   No mattresses, no blankets
and no pillows are furnished by the CPD to those in its custody.
Arrestees may also be kept in a police station lock-up during
part of the "hold" period, however, the lock-up has no sleeping
facility either.

20.   As a result, arrestees detained under the hold
past court call procedure are routinely deprived of meaningful
sleep in a manner which has long been recognized as torturous and
unconstitutional.

21.   In totality, the procedure allows CPD officers and
detectives to deprive arrestees, who have not even received a
judicial determination of probable cause, of necessary sleep

while continuing to interrogate them, all in a manner that raises the specter of false confessions due to coercion and exhaustion.

### Jurisdiction and Venue

22.   This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1331. Venue is proper under 28 U.S.C. § 1391(b). On information and belief, all parties reside in this judicial district, and the events giving rise to the claims asserted herein all occurred within district.

### Class Action Allegations

23.   Each of the foregoing Paragraphs are incorporated herein by reference.

24.   The named Plaintiff, Joseph Lopez, brings this action on his own behalf, and on behalf of a class of persons under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.

25.   The named Plaintiff seeks to represent a class of the following individuals:

> All persons arrested by the Chicago Police Department without an arrest warrant and who were detained in excess of 48 hours pending approval of felony charges by the State's Attorney at any time from March 15, 1999 to the present day (the "Class Period").

26.   The individuals in the Class are so numerous that joinder of all members is impracticable. The named Plaintiff estimates that the Class numbers in at least the thousands.

a.   On information and belief, approximately 200,000 persons have been arrested by the CPD in each year of the Class

7

Period. In the year 1999 alone, the Chicago Police Department arrested over 268,000 persons. Many of these were held over awaiting trial; and

b. Chicago police personnel, testifying as representatives of the CPD and the CITY OF CHICAGO, have stated under oath that most CPD felony arrests take in excess of 48 hours to obtain SAO approval of the charges and that all those arrestees would be detained in the manner described above during that time;

c. Chicago police personnel, testifying as representatives of the CPD and the CITY OF CHICAGO, have stated under oath that the hold past court call procedure is invoked routinely and often and that the CPD maintains computerized forms for this procedure; and

d. Chicago police personnel, testifying as representatives of the Chicago Police Department and the CITY OF CHICAGO, have stated under oath that there is no policy or practice of the CPD which limits the length of time an arrestee can be held in an interview room, making it likely that this unconstitutional condition of detention occurs again and again.

27. There are questions of law and fact common to the Class. Among these common questions are:

a. Whether the hold past court call procedure violates arrestees' Fourth Amendment rights in a manner which is actionable under 42 U.S.C. § 1983;

8

b.    Whether the CPD's practice of housing arrestees in excess of 24 hours without furnishing them any sleeping facilities violates the Fourteenth Amendment in a manner which is actionable under 42 U.S.C. § 1983; and

c.    Whether the City of Chicago maintains policies and/or practices that are the moving force behind the challenged conduct.

28.    Named Plaintiff Lopez' unlawful detention and torture claims are typical of the claims of the Class.    Mr. Lopez alleges, *inter alia*, that he was detained in excess of 48 hours based on CPD policy which prevents felony arrestees from receiving a probable cause hearing until the SAO approves charges and the hold past court call procedure and for purposes of continuing the investigation against him; that he was denied any facility for sleeping during that time; and that he has suffered damages as result.

29.    Named Plaintiff Lopez will fairly and adequately represent the interests of the Class.    Mr. Lopez has retained skilled counsel with experience in constitutional and class action litigation to represent the Class in this litigation.

30.    The questions of law and fact common to the Class, as described in paragraph 27 above, predominate over individual issues.

9

### Plaintiff Lopez' Individual Allegations

31. On or about July 19, 2000, in the Humbolt Park neighborhood on the West side of Chicago, 27-year-old Miguel Figueroa stood in the sunroof of a moving Pontiac Bonneville and fired shots from a .38-caliber weapon at rival gang members.

32. A stray bullet struck a nearby 12-year old boy, killing him.

33. Within a week, Miguel Figueroa confessed to the murder on videotape. He presently faces the death penalty for his crime.

34. At the time of the shooting Plaintiff, Joseph Lopez, was an 18-year-old resident of the Humbolt Park neighborhood.

35. The day following the shooting, Plaintiff was talking to a friend on the street when the two of them were approached by several Chicago police officers.

36. One of the officers was Officer Gomez, an officer known in Plaintiff's neighborhood as a dangerous and violent man.

37. Without any probable cause to believe Plaintiff had committed any wrongdoing, the officers handcuffed Plaintiff and placed him in their squad car.

38. The officers drove Plaintiff to a nearby alley. Following a brief interrogation, Officer Gomez punched Plaintiff in the face.

10

39.  The officers told Plaintiff they believed he was a witness to the shooting.  Plaintiff was then taken to the police station.

40.  Upon his arrival at the police station, Defendants took Plaintiff to the "Area 5" detective division where he was placed in a small "interview room" and shackled to the wall with handcuffs.

41.  Plaintiff Lopez was kept in this room for the approximately five days.  The room contained no facility for sleeping.  The room contained only a small metal bench of four feet in length and ten inches in width.  At no time was Plaintiff furnished a mattress, blanket or pillow.

42.  At no time during this approximately five day period was Plaintiff taken to court for a probable cause hearing.  Rather, Plaintiff was kept from court pursuant to CPD policy which prevents felony arrestees from receiving a probable cause hearing or being transferred to the Cook County jail facility until the SAO approves charges against them.  During this period of time several "hold forms" were issued to prevent Mr. Lopez from being transferred to the custody of Cook County or from receiving a probable cause hearing.

43.  During virtually this entire period, Plaintiff remained in a small room/cell with his wrist handcuffed to a ring on the wall.  The only human contact permitted Plaintiff was when

11

he was interrogated by various Defendant Police Officers who attempted to coerce him into confessing to the murder.

44. Under these conditions of confinement, Plaintiff was unable to obtain proper sleep.

45. During this approximately five day period, the Defendant officers and the CPD continued to investigate and develop evidence purportedly linking Mr. Lopez with the shooting.

46. During this time, Defendants also denied Plaintiff access to an attorney despite his requests to speak with an attorney.

47. Plaintiff's faculties were overcome by sleep deprivation and the unconstitutional and torturous tactics being used on him. Plaintiff at one point made an inculpatory statement indicating that he shot the boy. However, the facts of the statement conflicted with the true facts of the shooting. Upon being told that his facts were incorrect, Plaintiff recanted his statement.

48. After five days, the SAO approved the charge of capital murder against Mr. Lopez. Mr. Lopez, then only 18 years old, was informed that the death penalty would be sought against him. The CPD also announced to the public media that Plaintiff was the murderer.

49. Approximately one hour after prosecutors stated they were seeking the death penalty against Plaintiff, police

12

arrested Miguel Figueroa for the crime Plaintiff allegedly committed.

50. Thereafter, Figueroa (then age 28) gave a video-taped confession to the Chicago Police regarding the shooting.

51. Thereafter, Plaintiff was released and the wrongful charges against him were dismissed.

52. Notwithstanding the decision to initiate and pursue Plaintiff's prosecution, the Defendant Police Officers had actual knowledge that Plaintiff was not the killer.

53. Some of the eye-witnesses to the shooting told the Defendant Police Officers that Lopez was not the man who shot DeLaRosa. The shooter had a different complexion than Plaintiff and longer hair. Plaintiff's head was shaved at the time.

54. The Defendant Police Officers intentionally and without justification ignored these eyewitnesses who attested to Plaintiff's innocence, and instead claimed to have relied upon the purported identification of Plaintiff by several gang members hostile to Plaintiff.

55. This line-up conducted by the Defendant Police Officers, supposedly resulting in the positive identification of Plaintiff who was bald and ten years younger than the longer-haired shooter, was deeply flawed. The Defendant Police Officers intentionally chose to ignore the eyewitnesses who claimed Plaintiff was innocent and instead only attempted line-up identifications from gang members hostile to Plaintiff.

13

56. The Defendant Police Officers' actions referenced above were all taken intentionally to frame Plaintiff for a murder he did not commit.

### COUNT I - 42 U.S.C. § 1983: Unlawful Detention Claim Of Plaintiff and The Class Against Defendant City of Chicago

57. Plaintiff realleges each of the forgoing paragraphs as if fully stated herein.

58. As described more fully above, Plaintiff and the members of the Class have been detained without being afforded a prompt post-arrest probable cause hearings, all in a manner which violates the Fourth Amendment of the United States Constitution. This deprivation of Plaintiff and the Class members' constitutional rights was effected under color of law, and Plaintiff and the members of the Class have been damages as a result.

59. The City of Chicago caused this deprivation of rights and is liable for Plaintiff's and the Class Members' damages, *inter alia*, because:

a. The City of Chicago maintains an unjustified and unconstitutional policy preventing arrestees from obtaining a probable cause hearing until the SAO has completed a felony review process. The policy makes no exception for instances when the SAO does not complete its review within 48 hours. Indeed, the City Of Chicago maintains the hold past court call procedure

14

which is designed to prevent an arrestee from obtaining a probable cause hearing while CPD gather additional evidence;

b. The City of Chicago fails to adequately train its officers on the constitutional requirements for affording prompt probable cause hearings, and fails to supervise and control its officers' activities in this area, and is thereby the moving force behind the very type of misconduct at issue here, and its failure to do so manifests deliberate indifference;

c. As a matter of both policy and practice, the Chicago Police Department facilitates the very type of misconduct at issue here by failing to adequately punish and discipline prior instances of similar misconduct, thereby leading Chicago Police Officers to believe their actions will never be scrutinized and, in that way, directly encouraging future abuses such as those affecting Plaintiff and the members of the Class; and

d. The City of Chicago has failed to act to remedy the patterns of misconduct described in the preceding sub-paragraphs, despite actual knowledge of the same, thereby causing the types of injuries alleged here.

WHEREFORE, the named Plaintiff, JOSEPH LOPEZ, on behalf of himself and a class of others similarly situated, respectfully requests that the Court certify the Class defined herein and enter judgment against Defendant CITY OF CHICAGO, awarding appropriate compensatory damages, establish a common fund with

15

all of these monies to award Plaintiff a portion thereof for his
attorneys fees, award statutory attorneys' fees, and award any
other relief this Court deems just and appropriate.

### COUNT II - 42 U.S.C. § 1983:
### Fourteenth Amendment Claim Of Plaintiff and The Class
### Against Defendant City of Chicago

60.     Plaintiff realleges each of the forgoing
paragraphs as if fully stated herein.

61.     As described more fully above, Plaintiff and the
members of the Class have been subjected to torturous conditions
of confinement while being held in the custody of the CPD
including being deprived of even minimally proper facilities for
sleeping, all in a manner which violates the Fourteenth Amendment
of the United States Constitution.  The deprivation of Plaintiff
and the Class members' constitutional rights was under color of
law, and Plaintiff and the members of the Class have been damages
as a result.

62.     The City of Chicago caused this deprivation of
rights and is liable for Plaintiff's and the Class Members'
damages, *inter alia*, because:

a.     The City of Chicago maintains an unjustified
and unconstitutional policy discussed above which prevents
arrestees from being transferred to the Cook County jail for
extended periods of time in order to prevent them from being
transported to court for a probable cause hearing.  This policy
causes arrestees to remain in CPD custody for extended periods of

16

time, but yet the City of Chicago fails to provide any facility designed for housing arrestees for such duration and in particular for affording them minimally appropriate facilities for sleeping. The need for appropriate sleeping facilities while being detained for extended periods by the CPD is so obvious that the failure to provide them while continuing to maintain this policy manifests deliberate indifference;

      b.  The City of Chicago maintains no policies regarding furnishing proper sleeping facilities to arrestees, nor does it maintain any policies regarding the maximum duration for which an arrestee may be kept in an interview room. The failure to maintain such policies is likely to result in the unconstitutional use of such rooms to house arrestees that it manifests deliberate indifference;

      c.  The City of Chicago fails to adequately train its officers on the constitutional requirements for affording proper care for persons detained in its custody for extended periods, and fails to supervise and control its officers activities regarding care for arrestees needs during such detentions, and is thereby the moving force behind, the very type of misconduct at issue here, and its failure to do so manifests deliberate indifference;

      d.  As a matter of both policy and practice, the Chicago Police Department facilitates the very type of deprivation at issue here by failing to adequately punish and

discipline officers involved in prior instances of similar deprivations, thereby leading Chicago Police Officers to believe their actions will never be scrutinized and, in that way, directly encourages abuses such as those affecting Plaintiff and the members of the Class; and

e. The City of Chicago has failed to act to remedy the patterns of deprivation described in the preceding sub-paragraphs, despite actual knowledge of the same, thereby causing the types of injuries alleged here.

WHEREFORE, the named Plaintiff, JOSEPH LOPEZ, on behalf of himself and a class of others similarly situated, respectfully requests that the Court certify the Class defined herein and enter judgment against Defendant CITY OF CHICAGO, awarding appropriate compensatory damages, establish a common fund with all of these monies to award Plaintiff a portion thereof for his attorneys fees, award statutory attorneys' fees, and award any other relief this Court deems just and appropriate.

### COUNT III - 42 U.S.C. § 1983:
### Individual Excessive Force Claim Of The Plaintiff

63. Plaintiff realleges each of the forgoing paragraphs as if fully stated herein.

64. As a result of Officer Gomez's unjustified and excessive use of force, Plaintiff suffered pain and injury, as well as emotional distress.

65. As a result of the failure of Officer Myers, Officer Gomez's partner, to intervene to prevent Officer Gomez's

18

excessive use of force, Plaintiff suffered pain and injury, as well as emotional distress. Officer Myers had a reasonable opportunity to prevent the harm had he been so inclined, but failed to do so.

66. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

67. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

68. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in that:

a.   As a matter of both policy and practice, the Chicago Police Department directly encourages, and is thereby the moving force behind, the very type of excessive force at issue here by failing to adequately train, supervise and control its officers, such that its failure to do so manifests deliberate indifference;

b.   As a matter of both policy and practice, the Chicago Police Department facilitates the very type of excessive force at issue here by failing to adequately punish and discipline prior instances of misconduct, thereby leading Chicago Police Officers to believe their actions will never be

19

scrutinized and, in that way, directly encouraging future abuses such as those affecting Plaintiff;

c.    Generally, as a matter of widespread practice so prevalent as to comprise municipal policy, officers of the Chicago Police Department use excessive force against citizens in a manner similar to that alleged by Plaintiff in this Count on a frequent basis, yet the Chicago Police Department makes findings of wrongdoing in a disproportionately small number of cases;

d.    Municipal policy-makers are aware of (and condone and facilitate by their inaction) a "code of silence" in the Chicago Police Department, by which officers fail to report misconduct committed by other officers, such as the misconduct at issue in this case; and

e.    The City of Chicago has failed to act to remedy the patterns of abuse describe in the preceding sub-paragraphs, despite actual knowledge of the same, thereby causing the types of injuries alleged here.

WHEREFORE, Plaintiff, JOSEPH LOPEZ, respectfully requests that the Court enter judgment in his favor and against Defendants, CITY OF CHICAGO, OFFICER JOSE GOMEZ and OFFICER ROBERT MYERS, awarding compensatory damages and attorneys' fees, along with punitive damages against Defendants OFFICER JOSE GOMEZ and OFFICER ROBERT MYERS in their individual capacities, and any other relief this Court deems just.

## COUNT IV - State Law Claim:
### Plaintiff's Individual Claim For Assault and Battery

69. Plaintiff realleges each of the forgoing paragraphs as if fully stated herein.

70. As described more fully in the preceding paragraphs, Plaintiff was attacked by Defendant Officer Gomez without justification or provocation.

71. The actions of Defendant Officer Gomez constituted an offensive physical contact, undertaken willfully and wantonly, proximately causing Plaintiff's injuries.

72. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

73. As a result of the offensive touching, Plaintiff sustained bodily injuries, including but not limited to a reasonable apprehension of great bodily harm.

WHEREFORE, Plaintiff, JOSEPH LOPEZ, respectfully requests that the Court enter judgment in his favor and against Defendant, OFFICER JOSE GOMEZ, awarding compensatory damages and punitive damages, as well as any other relief this Court deems just and appropriate under the circumstances.

## COUNT V - State Law Claim:
### Plaintiff's Individual Claim For
### Intentional Infliction of Emotional Distress

74. Plaintiff realleges each of the forgoing paragraphs as if fully stated herein.

21

75. As described more fully in the preceding paragraphs, the Defendant Police Officers engaged in extreme and outrageous conduct with respect to Plaintiff, to wit, the Defendants used violence, torture and unlawful methods to attempt to coerce Plaintiff into confessing to a murder he did not commit.

76. The misconduct described in this Count was undertaken with intent, knowledge or callous disregard for the fact that there was a high probability that the conduct would inflict severe emotional distress on Plaintiff.

77. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

78. As a proximate result of this misconduct, Plaintiff suffered severe emotional distress and anguish.

WHEREFORE, Plaintiff, JOSEPH LOPEZ, respectfully requests that the Court enter judgment in his favor and against the DETECTIVE JAMES, DELAFONT, DETECTIVE JENNIFER DeLUCIA, DETECTIVE HECTOR VERGARA, OFFICER JOSE GOMEZ, OFFICER DANIEL JACOBS and OFFICER ROBERT MYERS, awarding compensatory damages, punitive damages, and any other relief this Court deems just and appropriate under the circumstances.

### Count VI - 42 U.S.C. § 1983:
### Individual Claim for Unlawful Detention By The Defendant Officers

79. Plaintiff realleges each of the forgoing paragraphs as if fully stated herein.

80. As described more fully above, Defendants held Plaintiff without affording him a probable cause hearing in a manner which violated the Fourth Amendment.

81. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

82. As a result of this misconduct, Plaintiff sustained damages.

83. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

WHEREFORE, Plaintiff, JOSEPH LOPEZ, respectfully requests that the Court enter judgment in his favor and against Defendants, awarding compensatory damages, punitive damages against DETECTIVE JAMES, DELAFONT, DETECTIVE JENNIFER DeLUCIA, DETECTIVE HECTOR VERGARA, OFFICER JOSE GOMEZ, OFFICER DANIEL JACOBS and OFFICER ROBERT MYERS in their individual capacities, and any other relief this Court deems just and appropriate under the circumstances.

## Count VII - 42 U.S.C. § 1983
### Individual Claim For Police Torture By Defendant Officers

84. Plaintiff realleges each of the forgoing paragraphs as if fully stated herein.

85. In attempting unlawfully to coerce Plaintiff to confess to a murder he did not commit, the Defendants employed such inhuman methods as shackling Plaintiff's wrist to the wall for excessive amounts of hours and intentionally depriving Plaintiff of sleep.

86. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

87. As a result of this misconduct, Plaintiff sustained physical and emotional injuries.

88. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

WHEREFORE, Plaintiff, JOSEPH LOPEZ, respectfully requests that the Court enter judgment in his favor and against the Defendants, awarding compensatory damages, punitive damages against the DETECTIVE JAMES, DELAFONT, DETECTIVE JENNIFER DeLUCIA, DETECTIVE HECTOR VERGARA, OFFICER JOSE GOMEZ, OFFICER DANIEL JACOBS and OFFICER ROBERT MYERS in their individual capacities, and any other relief this Court deems just and appropriate under the circumstances.

24

### Count VIII - State Law Claim:
### Individual Claim For Respondeat Superior

89.  Plaintiff realleges each of the forgoing paragraphs as if fully stated herein.

90.  In committing the acts alleged in the preceding paragraphs, the Defendant Police Officers were members of, and agents of, the Chicago Police Department acting at all relevant times within the scope of their employment.

91.  Defendant CITY OF CHICAGO is liable as principal for all torts committed by its agent.

WHEREFORE, Plaintiff, JOSEPH LOPEZ, respectfully requests that the Court enter judgment in his favor and against Defendant, CITY OF CHICAGO, in an amount equal to any award against the Defendant Police Officers, as well as any other relief this Court deems just and appropriate under the circumstances.

### COUNT IX - State Law Claim:
### Individual Claim Based On Indemnification Statute

92.  Plaintiff realleges each of the forgoing paragraphs as if fully stated herein.

93.  Illinois law, 735 ILCS 10/9-102, provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

25

94. The Defendant Police Officers are or were employees of the City of Chicago who acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff, JOSEPH LOPEZ, respectfully requests that the Court enter judgment in his favor and against Defendant CITY OF CHICAGO in the amounts awarded to Plaintiffs against Defendant Police Officers as compensatory damages, attorneys' fees, punitive damages, and any other relief this Court deems just and appropriate under the circumstances.

### JURY DEMAND

Plaintiff, JOSEPH LOPEZ, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

_____
Attorneys for Plaintiff

Arthur Loevy
Michael Kanovitz
Jon Loevy
Jon Rosenblatt
LOEVY & LOEVY
312 North May St.
Suite 100
Chicago, IL 60607
(312) 243-5900

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 001

PEOPLE OF THE STATE OF ILLINOIS

                VS                    NUMBER 97CR1147402

    ERIC        KITTLER

            CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
with the Clerk of the Circuit Court.

Charging the above named defendant with:

| | | | |
|---|---|---|---|
| 720-5/9-1(A)(1) | F | | MURDER/INTENT TO KILL/INJ |
| 720-5/9-1(A)(2) | F | | MURDER/STRONG PROB KILL/I |
| 720-5/9-1(A)(3) | F | | MURDER/OTHER FORCIBLE FEL |
| 720-5/9-1(A)(3) | F | | MURDER/OTHER FORCIBLE FEL |
| 720-5/9-1(A)(3) | F | | MURDER/OTHER FORCIBLE FEL |
| 720-5/9-1(A)(1) | F | (ATT) | MURDER/INTENT TO KILL/INJ |
| 720-5/18-2(A) | F | | ARMED ROBBERY |
| 720-5/24-1.2(A)(2) | F | | AGG DISCHARGE FIREARM/OCC |
| 720-5/18-2(A) | F | (ATT) | ARMED ROBBERY |
| 720-5/24-1(A)(10)1 | F | | CARRY/POSSES FIREARM IN P |
| 720-5/24-3.1(A)(1)1 | F | | UNLAWFUL POSSESS HNDGUN<1 |

The following disposition(s) was/were rendered before the Honorable Judge(s):

04/17/97 IND/INFO-CLK OFFICE-PRES JUDGE        05/01/97 1701
        97CR1147402 ID# CR100330274
05/01/97 CASE ASSIGNED                         05/01/97 1720
        FITZGERALD, THOMAS R.
05/01/97 DEFENDANT IN CUSTODY
        KELLEY, DANIEL J
05/01/97 PRISONER DATA SHEET TO ISSUE
        KELLEY, DANIEL J
05/01/97 APPEARANCE FILED
        KELLEY, DANIEL J
05/01/97 DEFENDANT ARRAIGNED
        KELLEY, DANIEL J
05/01/97 PLEA OF NOT GUILTY
        KELLEY, DANIEL J
05/01/97 MOTION FOR DISCOVERY                              F        1
        KELLEY, DANIEL J
05/01/97 ADMONISH AS TO TRIAL IN ABSENT
        KELLEY, DANIEL J
05/01/97 CONTINUANCE BY AGREEMENT              06/04/97
        KELLEY, DANIEL J



EXHIBIT
4

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS      Page 008

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 97CR1147402

      ERIC       KITTLER

          CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
01/22/99 WITNESSES ORDERED TO APPEAR
      KELLEY, DANIEL J
01/22/99 CONTINUANCE BY AGREEMENT          02/26/99
      KELLEY, DANIEL J
02/26/99 DEFENDANT IN CUSTODY
      KELLEY, DANIEL J
02/26/99 PRISONER DATA SHEET TO ISSUE
      KELLEY, DANIEL J
02/26/99 CONTINUANCE BY AGREEMENT          03/24/99
      KELLEY, DANIEL J
03/24/99 DEFENDANT IN CUSTODY
      MORRISSEY, JOHN E.
03/24/99 PRISONER DATA SHEET TO ISSUE
      MORRISSEY, JOHN E.
03/24/99 WITNESSES ORDERED TO APPEAR
      MORRISSEY, JOHN E.
03/24/99 CONTINUANCE BY AGREEMENT          04/05/99
      MORRISSEY, JOHN E.
04/05/99 DEFENDANT IN CUSTODY
      MOORE, COLLEEN MCSWEENEY
04/05/99 PRISONER DATA SHEET TO ISSUE
      MOORE, COLLEEN MCSWEENEY
04/05/99 CONTINUANCE BY AGREEMENT          04/06/99
      MOORE, COLLEEN MCSWEENEY
04/06/99 DEFENDANT IN CUSTODY
      KELLEY, DANIEL J
04/06/99 PRISONER DATA SHEET TO ISSUE
      KELLEY, DANIEL J
04/06/99 CONTINUANCE BY AGREEMENT          04/09/99
      KELLEY, DANIEL J
04/09/99 DEFENDANT IN CUSTODY
      KELLEY, DANIEL J
04/09/99 PRISONER DATA SHEET TO ISSUE
      KELLEY, DANIEL J
04/09/99 MOTION TO SUPPRESS                D      2
      KELLEY, DANIEL J
04/09/99 WITNESSES ORDERED TO APPEAR
      KELLEY, DANIEL J

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 009

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 97CR1147402

        ERIC          KITTLER

        CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
04/09/99 CONTINUANCE BY AGREEMENT                    05/03/99
        KELLEY, DANIEL J
04/28/99 DEFENDANT IN CUSTODY
        KELLEY, DANIEL J
04/28/99 PRISONER DATA SHEET TO ISSUE
        KELLEY, DANIEL J
04/28/99 CASE ADVANCED                              05/03/99
        KELLEY, DANIEL J
4/28/99 WITNESSES ORDERED TO APPEAR
        KELLEY, DANIEL J
4/28/99 CONTINUANCE BY AGREEMENT                    05/03/99
        KELLEY, DANIEL J
5/03/99 DEFENDANT IN CUSTODY
        KELLEY, DANIEL J
5/03/99 PRISONER DATA SHEET TO ISSUE
        KELLEY, DANIEL J
5/03/99 PLEA OF NOT GUILTY
        KELLEY, DANIEL J
5/03/99 SPECIAL ORDER
        JURY-SELECTED
        KELLEY, DANIEL J
5/03/99 WITNESSES ORDERED TO APPEAR
        KELLEY, DANIEL J
5/03/99 CONTINUANCE BY AGREEMENT                    05/05/99
        KELLEY, DANIEL J
5/05/99 TRIAL COMENCED AND CONTINUED                05/06/99
        KELLEY, DANIEL J
5/06/99 TRIAL COMENCED AND CONTINUED                05/07/99
        KELLEY, DANIEL J
5/07/99 DEFENDANT IN CUSTODY
        KELLEY, DANIEL J
5/07/99 PRISONER DATA SHEET TO ISSUE
        KELLEY, DANIEL J
5/07/99 PLEA OF NOT GUILTY                          CALL
        KELLEY, DANIEL J
5/07/99 FINDING OF GUILTY                           C001
        KELLEY, DANIEL J

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS     Page 010

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 97CR1147402

     ERIC        KITTLER

          CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
05/07/99 FINDING OF GUILTY              C002
     KELLEY, DANIEL J
05/07/99 FINDING OF GUILTY              C003
     KELLEY, DANIEL J
05/07/99 FINDING OF GUILTY              C004
     KELLEY, DANIEL J
05/07/99 FINDING OF GUILTY              C005
     KELLEY, DANIEL J
05/07/99 FINDING OF GUILTY              C007
     KELLEY, DANIEL J
05/07/99 FINDING OF GUILTY              C008
     KELLEY, DANIEL J
05/07/99 PRE-SENT INVEST. ORD, CONTD TO
     KELLEY, DANIEL J
05/07/99 M/S TO REVOKE BOND                          S      001
     KELLEY, DANIEL J
05/07/99 CONTINUANCE BY AGREEMENT            06/17/99
     KELLEY, DANIEL J
06/17/99 DEFENDANT IN CUSTODY
     KELLEY, DANIEL J
06/17/99 MOTION DEFENDANT - NEW TRIAL                D      2
     KELLEY, DANIEL J
06/17/99 JGMT ON FINDING/VERDICT/PLEA                F
     KELLEY, DANIEL J
06/17/99 DEF SENTENCED ILLINOIS DOC      C002
     COUNTS 1, 3, AND 4 MERGES WITH COUNT 2.
               35 YRS
     KELLEY, DANIEL J
06/17/99 DEF SENTENCED ILLINOIS DOC      C007
     TO RUN CONCURRENT WITH COUNT 2.
               30 YRS
     KELLEY, DANIEL J
06/17/99 DEF SENTENCED ILLINOIS DOC      C008
     TO RUN CONCURRENT WITH COUNT 2.
               15 YRS
     KELLEY, DANIEL J
06/17/99 CREDIT DEFENDANT FOR TIME SERV
                    812 DYS
     KELLEY, DANIEL J

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 012

PEOPLE OF THE STATE OF ILLINOIS

VS                    NUMBER 97CR1147402

ERIC        KITTLER

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
05/17/00 SUPPL REPORT OF PRCD PREPARED        00/00/00
05/25/00 SUPPL REC RECD BY APPL COUNSEL       00/00/00
     STATE APPELLATE DEFENDER
01/26/01 SUPPL REPORT OF PRCD PREPARED        00/00/00
01/26/01 SUPPL REC RECD BY APPL COUNSEL       00/00/00
     STATES ATTORNEY
11/14/01 MANDATE FILED                        11/28/01 1701
11/28/01 REVIEW COURT REVERSAL-RMD DRTN       12/12/01 1717
     BIEBEL, PAUL JR.
12/12/01 DEFENDANT IN CUSTODY                 00/00/00
     WADAS, KENNETH J.
12/12/01 PRISONER DATA SHEET TO ISSUE         00/00/00
     WADAS, KENNETH J.
12/12/01 DEF REM CUST CC SHERIF               00/00/00
     WADAS, KENNETH J.
12/12/01 NO BAIL                              00/00/00
     WADAS, KENNETH J.
12/12/01 DEF DEMAND FOR TRIAL                 00/00/00
     WADAS, KENNETH J.
12/12/01 MOTION STATE - CONTINUANCE -MS       12/26/01
     WADAS, KENNETH J.
12/26/01 DEFENDANT IN CUSTODY                 00/00/00
     WOOD, WILLIAM S.
12/26/01 PRISONER DATA SHEET TO ISSUE         00/00/00
     WOOD, WILLIAM S.
12/26/01 MOTION STATE - CONTINUANCE -MS       01/09/02
     WOOD, WILLIAM S.
12/26/01 DEFENDANT IN CUSTODY                 00/00/00
     WOOD, WILLIAM S.
01/09/02 DEFENDANT IN CUSTODY                 00/00/00
     WADAS, KENNETH J.
01/09/02 PRISONER DATA SHEET TO ISSUE         00/00/00
     WADAS, KENNETH J.
01/09/02 DEF DEMAND FOR TRIAL                 00/00/00
     WADAS, KENNETH J.
01/09/02 WITNESSES ORDERED TO APPEAR          00/00/00
     WADAS, KENNETH J.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 013

PEOPLE OF THE STATE OF ILLINOIS

                      VS                    NUMBER 97CR1147402

        ERIC          KITTLER

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION

| | | |
|---|---|---|
| 01/09/02 | MOTION DEFT - CONTINUANCE - MD | 01/30/02 |
| | WADAS, KENNETH J. | |
| 01/30/02 | DEFENDANT IN CUSTODY | 00/00/00 |
| | WADAS, KENNETH J. | |
| 01/30/02 | PRISONER DATA SHEET TO ISSUE | 00/00/00 |
| | WADAS, KENNETH J. | |
| 01/30/02 | CONTINUANCE BY AGREEMENT | 02/13/02 |
| | WADAS, KENNETH J. | |
| 02/13/02 | PRISONER DATA SHEET TO ISSUE | 00/00/00 |
| | WADAS, KENNETH J. | |
| 02/13/02 | CONTINUANCE BY AGREEMENT | 02/22/02 |
| | WADAS, KENNETH J. | |
| 02/22/02 | DEFENDANT IN CUSTODY | 00/00/00 |
| | WADAS, KENNETH J. | |
| 02/22/02 | PRISONER DATA SHEET TO ISSUE | 00/00/00 |
| | WADAS, KENNETH J. | |
| 02/22/02 | CONTINUANCE BY AGREEMENT | 03/21/02 |
| | WADAS, KENNETH J. | |
| 2/27/02 | SPECIAL ORDER | 00/00/00 |
| | DISCLOSURE TO STATE. | |
| 3/21/02 | PLEA OF NOT GUILTY | CALL 00/00/00 |
| | WADAS, KENNETH J. | |
| 3/21/02 | JURY WAIVED | 00/00/00 |
| | WADAS, KENNETH J. | |
| 3/21/02 | FINDING OF NOT GUILTY | CALL 00/00/00 |
| | WADAS, KENNETH J. | |
| 3/21/02 | SPECIAL ORDER | 00/00/00 |
| | DEFTDISCHARGED | |
| | WADAS, KENNETH J. | |
| 1/07/04 | SPECIAL ORDER | 00/00/00 |
| | NOTIFICATION OF MOTION TO AUTHORIZE VIEWING OF IMPOUNDING PEOPLES EXHIBIT | |
| 1/07/04 | SPECIAL ORDER | 00/00/00 |
| | BY ERIC KITTLER'S ATTORNEYS, LOERY & LOERY FILED | |
| 1/07/04 | HEARING DATE ASSIGNED | 04/12/04 1701 |
| :/12/04 | DEFENDANT ON BOND | 00/00/00 |
| | WADAS, KENNETH J. | |
| /12/04 | SPECIAL ORDER | 00/00/00 |
| | DEF ALLOWED TO VIEW PEOPLE EXH #24 WHICH IMPOUNDED BY CLERK OF CIRCUIT CO | |
| | WADAS, KENNETH J. | |

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 015

PEOPLE OF THE STATE OF ILLINOIS

VS                          NUMBER 97CR1147402

ERIC          KITTLER

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION

I hereby certify that the foregoing has been entered of record on the above captioned case.
Date 09/02/04

*Dorothy Brown MS*

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT OF COOK COUNTY



# Illinois Corrections
### Department of

| | Inmate Search ▶ | Other Inmate Locators |
|---|---|---|

**IDOC Links**
Director
Administration
Dept Overview FY 02
Inmate Search
Facilities
Visitation Rules
IDOC News
Reports & Stats
Jobs @ IDOC
Industries
Victim Services
Contact Us
FAQ
Attorney FAQ
Wanted Fugitives
Mission Statement
IDOC Home
☐ **State Links**
Search Illinois



[Go]
[Search Tips]



Federal Inmate Locator

Press for Printer Friendly Version (no graphics)

CHECK TO INCLUDE PHOTO ☐

 

## K66558 - STOCKDALE, JESSE

Parent Institution: Hill Correctional Center
Inmate Status: IN CUSTODY
Location: HILL
Discharge Reason:

### VITALS
Date of Birth: 04-11-1981
Weight: 217 lbs.
Hair: Black
Sex: Male
Height: 6 ft. 02 in.
Race: Black
Eyes: Brown

### MARKS, SCARS, & TATTOOS

### ADMISSION / RELEASE / DISCHARGE INFO
Custody Date: 07/15/1998
Projected Parole Date: 03/18/2007
Paroled Date: –
Tentative Discharge Date:
Discharge From Parole: 03/18/2010

### SENTENCING INFORMATION

| MITTIMUS: | 97CR13465 |
|---|---|
| CLASS: | X |
| COUNT: | 1 |
| OFFENSE: | ARMED ROBBERY |
| CUSTODY DATE: | 04/18/1997 |
| SENTENCE: | 19 YEARS 0 MONTHS 0 DAYS |
| COUNTY: | COOK |
| SENTENCE DISCHARGED?: | NO |
| | |
| MITTIMUS: | 97CR13466 |
| CLASS: | X |
| COUNT: | 1 |

| OFFENSE: | ARMED ROBBERY |
|---|---|
| CUSTODY DATE: | 04/18/1997 |
| SENTENCE: | 19 YEARS 0 MONTHS 0 DAYS |
| COUNTY: | COOK |
| SENTENCE DISCHARGED?: | NO |
| | |

**All complaints regarding the accuracy of information contained in these documents should be submitted, in writing, to the Illinois Department of Corrections, P.O. Box 19277, Springfield, IL 62794-9722.**

Copyright © 2002
IDOC

IDOC Privacy Information | Illinois Privacy Information | Kids Privacy | Web Accessibility | IDOC Webmaster

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

~~RECEIVED~~

ANTHONY HICKS and REGINALD FORD, )
                                     )       **JUL 0 6 2005**
           Plaintiffs,       )
                                       )     *MICHAEL W. DOBBINS*
          v.                 )    *CLERK, U.S. DISTRICT COURT*
                                       )    NO:   **MAGISTRATE JUDGE**
CITY OF CHICAGO, DETECTIVE F/N/U        )        **GERALDINE SOAT BROWN**
HALL, and PRESENTLY UNIDENTIFIED   )
CHICAGO POLICE OFFICERS,           )    **JUDGE KENNELLY**
                                       )    **05C 3932**
          Defendants.      )    JURY TRIAL DEMANDED

### COMPLAINT

NOW COME Plaintiffs ANTHONY HICKS, and REGINALD FORD, through their attorneys Loevy & Loevy, and for their complaint against Defendant CITY OF CHICAGO and PRESENTLY UNIDENTIFIED CHICAGO POLICE OFFICERS, state as follows:

### Introduction

1. This actions arises out of the arrest, detention and mistreatment of Plaintiffs Hicks and Ford by members of the Chicago Police Department in connection with a crime of which both were innocent. Plaintiffs seek recovery under 42 U.S.C. § 1983 as well as state law.

### Jurisdiction and Venue

2. This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331, 1367. Venue is proper under 28 U.S.C. § 1391(b). Defendant, City of Chicago, is a municipality physically situated in this judicial district, and the events giving rise to the claims in this case all occurred here.

**EXHIBIT**
**V**

**Facts**

3.     On information and belief, on or around May 8, 2005, an individual or individuals, who were possibly armed and who are unknown to Plaintiffs, robbed the Autozone store at 3577 W. Grand Avenue in Chicago, Illinois of money.  The robbery was captured on videotape.

4.     Several days later Plaintiffs came to the store to return for a refund approximately $40.00 worth of automobile parts that Mr. Ford had previously purchased.

5.     After Mr. Ford submitted the receipt and merchandise to an employee of the store, Plaintiffs were asked to wait.  Shortly, several unknown Chicago Police Officers arrived and ordered Plaintiffs to lie on the floor.

6.     Mr. Hicks explained that he had an artificial knee cap and could not comply without assistance.  Rather than assist the officers forced Mr. Hicks to the ground in a needlessly brutal fashion causing him great pain and suffering.

7.     Both Plaintiffs were then placed in the back of a police car outside of the store.  While they waited there, they overheard a conversation between the officers and personnel from a beauty supply shop which was next door to the Autozone, in which the officers were informed that Plaintiffs were not the persons who committed the robbery.

2

8.    Thereafter, Plaintiffs were taken to the Chicago Police Department facility at Kedzie and Harrison where they were turned over to the custody of Hall and others.

9.    On information and belief, Hall and others watched the videotape from the crime.  On information and belief the perpetrator or perpetrators depicted on the tape did not resemble the Plaintiffs.

10.    Plaintiffs were held at the station for approximately 62 hours.  There was no probable cause for the arrest nor for this detention.

11.    There was no arrest warrant nor any post-arrest judicial approval of probable cause for this detention and no emergency or extraordinary circumstances necessitating it.

12.    During this detention, both Plaintiffs were placed in numerous line-ups having nothing to do with the Autozone robbery, in Defendants' attempts to see if they could develop evidence to tie plaintiffs to other crimes.  On information and belief, much of the length of their detention was due to the Defendants' attempts to pin unrelated crimes on Plaintiffs with these line-ups.  Plaintiffs were not identified by anyone in any of the line-ups.

13.    Both Plaintiffs were shackled for long stretches of time during their detentions.  Hall and others interrogated Plaintiffs for long periods to try to get them to confess to the crime and/or implicate one another.

3

14. Hall and other Presently Unidentified Chicago Police Officers also starved Plaintiffs, *inter alia*, to try to force them to give an incriminating statement. Mr. Ford was provided food only one time during the detention and Mr. Hicks was fed only twice during the detention. Defendant Hall also physically assaulted each of the Plaintiffs as part of the interrogation.

15. Plaintiffs were also wrongfully deprived of sleep by shackling and otherwise. At no time during the entire detention did they receive a mattress, blanket or pillow. This is because Chicago has failed to provide proper facilities for arrestees being held overnight.

16. After approximately 62 hours, Plaintiffs were released without being charged with any crime.

17. The City of Chicago maintains an arrest/detention system which is the moving force behind the injuries that Plaintiffs suffered. As a matter of policy and widespread practice, Chicago Police Officers are indulged in arresting citizens without probable cause in order to try to develop probable cause after arrest. Moreover, Chicago does not enforce the 48-hour rule for post-arrest probable cause hearings. Despite ample notice that its officers routinely detain warrantless arrestees without a probable cause hearing in excess of 48 hours and that they delay probable cause hearings for impermissible purposes, Chicago takes no steps to review its

officers' actions, to investigate reported violations and/or to discipline its officers for violations of these requirements.

18. Similarly Chicago places no requirements on its officers to ensure that arrestees are provided proper means of sleep, no requirement that they be fed when held outside of a lock-up, and its policies and widespread practices allow shackling for excessive periods of time. As a matter of widespread practice, arrestees are often starved or provided with insufficient sustenance while in custody.

19. Despite the availability of ample evidence that mistreatment of the types that Plaintiffs suffered occur routinely in its police departments, Chicago has not undertaken to properly apprise itself of the existence of mistreatment, to investigate or discipline officers who inflict such mistreatment or to provide policies and/or training which would discourage officers from inflicting such mistreatment.

20. Rather, Chicago's policymakers condone such violations out of the misguided belief that arrests/detentions without probable cause and mistreatment during interrogations are effective law enforcement tools and that officers should not actually be restricted by requirements for probable cause, prompt probable cause hearings, or proper treatment.

21. The actions and omissions on the part of the City of Chicago were the moving force behind the violations Plaintiffs suffered.

## COUNT I - 42 U.S.C. § 1983 Claim for Unlawful Arrest

22. Plaintiffs reallege each of the forgoing paragraphs as if fully stated herein.

23. By all of the above, the Defendants City of Chicago and Presently Unidentified Chicago Police Officers caused Plaintiffs to be arrested without probable in violation of their Fourth Amendment rights and Plaintiffs have been damaged as a direct and proximate result.

WHEREFORE, Plaintiffs Hicks and Ford respectfully demand that judgment be entered against City of Chicago and the Presently Unidentified Chicago Police Officers who are responsible for these actions awarding actual damages as well as the costs, fees and attorneys fees incurred in connection with this action. Plaintiffs further demand that punitive damages be awarded against the Presently Unidentified Chicago Police Officers who are responsible for these actions.

## COUNT II - Unlawful Arrest under State Law

24. Plaintiffs reallege each of the forgoing paragraphs as if fully stated herein.

25. By all of the above, the Presently Unidentified Chicago Police Officers caused Plaintiffs to be arrested without

probable in violation of state law and Plaintiffs have been damaged as a direct and proximate result.

WHEREFORE, Plaintiffs Hicks and Ford respectfully demand that judgment be entered against the Presently Unidentified Chicago Police Officers awarding actual and punitive damages as well as the costs and fees incurred in connection with this action.

### COUNT III - 42 U.S.C. § 1983 Claim for Excessive Force

26. Plaintiffs reallege each of the forgoing paragraphs as if fully stated herein.

27. By all of the above, the Defendants City of Chicago, and Presently Unidentified Chicago Police Officers who effected the arrests unreasonably caused Plaintiff Hicks to experience unnecessary pain and suffering during the arrest in violation of his Fourth Amendment rights.

28. By all of the above, the Defendants City of Chicago and Hall unreasonably caused Plaintiff Hicks and Ford to experience unnecessary pain and suffering by assaulting and battering them and causing this to happen, in violation of their Fourth Amendment rights.

29. By all of the above, the Defendants City of Chicago, Hall, and the Presently Unidentified Chicago Police Officers responsible for Plaintiffs' care during the detention unreasonably caused Plaintiffs Hicks and Ford to experience

7

unnecessary pain and suffering by shackling them excessively, depriving them of food, depriving them of sleeping accommodations, and otherwise mistreating them.

WHEREFORE, Plaintiffs Hicks and Ford respectfully demand that judgment be entered against Defendants City of Chicago, Hall, and the Presently Unidentified Chicago Police Officers who were responsible for their care while in custody actions awarding actual damages as well as the costs, fees and attorneys fees incurred in connection with this action against all of them and punitive damages against the individual defendants.

### COUNT IV – Assault and Battery Under State Law

30. Plaintiffs reallege each of the forgoing paragraphs as if fully stated herein.

31. By all of the above, the Presently Unidentified Chicago Police Officers who effected the arrest unreasonably caused Plaintiff Hicks to experience unnecessary pain and suffering during the arrest in violation of his Fourth Amendment rights.

32. By all of the above, Defendant Hall unreasonably caused Plaintiff Hicks and Ford to experience unnecessary pain and suffering by assaulting and battering them, in violation of state law.

33. By all of the above, Defendants Hall and the Presently Unidentified Chicago Police Officers responsible for

8

their care during the detention unreasonably caused Plaintiffs Hicks and Ford to experience unnecessary pain and suffering by shackling them excessively, depriving them of food, depriving them of sleeping accommodations, and otherwise mistreating them.

WHEREFORE, Plaintiffs Hicks and Ford respectfully demand that judgment be entered against Defendants Hall, and the Presently Unidentified Chicago Police Officers who were responsible for their care while in custody awarding actual and punitive damages as well as the costs and fees incurred in connection with this action.

### COUNT V - 42 U.S.C. § 1983 Claim for Unlawful Detention

34. Plaintiffs reallege each of the forgoing paragraphs as if fully stated herein.

35. By all of the above, the Defendants City of Chicago, Hall and the Presently Unidentified Chicago Police Officers responsible for the detention caused Plaintiffs Hicks and Ford to be detained unreasonably in violation of their Fourth Amendment rights.

WHEREFORE, Plaintiffs Hicks and Ford respectfully demand that judgment be entered against Defendants City of Chicago, Hall, and the Presently Unidentified Chicago Police Officers who were responsible for their detention awarding actual damages as well as the costs, fees and attorneys fees incurred in connection

with this action against all of them and punitive damages against the individual defendants.

### COUNT VI - Unlawful Detention Under State Law

36. Plaintiffs reallege each of the forgoing paragraphs as if fully stated herein.

37. By all of the above, the Defendants City of Chicago, Hall and the Presently Unidentified Chicago Police Officers responsible for the detention caused Plaintiffs Hicks and Ford to be detained unreasonably in violation of state law.

WHEREFORE, Plaintiffs Hicks and Ford respectfully demand that judgment be entered against Defendants Hall, and the Presently Unidentified Chicago Police Officers who were responsible for their detention awarding actual and punitive damages as well as the costs and fees incurred in connection with this action.

### COUNT VII - *Respondeat Superior* Under State Law

38. Plaintiffs reallege each of the forgoing paragraphs as if fully stated herein

39. By all of the above employees of the City of Chicago subjected Plaintiffs Ford and Hicks to the violations set our in Counts II, IV and VI all in a manner which violates Illinois law.

40. These employee's actions and omissions were taken within the scope of their employment with Defendant City of Chicago.

41. Plaintiffs have suffered damages as a result.

WHEREFORE, Plaintiffs Hicks and Ford respectfully demand that judgment be entered against City of Chicago awarding actual damages as well as the costs and fees incurred in connection with this action.

### COUNT VIII - Indemnity Under State Law

42. Plaintiffs reallege each of the forgoing paragraphs as if fully stated herein

43. Under Illinois law, Defendant City of Chicago is required to indemnify any judgment entered against Defendants Hall and/or the Presently Unidentified Chicago Police officers.

WHEREFORE, Plaintiffs Hicks and Ford respectfully demand that judgment be entered against City of Chicago awarding actual damages as well as the costs and fees incurred in connection with this action.

11

## JURY DEMAND

Plaintiffs Ford and Hicks demand a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED,

_____
Attorneys for Plaintiffs

Arthur Loevy
Michael Kanovitz
Russell Ainsworth
LOEVY & LOEVY
312 North May St., Suite 100
Chicago, IL 60607
(312) 243-5900

12

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3

 4     JOSEPH LOPEZ,                    )
                                        )
 5          Plaintiff,                  )
                                        )
 6       vs.                            )  01 C 1823
                                        )
 7     CITY OF CHICAGO, DETECTIVE       )
       JAMES DELAFONT, DETECTIVE        )
 8     JENNIFER DeLUCIA, DETECTIVE      )
       HECTOR VERGARA, OFFICER JOSE     )
 9     GOMEZ, OFFICER DANIEL JACOBS     )
       and OFFICER ROBERT MYERS,        )
10                                      )
            Defendants.                 )
11

12          Deposition of JULIAN BRYANT taken before

13     CAROL CONNOLLY, CSR, CRR, and Notary Public, pursuant to

14     the Federal Rules of Civil Procedure for the United

15     States District Courts pertaining to the taking of

16     depositions, at 77 West Wacker Drive, Chicago, Illinois,

17     commencing at 2:45 p.m. on the 26th day of November,

18     A.D., 2003.

19

20

21

22

23

24
```

COPY

EXHIBIT

W

56

1     Q    When on the first day did you bang on the wall

2  to get water?

3     A    I don't know what time it was.  It was sometime

4  the first day though.

5     Q    How much water did she bring you?

6     A    She brought me little Styrofoam cup full of

7  water.

8     Q    Did you have anything to drink on the second

9  day?

10    A    No.

11    Q    Did you ever ask anyone for anything to drink

12  on the second day?

13    A    No.  I was tired of being in there and asking

14  for nothing.  I asked the judge to have something to

15  eat.

16    Q    Did you use the restroom on the second day?

17    A    No.

18    Q    Did you need to use the restroom?

19    A    No.

20    Q    Did you stay in that room for a second night?

21    A    I stayed in there for three nights.

22    Q    During the day on the second day, did you sleep

23  at all?

24    A    No.

1    Q    Did you try to sleep?

2    A    No.

3    Q    Did you want to sleep?

4    A    Yes.  I couldn't sleep.

5    Q    How come?

6    A    Because I was tired of being in there and they

7    ain't giving me nothing to eat.  They keep asking me the

8    same questions over and over trying to get me to change

9    my story.

10   Q    On the second night did you sleep?

11   A    No.

12   Q    Was the light on in the room the second night?

13   A    All the nights the light was on.

14   Q    Did you try to sleep on the second night?

15   A    Yes.

16   Q    How come you couldn't?

17   A    I couldn't sleep.  I slept eventually I guess.

18   Q    Eventually you slept?

19   A    I ain't never sleep.  I stay awoke.

20   Q    Did you lay down on the bench?

21   A    Yes.

22   Q    Did you try to sleep?

23   A    No.

24   Q    Did you want to sleep?

1    A    Yes.

2    Q    During the second night did anyone come to

3    speak with you?

4    A    They kept coming in every few hours, second day

5    all the way to the third night.

6    Q    On the third day when did the detectives come

7    to speak with you?

8    A    They came in all day.  They came early in the

9    morning probably about 7:00 something because court was

10   just starting.  You could hear all the clerks running

11   past with the little buggies and stuff like that.

12   Q    You speak with the detectives?

13   A    I didn't say nothing to them.  I told them I

14   want to talk to the lawyer, and that's when they brought

15   in the State's Attorney probably about right on that

16   day.  Sometime they came in ask me the same thing, I

17   told them the same thing.

18   Q    On that third morning was that the first time

19   that you had asked to speak with a lawyer?

20   A    Yes because I was tired of talking to them.

21   They weren't treating me right.

22   Q    What time during that day did the State's

23   Attorney come in?

24   A    I don't know the time it was.  It was later on

**Page 2**

1
2          The deposition of LEONARD LOFTON
3   called for examination by the Defendants pursuant to
4   notice and pursuant to the provisions of the Federal
5   Rules of Civil Procedure of the United States Court,
6   pertaining to the taking of depositions, taken
7   before Arnold N. Goldstine, a Certified Shorthand
8   Reporter within and for the County of Cook and State
9   of Illinois, at 312 North May Street, in the City of
10  Chicago, County of Cook and State of Illinois, on
11  the November 23, 2003, commencing at the hour of
12  1:30 o'clock p.m.
13
14
15
16
17
18
19
20
21
22
23
24

**Page 3**

1   APPEARANCES:
2
3
    Mr. Michael Kanovits, Esq.
4   Mr. Russell Ainsworth, Esq.
    Loevy & Loevy
5   312 North May Street
    Chicago, Illinois 60607
6
       appeared on behalf of the
7      Plaintiff;
8
9
10  Ms. Karey V. Skiermont, Esq.
    Jones Day
11  77 West Wacker Drive
    Chicago, Illinois 60601-1692
12
       appeared on behalf of
13     Defendant City of Chicago;
14
15  Mr. Perry M. Kendall, Esq.
    Ancel, Glink, Diamond, Bush, DiCianni & Rolek, P.C.
16  140 South Dearborn Street
    6300 Sears Tower
17  Chicago, Illinois 60603
18     appeared on behalf of the
       Individual Defendants.
19
20
21
22
23
24

**Page 4**

1
2              I N D E X
3
    WITNESS:              PAGE
4
    LEONARD LOFTON
5
6   DIRECT EXAMINATION
7      BY MS. SKIERMONT      6
8   CROSS EXAMINATION
9      BY MR. KENDALL      55
10     BY MR. KANOVITS      59, 64
11  REDIRECT EXAMINATION
12     BY MS. SKIERMONT      62
13
14
15
16           E X H I B I T S
17
18  LOFTON DEPOSITION NOS.
19  No. 1              15
20
21
22
23
24

**Page 5**

1          (The oath was administered)
2              LEONARD LOFTON
3   having been first duly sworn,
4   was examined and testified as follows:
5          DIRECT EXAMINATION
6   BY MS. SKIERMONT:
7      Q  Mr. Lofton, my name is Karey Skiermont.
8   You can call me Karey, I represent the City of
9   Chicago. I am going to be asking you a bunch of
10  questions today. It is not a police interview.
11  Obviously, this is just a chance to tell your side
12  of the story. And I just want you and I to go
13  through what happened.
14         So, first I have a couple of routine
15  questions.
16         Could you please state your name and
17  address for the record?
18     A  Leonard Lofton. I stay at 1916 South
19  Hardin now.
20     Q  Okay.
21         During this deposition, I'm going to
22  ask you questions. And my questions and your
23  answers are going to be recorded by the gentleman at
24  the end of the table.

Arnold Goldstine & Associates, Ltd.  -  Chicago, IL 60611
agaltd@ameritech.net

312.222.1644                                    Fax 312.222.1645

Page 22

1   A   Yeah. I could turn the light on and off.
2   Q   You say the room was filthy?
3   A   It was filthy.
4   Q   Could you give me some more details about
5   that?
6   A   That was dirt all over the floor. You
7   could see where people who was in there before had
8   spit all over and it smelled like urine.
9   Q   Were there any rats or roaches?
10  A   I didn't see no rats or roaches.
11  Q   I have to ask.
12      Was there anything in the room
13  besides the bench?
14  A   There was a chair in there, but they took
15  the chair out.
16  Q   So you were left in the room with only the
17  bench?
18  A   Yes.
19  Q   But you were not handcuffed to anything in
20  the room?
21  A   No.
22  Q   Okay.
23      Let me go back a little bit.
24      You say you were handcuffed in the

Page 23

1   room for about an hour?
2   A   Yeah. I was sitting behind, my back on
3   the bench.
4   Q   Okay.
5       Your hands were cuffed behind your
6   back on the bench for about an hour, then someone
7   came in and removed the handcuffs?
8   A   Yes.
9   Q   Who came into the room?
10  A   One of the detectives, I think he was the
11  detective that was handling the case.
12  Q   Okay.
13      Was it just one person?
14  A   He came and his partner stood at the door.
15  Q   Was the partner inside the room or outside
16  the room?
17  A   He was standing like in between the door.
18  Q   Okay.
19      Did they talk to you at that time?
20  A   No. They didn't talk to me. They
21  searched me, took my belt. My shoe strings. I
22  asked them why they was doing that. They say well
23  we don't want you to commit suicide.
24  Q   Did you have a watch on at this time?

Page 24

1   A   No.
2   Q   Okay.
3       So you were arrested. Was it a
4   Sunday on the day that you were arrested?
5   A   Yes.
6   Q   And it was at ten-thirty in the morning?
7   A   Yes.
8   Q   What had you been doing on that day before
9   you were arrested?
10  A   Well, before I got arrested, I remember
11  walking the dog and taking out the garbage. Then I
12  went in my room to watch a video, DVD. And that was
13  it.
14  Q   Okay.
15      Had you had any meals that day before
16  your arrest?
17  A   Yeah, I eat. A bowl of cereal.
18  Q   Had you had anything to drink that day,
19  water, soda?
20  A   Well the milk with the cereal.
21  Q   Okay.
22      Had you used the restroom before you
23  had gone, before you had been arrested?
24  A   That was the first thing I do, I get up in

Page 25

1   the morning, shower and wash everything.
2   Q   Okay.
3       Had you had a good night's sleep the
4   night before?
5   A   Yes.
6   Q   Okay.
7       Now, the incident that took place in
8   April of 2001. The actual fight that you had with
9   Mr. Moore.
10      Were you arrested after that fight,
11  were you arrested in April?
12  A   I never was arrested.
13  Q   Okay.
14      Now, in the room upstairs with the
15  bench, what was the temperature, was it cold or hot?
16  A   It was cold.
17  Q   Okay.
18  A   It was hot outside. They had air
19  conditioning.
20  Q   Okay.
21      So you were in there for an hour and
22  they came in and removed your handcuffs, but they
23  did not talk to you at that time?
24  A   No.

7 (Pages 22 to 25)

Page 34

1  State's Attorney came in and told you why you were
2  there, how many more times did people come in to
3  question you about the case?
4  A   I can't say.
5  Q   Were they in and out kind of a lot?
6  A   They was in and out, not a lot, often.
7  Q   Often you would say?
8  A   Yeah.
9  Q   Okay.
10      Was it always the same detective?
11  A   It was the ones who was handling my case.
12  Q   Did the Assistant State's Attorney come in
13  again?
14  A   He came in and tried to get me to make a
15  statement, but I wouldn't make a statement.
16  Q   How did they try to make you give a
17  statement?
18  A   They was telling me that they got
19  witnesses. They got people here that's going to
20  pick me out in the line-up. And I should, you know,
21  be truthful, confess.
22  Q   But did you refuse?
23  A   I refused to give a statement.
24  Q   Okay.

Page 35

1      Was that all that you told them, no,
2  I won't?
3  A   I told them I ain't going to sign nothing
4  because I ain't got no lawyer here.
5  Q   How long would you say that you were in
6  the room with the bench total?
7  A   From Sunday to like Wednesday in the
8  morning in the wee hours of the morning I was down
9  there.
10  Q   But how long were you in the room
11  upstairs?
12  A   From Sunday to the wee hours of the
13  morning on Wednesday.
14  Q   Okay.
15      They didn't take you downstairs at
16  any time?
17  A   No.
18  Q   Were you able to sleep while you were in
19  the room?
20  A   No. I tried to sleep on the bench, it was
21  too small. I had to take my shirt off and sleep on
22  the filthy floor.
23  Q   But you were able to sleep on the floor?
24  A   No, I wasn't able to sleep.

Page 36

1  Q   But you tried?
2  A   I tried. I was worried, I was depressed,
3  I was frustrated. And I couldn't sleep.
4  Q   So at some point the Assistant State's
5  Attorney asked you to write down a statement?
6  A   And I refused.
7  Q   Okay.
8      Did he then write down a statement
9  for you?
10  A   He wrote a statement down.
11  Q   And then he read it out loud to you?
12  A   Yes.
13  Q   Okay.
14      And did you sign the statement?
15  A   I signed the statement. Yeah.
16  Q   Did it accurately reflect what you felt
17  had happened?
18  A   To the fight. Yeah.
19  Q   What all did the statement say?
20  A   I can't remember what it said
21  word-for-word.
22  Q   Did it describe the fight that you had had
23  with Mr. Moore, kind of the way that you described
24  it to me earlier?

Page 37

1  A   Little bit.
2  Q   Okay.
3      Was there anything different?
4  A   Other than me saying I killed him.
5  Q   Did the statement say that you had killed
6  him?
7  A   It say I beat him to death with a blunt
8  object, caused his death.
9  Q   Did the statement say you admitted to
10  doing that?
11  A   Yeah. That's what the statement was
12  about.
13  Q   But you do admit that you had the fight
14  with him?
15  A   I did have a fight with him.
16  Q   Okay.
17      Did the Assistant State's Attorney
18  come in with a videotape recorder?
19  A   I was in the video room.
20  Q   Okay.
21      Did they take you from the room
22  where --
23  A   They took me out of this room right next
24  door to another conference room.

10 (Pages 34 to 37)

**Page 42**

1   Q  Okay.

2     Do you remember what time of day it

3  was or what day it was when you were taken

4  downstairs?

5   A  I couldn't tell.

6   Q  Okay.

7     And what did they do when they took

8  you downstairs?

9   A  When they take you downstairs, they

10  fingerprint you and book you in. They put you in a

11  cell, wait to go to court.

12   Q  Okay.

13     At any time were you taken to be part

14  of a line-up?

15   A  I did a line-up.

16   Q  Okay.

17     When did that happen?

18   A  I couldn't say.

19   Q  Was it before you were taken downstairs?

20   A  When they did the line-up, yeah, before

21  you go downstairs you did the line-up.

22   Q  Okay.

23     Was it at the same time you were

24  taken downstairs?

**Page 43**

1     MR. KANOVITS: Objection to the question.

2  You can answer the question.

3   A  No.

4  BY MS. SKIERMONT:

5   Q  Okay.

6     So at some point while you were in

7  the room upstairs, did someone come in to take you

8  to the line-up?

9   A  When I was arrested they took me -- I was

10  in that room, right the next day or so, that's when

11  I did the line-up.

12   Q  Okay.

13     Then after the line-up did they take

14  you back to the room?

15   A  That's where I stayed at all the time, I

16  was in that room.

17   Q  Then they took you downstairs and put you

18  in the lock-up?

19   A  After everything was over. That's when I

20  went downstairs.

21   Q  Okay.

22     How long were you in the lock-up

23  before you were taken to court?

24   A  Maybe five to six hours, something like

**Page 44**

1  that.

2   Q  Okay.

3     So how many times did you get to eat

4  while you were in the room upstairs?

5   A  Maybe two or three.

6   Q  What did you get to eat?

7   A  They mostly brought Burger Kings and I

8  don't eat meat, so I just eat fries. I left the

9  meat there.

10   Q  You're a vegetarian?

11   A  Yes.

12   Q  Did they provide vegetarian food for you?

13   A  No.

14   Q  The French fries?

15   A  That was it.

16   Q  Okay.

17     So they also brought you some pop?

18   A  The pop come with the little Value Meal,

19  whatever it is.

20   Q  Okay.

21     Did they let you smoke any

22  cigarettes?

23   A  I had my own cigarettes.

24   Q  Okay.

**Page 45**

1     So you smoked cigarettes while you

2  were in the room?

3   A  I smoke them, yes.

4   Q  You had a lighter with you and everything?

5   A  I had matches.

6   Q  Matches.

7     So you were able to smoke while you

8  were in the room?

9   A  Yeah.

10   Q  Were you in any physical pain while you

11  were being held in the room?

12   A  Cold. You couldn't sleep.

13   Q  Right.

14     Other than that?

15   A  My back was aching because I got the

16  bullets in me.

17   Q  But you were not handcuffed?

18   A  No.

19   Q  So what happened once they took you to

20  court?

21   A  I went to court, I was given a bond, the

22  bond was $275,000. And I went through and I was

23  booked.

24   Q  Where did you get taken?

Arnold Goldstine & Associates, Ltd. - Chicago, IL 60611
agaltd@ameritech.net

312.222.1644                                             Fax 312.222.1645

1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF ILLINOIS

 3                    EASTERN DIVISION

 4

 5   JOSEPH LOPEZ,              )

              Plaintiff,        )

 6                              )   Judge Darrah

        -vs-                    )   No.  01 C 1823

 7                              )

     CITY OF CHICAGO, DETECTIVE)

 8   JAMES DELAFONT, DETECTIVE )

     JENNIFER DeLUCIA,          )

 9   DETECTIVE HECTOR VERGARA, )

     OFFICER JOSE GOMEZ,        )

10   OFFICER DANIEL JACOBS and )

     OFFICER ROBERT MYERS,      )

11            Defendants.       )

12        Deposition of JESUS PEREZ, taken before NICOLE

13   MARIE DeBARTOLO, C.S.R., R.P.R., and Notary Public,

14   pursuant to the Federal Rules of Civil Procedure for

15   the United States Courts pertaining to the taking of

16   depositions for the purpose of discovery, at

17   Suite 100, 312 North May, Chicago, Illinois,

18   commencing at 6:10 p.m., on the 20th day of November,

19   2003.

20

21

22

23

24
```

26

```
18:32:42  1    police officers came in?
18:32:42  2       A  Day and a half I was there and then another
18:32:45  3    day and a half downstairs.
18:32:46  4       Q  Okay.  So when you were in the room with the
18:32:51  5    bench, you -- did you sleep at all?
18:32:55  6       A  Probably for about half an hour, 45 minutes
18:32:57  7    the most.
18:32:58  8       Q  So were you trying to sleep or did you nod
18:33:01  9    off?
18:33:01 10       A  I just nodded out, like too exhausted.
18:33:05.11       Q  But you were able to sleep?
18:33:07 12       A  No.
18:33:08 13       Q  But you did fall asleep?
18:33:09 14       A  I did fall asleep eventually, but it was
18:33:12 15    hurting, so, you know...
18:33:14 16       Q  Did you have any dreams while you were
18:33:16 17    sleeping?
18:33:17 18       A  Nightmares.
18:33:18 19       Q  What were your nightmares about?
18:33:21 20       A  My whole life in jail.  You know, not being
18:33:26 21    able to see my daughter being born and whatnot.
18:33:32 22       Q  So you nodded off, you woke up, police
18:33:37 23    officers came in, and you were taken down and -- and
18:33:42 24    booked.  What did they do at that point?  Did they
```

27

```
18:33:44  1    take your fingerprints?
18:33:48  2       A  Everything, fingerprints, picture.
18:33:51  3       Q  Nothing else?
18:33:51  4       A  That's it, nothing else.
18:33:53  5       Q  And then what happened?
18:33:54  6       A  I was asking if I could make my phone call,
18:33:56  7    and eventually they did, and as I was calling my
18:34:01  8    girlfriend, the guard wouldn't let me talk to my
18:34:04  9    girlfriend and let her know where I was at, what was
18:34:07 10    going on, so he hurried me up.  Luckily enough I got
18:34:16 11    the information to my girl and she got the lawyers to
18:34:18 12    get me out.
18:34:19 13       Q  So when were you allowed to make the phone
18:34:21 14    call?
18:34:21 15       A  When they booked us and everything.
18:34:23 16       Q  Was it right after you were booked?
18:34:25 17       A  Not right after.  I had to wait for at least
18:34:27 18    an hour or so.
18:34:28 19       Q  Where did you wait?
18:34:29 20       A  In the cell.
18:34:30 21       Q  They put you in a cell?
18:34:32 22       A  Yeah.
18:34:32 23       Q  What did the cell look like?
18:34:33 24       A  Bars, benches on the side, toilet in the
```

28

```
18:34:37  1    middle.
18:34:37  2       Q  Was there -- so you say there was a toilet
18:34:40  3    and two benches?
18:34:41  4       A  Uh-hum.
18:34:41  5       Q  One on each side?
18:34:43  6       A  Yes, ma'am.
18:34:43  7       Q  Would you say that they were kind of bunks?
18:34:45  8       A  No.
18:34:46  9       Q  Just benches?
18:34:47 10       A  Steel benches.
18:34:48 11       Q  Okay.  How wide were they?
18:34:51 12       A  I would say about six feet wide.
18:34:58 13       Q  Would you have been able to lie down on one
18:35:01 14    of them?
18:35:01 15       A  Yeah.
18:35:01 16       Q  Did you lie down on one of them?
18:35:03 17       A  I did lie down because my --
18:35:06 18       Q  Did you sleep at all?
18:35:07 19       A  No, I couldn't sleep.  I wanted to fall
18:35:09 20    asleep, but I was just thinking.  Every time I would
18:35:13 21    hear someone opening the door, I would get up hoping
18:35:17 22    it was my turn to get out.
18:35:18 23       Q  You said also there was a toilet in your
18:35:20 24    cell?
```

29

```
18:35:20  1       A  Uh-hum.  A little fountain for water,
18:35:23  2    drinking fountain.
18:35:24  3       Q  So you had a toilet and you had water?
18:35:26  4       A  Uh-hum.
18:35:27  5       Q  And you were in the cell for an hour and they
18:35:30  6    let you make a phone call, right?
18:35:31  7       A  Uh-hum.
18:35:32  8       Q  And you called your girlfriend and told her
18:35:34  9    where you were?
18:35:34 10       A  Uh-hum.
18:35:37 11       Q  Could you answer with a yes?
18:35:39 12       A  Yes.
18:35:40 13       Q  Thank you.  And your girlfriend called a
18:35:45 14    lawyer for you?
18:35:46 15       A  She called my sister because I couldn't get
18:35:49 16    across to my sister, and after that I don't know if
18:35:54 17    she got the lawyer or my sister got the lawyer, but
18:35:57 18    they got me out eventually.  Not that same day, but
18:36:02 19    you know...
18:36:02 20       Q  So after you made your phone call, did you go
18:36:05 21    back to your cell?
18:36:06 22       A  Yeah.
18:36:06 23       Q  And was there a police officer with you the
18:36:09 24    whole time that you made your phone call and went
```

8 (Pages 26 to 29)

1

1          IN THE DISTRICT COURT OF THE UNITED STATES

          FOR THE NORTHERN DISTRICT OF ILLINOIS

2                 EASTERN DIVISION

3

   JOSEPH LOPEZ,               )

4                     )

            Plaintiff,   )

5                     )

          -vs-         )  No. 01 C 1823

6                     )

   CITY OF CHICAGO,        )

7                     )

           Defendant.   )

8

9         Deposition of MARIO PEREZ taken before

10  TIMI M. HANNON, C.S.R., R.P.R., and Notary Public,

11  pursuant to the Federal Rules of Civil Procedure for the

12  United States District Courts pertaining to the taking

13  of depositions, at Suite 100, 312 North May Street, in

14  the City of Chicago, Cook County, Illinois at 1:43

15  o'clock p.m. on the 22nd day of November, A.D. 2003.

16

17

18

19

20

21

22

23

24

28 (Pages 106 to 109)

**106**

1 Q I'm just asking you if there was a settlement
2 for an amount of money?
3 A Yes.
4 Q Okay. Have you filed any other lawsuits?
5 A No.
6 Q Do you feel that you were harmed by your
7 experience in the police lockup in March of 2001?
8 A Yes.
9 Q How do you feel that you were harmed?
10 A I feel I was harmed because recently I had
11 gotten beaten up by the police. And then now I was
12 going to jail for something I didn't do.
13 Q Do you feel that you were harmed by the
14 questioning that was done by the officers?
15 A Yes.
16 Q How do you feel that you were harmed?
17 A They were just telling me bad, bad things, and
18 what's going to happen to me.
19 Q What do you feel your harm was?
20 A I was going to jail for a long time.
21 Q Do you feel that you were harmed because you
22 were wrongfully accused?
23 A Yes.
24 Q Did you feel harm in any other way from your

**107**

1 time in March 2001 at the police station?
2 A No.
3 Q As a result of the harm that you felt during
4 that time, have you seen a therapist?
5 A No.
6 Q Have you seen a doctor?
7 A No.
8 Q Have you done anything as a result of that harm?
9 A No.
10 MS. HAWLEY: I don't have anymore questions.
11 MS. BENWAY: I don't.
12 MR. KANOVITZ: I have a couple.
13 EXAMINATION
14 BY MR. KANOVITZ:
15 Q Mr. Perez, at the beginning of your deposition,
16 you were talking about the reasons why you feel that
17 what happened to you was wrong and what would have
18 happened to the other people in the class was wrong. Do
19 you recall testifying to that?
20 A Yes.
21 Q Okay. Do you feel that the detention that you
22 experienced at the Chicago Police Department was wrong?
23 A Yes.
24 Q Do you feel that similar detentions that other

**108**

1 people may have experienced would be wrong, also?
2 A Yes.
3 Q Okay. Why?
4 A They shouldn't happen to anybody.
5 Q Do you feel that you were mistreated while you
6 were detained?
7 A Yes.
8 Q Okay. What sorts of things were done to you
9 that you consider to be mistreatment?
10 A Well, my rights taken away from me.
11 Q All right. Do you feel like you were properly
12 fed while you were in the custody of the Chicago Police
13 Department?
14 A No.
15 Q Do you feel that your needs, your human needs as
16 a person were being met?
17 A Yes.
18 Q Do you feel that your needs for sleep were being
19 met?
20 A Yes.
21 Q You do? Were being met or denied?
22 A Well, what do you mean by met?
23 Q Well, is it your habit to sleep every day?
24 A Oh, no.

**109**

1 Q No, you don't sleep every day?
2 A Yes, I sleep, but I couldn't sleep at the time
3 when I was —
4 Q In custody?
5 A Yes.
6 Q So do you feel like — Do you normally need
7 sleep every day?
8 A Yes.
9 Q Do you feel like your need for sleep was met
10 while you were at the police department?
11 A Yes.
12 Q How was it met?
13 A Couldn't really sleep.
14 Q Okay. Do you know what I mean by having a need
15 met?
16 A No.
17 Q Okay. Like if you need food — This would be an
18 example. Your need for food would be met by having
19 somebody give you food. Let me try asking a different
20 way, and I apologize for being confusing about this.
21 Were you able to get the sleep that you
22 normally need while you were in the custody of the
23 Chicago Police Department?
24 A I didn't, no.

1

1          IN THE DISTRICT COURT OF THE UNITED STATES

            FOR THE NORTHERN DISTRICT OF ILLINOIS

2                   EASTERN DIVISION

3

    JOSEPH LOPEZ,                )

4                              )

             Plaintiff,   )

5                              )

         -vs-           )  No. 01 C 1823

6                              )

    CITY OF CHICAGO,       )

7                              )

             Defendant.   )

8

9          Deposition of DENNY ROBINSON taken before

10   TIMI M. HANNON, C.S.R., R.P.R., and Notary Public,

11   pursuant to the Federal Rules of Civil Procedure for the

12   United States District Courts pertaining to the taking

13   of depositions, at Suite 100, 312 North May Street, in

14   the City of Chicago, Cook County, Illinois at 11:25

15   o'clock a.m. on the 22nd day of November, A.D. 2003.

16

17

18

19

20

21

22

23

24

16 (Pages 58 to 61)

58

1   A   Yes.
2   Q   Did he let you use the washroom by yourself?
3   A   What do you mean?
4   Q   Did he go into the washroom with you?
5   A   Yes.
6   Q   Were you handcuffed?
7   A   My left arm.
8   Q   Did you use the washroom again that day?
9   A   I don't remember.
10  Q   When you needed to use the washroom, how did you
11  let the detective know?
12  A   I had to yell or stretch across the room and
13  kick the door.
14  Q   When you did that, did someone respond?
15  A   Occasionally.
16  Q   When you say occasionally, what do you mean?
17  A   Sometimes they did; sometimes they didn't.
18  Q   About how many times do you think you yelled to
19  use the washroom?
20  A   About three.
21  Q   About how many times did someone respond to your
22  yelling to use the washroom?
23  A   I think twice. One time they just — Somebody
24  raised the paper, looked in, and then kept going.

59

1   Q   And the other two times, someone did respond?
2   A   No. One time. I said they — Two times they
3   responded. Once they — I went to the washroom. Once
4   they raised the paper, looked in and kept going.
5   Q   About how many times did you reach over and kick
6   the door to get attention?
7   A   Twice.
8   Q   Did someone respond both of those times?
9   A   Yes.
10  Q   Did you use the washroom those two times?
11  A   One of those times.
12  Q   Why did you not use the washroom the other time?
13  A   Because the officer just looked. Raised the
14  paper, looked in, and just kept going.
15  Q   So on this first day, do you think you used the
16  washroom twice?
17  A   Yes.
18  Q   And both of those times, was it Detective Downs
19  that took you?
20  A   No. Once was Detective Downs.
21  Q   Who took you the other time?
22  A   I don't know.
23  Q   Were you handcuffed?
24  A   My left arm.

60

1   Q   Were you ever thirsty on that first day?
2   A   Yes.
3   Q   Did you ever ask for any water?
4   A   I had drank some water when I went to the
5   restroom.
6   Q   Did you drink water at any other time?
7   A   No.
8   Q   Did you ever ask for water any other time?
9   A   No.
10  Q   Did anyone ever ask you if you wanted something
11  to drink?
12  A   No.
13  Q   Did anyone ever ask you if you wanted something
14  to eat other than the lunch that you had and the bologna
15  sandwich you had in the evening?
16  A   No.
17  Q   Did you ever ask anyone for something to eat?
18  A   Yes.
19  Q   When was that?
20  A   That day around 5:00.
21  Q   Who did you ask?
22  A   One of the officers. I don't know his name.
23  Q   What did he say when you asked?
24  A   You'll eat when everybody else eat.

61

1   Q   Did he indicate when that might be?
2   A   No, he didn't.
3   Q   Did you ask him?
4   A   Yes, I did.
5   Q   What did he respond?
6   A   He didn't.
7   Q   After you had the bologna sandwich that night,
8   what happened after that?
9   A   Nothing.
10  Q   When is the next time that you saw a police
11  officer?
12  A   The following morning.
13  Q   That night, did you sleep in the room?
14  A   I rested my eyes, yes.
15  Q   Did you actually fall asleep?
16  A   Not — No.
17  Q   Why is that?
18  A   Because I was very uncomfortable.
19  Q   Why were you uncomfortable?
20  A   Because my arm was suspended in the air.
21  Q   Did you try to lie down?
22  A   I tried to.
23  Q   How much of the time do you think you were lying
24  down?

1

2              IN THE UNITED STATES DISTRICT COURT

3            FOR THE NORTHERN DISTRICT OF ILLINOIS

4                       EASTERN DIVISION

5

6    JOSEPH LOPEZ,                    )

7                 Plaintiff,         )

8         vs.                        ) No. 01 C 1823

9    CITY OF CHICAGO, DETECTIVE )

10   JAMES DELAFONT, et al.,         )

11                Defendants.  )

12   _____)

13

14

15

16                     DEPOSITION OF

17                     RYAN SOLOMON

18                   November 20, 2003

19

20

21

22

23

24

**Page 34**

1   Put your hands up. Get in the car. Put the
2   handcuffs on me.
3       Q. Did they say, "You're under arrest"?
4       A. No.
5       Q. When you arrived at the police
6   station, who took you into the police station?
7       A. The police.
8       Q. The police who were in the car with
9   you?
10      A. Yeah.
11      Q. Okay. Where did they take you in the
12  police station?
13      A. To a little room.
14      Q. Where was the little room in the
15  police station?
16      A. Like, first get in -- when you first
17  walk in, on this side or something (indicating).
18      Q. The witness was indicating on the --
19  on which side as you walk in?
20      A. On the left.
21      Q. Did you go up any stairs?
22      A. No.
23      Q. Tell me about the room that they took
24  you into. What was it like?

**Page 35**

1       A. It was like a little room with a
2   door -- I mean with a little window with a white
3   piece of paper covering it.
4       Q. Was the window in the door?
5       A. Yeah, it was in the door.
6       Q. Was it covered with white paper on
7   the inside or the outside of the door?
8       A. Outside.
9       Q. Did they take you into the room?
10      A. Yeah.
11      Q. Where did you go when you got into
12  the room?
13      A. Where did I go? On the little bench.
14      Q. So, what was inside the room in terms
15  of furnishings?
16      A. A bench, this little ring thing that
17  they handcuffed me to.
18      Q. Where was the little ring thing?
19      A. On the wall.
20      Q. Was it behind the bench?
21      A. Yeah. It was, like, the bench right
22  here, and the ring right there on the wall
23  screwed in (indicating).
24      Q. How high was the ring in terms of how

**Page 36**

1   you were sitting?
2       A. Like this, about like this
3   (indicating).
4       Q. Would you say -- the witness is
5   gesturing, and it looks like you're saying -- it
6   looks like you have your arm at waist height.
7       A. Right.
8       Q. Could you put your arms on the bench
9   if you were handcuffed to the ring?
10      A. Probably not this hand that's
11  handcuffed. But there's like a little pole
12  here, too. I can hold it sitting on the pole or
13  whatever. And then my other hand is free.
14      Q. Were you handcuffed to the ring?
15      A. Just one hand was handcuffed to the
16  ring.
17      Q. And what was the bench like?
18      A. Steel.
19      Q. How wide was it?
20      A. About the size of this table, a nice
21  little size.
22      Q. I'm sorry?
23      A. A nice little size.
24      Q. A nice little size?

**Page 37**

1       A. Yeah.
2       Q. Was it wide enough to sit on?
3       A. Yeah, it was wide enough to sit on.
4   Wide enough to sit on but not sleep on.
5       Q. Was it long enough to lie down on?
6       A. Yeah. It was long enough to lie on,
7   but uncomfortable.
8       Q. How tall are you?
9       A. About, like, -- I don't know.
10      Q. Was the bench longer than you or were
11  you longer than the bench if you were lying
12  down?
13      A. Probably longer than the bench if I
14  was lying down.
15      Q. Did you lie down on the bench?
16      A. Yeah, I lied on the bench.
17      Q. Where was your arm that was
18  handcuffed when you were lying down on the
19  bench?
20      A. On the pole, sitting on the pole.
21  Just sitting like this (indicating).
22      Q. So, you could lie down on the bench
23  and rest your handcuffed arm on a pole, is that
24  correct?

10 (Pages 34 to 37)

**Page 50**

1 left after you were hit, did anyone return to
2 the room that you were in?
3 A. No.
4 Q. Did anyone else come to the room that
5 you were in?
6 A. No.
7 Q. What happened then in that room after
8 they left?
9 A. I was just in the room. And I guess
10 it was, like, in the morning, nighttime. I
11 think it was dark outside. And they had took me
12 to Western and 51st, the other station or
13 whatever.
14 Q. Did you spend a night in the little
15 room with the metal bench at 61st before you
16 went to 51st and Wentworth?
17 A. Yes, yeah.
18 Q. Did you sleep that night?
19 A. No, I didn't sleep. I probably dozed
20 off and woke up. But not the full sleep that I
21 would get if I was at home in bed.
22 Q. Did you lie down?
23 A. I laid.
24 Q. From the time that you were brought

**Page 51**

1 to 61st and Racine until the time you left did
2 you have anything to eat?
3 A. No.
4 Q. Did you ask for anything to eat?
5 A. No.
6 Q. Why didn't you ask for anything to
7 eat?
8 A. Because I didn't really have an
9 appetite to eat.
10 Q. Were you thirsty?
11 A. No.
12 Q. Did you ask for anything to drink?
13 A. (Shaking head).
14 Q. Did anyone bring you anything to
15 drink?
16 A. No.
17 Q. Did you have anything to drink?
18 A. No.
19 Q. Did you have to go to the bathroom?
20 A. Yeah.
21 Q. Did you get to go to the bathroom?
22 A. Yeah, they let me go to the washroom
23 once.
24 Q. What happened when you needed to go

**Page 52**

1 to the bathroom?
2 A. Kept me handcuffed behind my back.
3 Brought me to the washroom, a little room like
4 this. I go in and use the washroom, whatever.
5 Q. When you first realized you had to go
6 to the bathroom, were you sitting on the metal
7 bench?
8 A. Yeah.
9 Q. Was there anyone in the room with you
10 at the time?
11 A. No.
12 Q. Did you yell?
13 A. Yeah.
14 Q. Did someone come?
15 A. Yeah.
16 Q. Who came?
17 A. A man. I don't think he was a police
18 or whatever. He was just someone that worked
19 there or whatever. Took me to the washroom.
20 Q. Did they keep you handcuffed while
21 you went to the washroom?
22 A. Yeah.
23 Q. Did they allow you to go into the
24 washroom by yourself?

**Page 53**

1 A. Yeah.
2 Q. Were you able to go to the bathroom
3 by yourself?
4 A. Yes.
5 Q. Then did you return to the metal room
6 after you went to the bathroom?
7 A. Yeah.
8 Q. Were you escorted to the metal room?
9 A. Yeah.
10 Q. Were you handcuffed on your way back
11 to the metal room? I'm sorry. I keep saying,
12 "the metal room." The room with the metal bench
13 is what I mean when I say, "the metal room."
14 I'm sorry.
15 A. Yeah.
16 Q. Were you placed back on the metal
17 bench when you returned to the room?
18 A. Yes.
19 Q. Were you handcuffed when you were
20 returned to the metal room?
21 A. Yes.
22 Q. How many times did you go to the
23 bathroom when you were at 61st and Racine?
24 A. Once.

14 (Pages 50 to 53)

Page 74

1    A. Right, yeah, they left. They left
2 out the room then.
3    Q. Were you left alone in the room?
4    A. Yeah.
5    MR. KANOVITZ: I don't want to
6 interrupt your flow, but when you reach a good
7 stopping point, I'd like to take a break.
8    MR. DUNLOP: Sure. Why don't we take
9 a five-minute break now?
10    (Whereupon a recess was had.)
11    MR. DUNLOP: Would you read back,
12 please, Miss Court Reporter, the last couple of
13 lines?
14    (Whereupon the record was read
15    by the reporter as requested.)
16 BY MR. DUNLOP:
17    Q. What happened after you were left
18 alone in the room at 51st and Wentworth?
19    A. I sat there by myself.
20    Q. How long did you sit there?
21    A. Like 30 minutes, something like that.
22    Q. What happened after 30 minutes?
23    A. Nothing.
24    Q. Did you spend a night in that room?

Page 75

1    A. Yeah.
2    Q. Did anything happen between the time
3 the officers who asked you about your
4 handwriting and your spending the night in the
5 room -- did anything happen between the time the
6 officers left and you went to sleep?
7    A. No.
8    Q. Did you go to sleep?
9    A. I was up. I say I might have went to
10 sleep and woke back up, or whatever, but I
11 wouldn't call it sleep. Probably dozing off and
12 waking up.
13    Q. Did you have trouble sleeping?
14    A. Yeah.
15    Q. Why did you have trouble sleeping?
16    A. That steel bench or whatever.
17    Q. Was there anything on your mind that
18 was keeping you up?
19    A. Yeah. I'm in jail or whatever for
20 something I didn't do.
21    Q. Was that on your mind when you spent
22 the night at 61st and Racine?
23    A. Yes.
24    Q. And did it keep you up when you were

Page 76

1 at 61st and Racine?
2    A. Yeah.
3    Q. While you were at 51st and Wentworth
4 in the room with the metal bench or at any
5 time -- strike that.
6    While you were at 51st and Wentworth,
7 were you given anything to eat?
8    A. No.
9    Q. Did you ask for anything to eat?
10    A. No.
11    Q. I believe you said earlier that when
12 you went to 51st and Wentworth you were hungry?
13    A. Yeah.
14    Q. Did you tell anyone you were hungry?
15    A. No.
16    Q. Why didn't you tell anyone you were
17 hungry?
18    A. I was scared.
19    Q. Did you continue to be scared while
20 you were at 51st and Wentworth?
21    A. Yeah.
22    Q. And were you so scared that you
23 didn't want to ask anyone for something to eat?
24    A. Yeah.

Page 77

1    Q. Did you continue to be hungry?
2    A. Yeah.
3    Q. Were you thirsty?
4    A. Yeah. Not really. I wasn't really
5 thirsty.
6    Q. Why weren't you thirsty?
7    A. I don't know. I wasn't, though.
8    Q. Did you have some water?
9    A. Probably my little juice that I
10 bought from the store. That was about it.
11    Q. Do you mean that you had -- I'm
12 sorry. When did you have the juice from the
13 store?
14    A. I was telling you I had went to the
15 store and I was coming through the alley or
16 whatever and they had grabbed me and put me in
17 the car and took me to 61st Street and Racine.
18    Q. Did you have any water to drink after
19 that?
20    A. No.
21    Q. You didn't have any water to drink at
22 61st and Racine?
23    A. No.
24    Q. I thought you said earlier that you

20 (Pages 74 to 77)

# D.S.O. 79-40     **Chicago Police Department**

**TITLE:**              DETENTION REPORT

**ISSUE DATE:**         **20 December 1979**

**EFFECTIVE DATE:**     **21 December 1979**

**DISTRIBUTION:**       **A**

**RESCINDS:**           **Department Special Order 74-41**

## I.   PURPOSE

This order:

A.   states Department policy relating to detention of adult arrestees.

B.   describes procedures for using the Detention Report (CPD-11.516).

## II.   POLICY

It is Department policy to process an arrested person without unnecessary or unreasonable delay. It is recognized, however, that the time required to complete these processes will vary. It is the responsibility of each Department member to ensure that the reason for detaining any arrestee is valid.

## III.   PURPOSE OF THE DETENTION REPORT

A.   The Detention Report provides district watch commanders, Central Detention watch sergeants and the Identification Section with a written account of persons who were arrested prior to 2400 hours the previous day and who have not been released or sent to court that morning.

B.   The Detention Report provides district commanders and the Commanding Officer of the Central Detention Section with a written explanation of why an arrestee was detained past the morning court call.

## IV.   PROCEDURES

A.   Initiation by Lockup Personnel

D.S.O.  79-40        **DETENTION REPORT**
ISSUE DATE:          **20 December 1979**


EXHIBIT
X

1. Each day, at the beginning of the 2nd watch, lockup keepers assigned to the Central Detention Section and Districts 2 through 21, 23 and 24 will determine if any persons arrested prior to 2400 hours the previous day, male or female, have not been released or sent to court.

    a. If all arrestees have been released or sent to court, the lockup keeper will prepare the Detention Report, entering the following statement, "NO OUTSTANDING C.B. NOS." He will then submit the report to the 2nd watch commander for review.

    b. After reviewing the Detention Report, the 2nd watch commander will initial it in the lower left-hand corner and forward the report to the district commander for his approval and signature.

    c. Central Detention Section watch commanders will follow the same procedures as outlined and forward the report to the Commanding Officer of the Central Detention Section for his approval and signature.

2. If for any reason an arrestee has not been released or sent to court (confined to hospital, awaiting line-up, etc.), the lockup keeper will prepare two copies of the Detention Report and submit them to the 2nd watch commander for review. The report will contain the following information: arrestee's name, CB number, reason for arrest, date and time of arrest, date and time charged, and a written explanation of why the arrestee has not been released or sent to court.

    a. After reviewing the Detention Report, the 2nd watch commander will indicate his approval by initialing the report in the lower left-hand corner. If, in the opinion of the 2nd watch commander. continued detention of the arrestee is unwarranted, he will take appropriate action in accordance with the General Order entitled "Processing Persons Under Department Control."

    b. After initialing the report he will:

        (1) forward the original to the district commander for his approval and signature.

(2)     forward the duplicate copy to the Identification Section, via Department Mail, before 0900 hours.

B.     Review by district commander/Commanding Officer of Central Detention Section

1.     Upon receipt of the Detention Report from the 2nd watch commander, district commanders/Commanding Officer of the Central Detention Section will review the report to determine the justification for the extended detention of any arrestee. If it is determined that the reason is not valid and follow-up action is taken, a description of the action will be documented on the reverse side of the report.

2.     After the Detention Report has been approved, the district commander/Commanding Officer of the Central Detention Section will sign it. The report will then be:

a.     filed by date.

b.     Maintained in a location within the unit where it will be available for inspection on a 24 hour basis.

c.     RETENTION OF THE DETENTION REPORT CPD -11.516 IS CHANGED TO 3 YEARS.
(Item IV-B-2-c amended, 31 Mar 89, Facsimile Message 89-02036).

3.     In the brief absence of the district commander/Commanding Officer of the Central Detention Section (Saturday, Sunday, holiday, etc.), the second watch commander's approval will suffice for that particular absence only.

C.     Review by the Identification Section

Upon receipt of the duplicate copies of the Detention Report from the districts and Central Detention Section, Identification Section personnel will:

1.     refer to the Arrest Control Set (CPD-31.200) which contains those CB numbers that have not been matched with the blue copy of the Arrest Report bearing the same CB number. (The blue copy of the Arrest Report is sent to the Identification Section when the arrestee is either released or sent to court.)

2.     match Arrest Control Sets with the duplicate copy of the Detention

Report (received from the districts or Central Detention Section) if the blue copy of the Arrest Report has not been received. This matched set will then be placed in a suspense file until the blue copy of the Arrest Report is received.

a.   Upon receipt of the blue copy of the Arrest Report, destroy the duplicate copy of the Detention Report. If more than one arrestee is listed on a Detention Report, the Detention Report will be retained until the blue copy of the Arrest Report for each arrestee has been matched which the Arrest Control Set.

b.   If neither a Detention Report nor the blue copy of an Arrest Report is received by 1300 hours, the Identification Section will contact the concerned unit by PAX and inform the desk sergeant/Central Detention Section watch commander of the deficiency. The desk sergeant/Central Detention Section watch commander will be responsible for correcting the deficiency.

Authenticated by:

Joseph DiLeonardi
Acting Superintendent of Police

18-79 WGE (JHP)

# FACSIMILE MESSAGE

| | |
|---|---|
| **Issue Date:** | **22 March 1989** |
| **Message Number:** | **89-01844** |
| **To:** | **All Department Members** |
| **From:** | **Joseph P.  Beazley**<br>**Commander Research & Development** |

**Message:**

DEPARTMENT SPECIAL ORDER 79-40 ENTITLED "DETENTION REPORT" is amended as follows:

| | | |
|---|---|---|
| D.S.O.  79-40 | DETENTION REPORT | |
| ISSUE DATE: | 20 December 1979 | Page 4 |

ITEM IV-B-2-c IS AMENDED TO READ:

c - RETAINED IN ACCORDANCE WITH EXISTING RECORDS RETENTION REQUIREMENTS
DEPARTMENT MEMBERS WILL ANNOTATE THEIR COPY OF THE ABOVE CITED DIRECTIVE TO REFLECT THIS CHANGE

TO BE READ AT ROLL CALL FOR THREE DAYS

# FACSIMILE MESSAGE

**Issue Date:**           **31 March 1989**

**Message Number:**       **89-02036**

**To:**                   **All Department Members**

**From:**                 **Joseph P. Beazley Commander Research and Development**

**Message:**

RETENTION OF THE DETENTION REPORT CPD -11.516 IS CHANGED TO 3 YEARS

DEPARTMENT MEMBERS WILL ANNOTATE THEIR COPY OF THE RETENTION SCHEDULE PAGE 4 TO REFLECT THIS CHANGE

```
1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
2                         EASTERN DIVISION

3

4  JOSEPH LOPEZ,                    )  Docket No. 01 C 1823
                                    )
5            Plaintiff,             )
                                    )  Chicago, Illinois
6            vs.                    )  March 14, 2005
                                    )  1:15 o'clock p.m.
7  CITY OF CHICAGO, et al.,         )
                                    )
8            Defendants.            )

9

10                          VOLUME 1A
                  TRANSCRIPT OF PROCEEDINGS, Trial
11      BEFORE THE HONORABLE SAMUEL DER-YEGHIAYAN, and a jury

12 APPEARANCES:
   For the Plaintiff:      LOEVY & LOEVY
13                         BY:  MR. ARTHUR R. LOEVY
                                MR. MICHAEL I. KANOVITZ
14                              MR. RUSSELL R. AINSWORTH
                           312 North May Street
15                         Suite 100
                           Chicago, Illinois  60607
16
   For the Defendants:     ANCEL, GLINK, DIAMOND, BUSH, DiCIANNI
17                            & ROLEK, P.C.
                           BY:  MR. THOMAS G. DiCIANNI
18                              MR. ALLEN DUARTE
                                MS. DARCY L. PROCTOR
19                         140 South Dearborn Street
                           6th Floor
20                         Chicago, Illinois  60603

21

22                      LAURA LACIEN, CSR, RMR
23                       Official Court Reporter
                219 South Dearborn Street, Suite 1714
24                     Chicago, Illinois  60604
                          (312) 408-5032
25
```



EXHIBIT

1   wall on the ring.

2   Q.  And can you show the jury where your hand would be when

3   you were sitting in that room?

4   A.  It would be like maybe this high from my body because --

5   the ring on the wall so I'll be sitting like this.

6   Q.  And were you handcuffed from the first moment you were

7   put into that room?

8   A.  Yes, sir.

9   Q.  Okay.  Can you describe the room for the jury?  How big

10  was it?

11  A.  It was maybe like between seven to nine feet both ways.

12  It had one door and a window like this long and this wide.

13  Q.  Could you see out the window?

14  A.  No, sir.

15  Q.  Why not?

16  A.  It had typing paper from top to bottom.

17  Q.  What did you think when you saw the typing paper?

18  A.  That they were holding me back from something and I had

19  no clue what it was but it didn't seem right to me.

20  Q.  Was there a bench in the room?

21  A.  Yes, sir.

22  Q.  How big was it roughly?

23  A.  Probably like maybe three to four feet long and nine to

24  11 inches width.

25  Q.  Okay.  What was the bench made out of?

1  Q.  Did you try to sleep while you were in the room?

2  A.  Yes, sir.

3  Q.  Did you try to lay down and sleep while you were in the

4  room?

5  A.  Yes, sir, but it wasn't -- it wasn't good for me.

6  Q.  Can you explain to the jury in your own words how it is

7  that you tried to lay down to sleep in the room?

8  A.  Well, it being that my hand was handcuffed to the ring on

9  the wall, I had to extend my arm over the bench and at the

10 same time hold myself with the pressure of me pulling myself

11 to the ring and lay like this on the floor and try to at

12 least get a nap in.

13       MR. KANOVITZ:  Your Honor, could he step down and

14 demonstrate how he had to situate his body?

15       THE COURT:  Yes.  He can.  Assume the door knob is

16 the ring.  Counsels may approach.

17    (Witness steps down.)

18       THE WITNESS:  I was laying like this --

19       THE COURT:  The jury, you could stand up and watch

20 him.

21       THE WITNESS:  I was laying on the floor like this

22 and my head over the bench and my arm extended to the ring

23 but at the same time my body weight was pulling my arm down

24 so I would have to try to hold myself up and hold myself

25 right here with my hand.

1    THE COURT:  Thank you.

2    (Witness resumes stand.)

3    THE COURT:  Let the record reflect that the witness

4  demonstrated how he was handcuffed and how he laid down in

5  his opinion.

6  BY MR. KANOVITZ:

7  Q.  Was the floor that you had to lay on clean?

8  A.  No, sir.

9  Q.  Were you able to fall asleep in that position?

10  A.  Yes.  I did, sir.

11  Q.  Okay.  How long did you fall asleep for?

12  A.  I don't know how long I fell asleep but I woke up in

13  pain.

14  Q.  Can you explain?

15  A.  I woke up to feeling my hand like if it was hot, burning

16  and cold at the same time.  And for me holding my arm up like

17  this, it got kind of stuck in the position it was.  It was

18  turning like a purplish blue and it was like sending little

19  shock waves down my arm.

20    And plus, I had -- when I got up, I had a little red

21  line from me trying to prop myself on the bench.  And my

22  side, my shoulder was hurting, my hip was hurting and my

23  knees were hurting from my body weight was trying to like --

24  I don't know.  I was trying to like hold my body up at the

25  same time, relax myself.  So as my body laid up there, I

**Lopez - Direct**

1  guess from me sleeping, my arm kind of lost all circulation

2  in it and then my shoulder started hurting, my hip and my

3  knees.

4  Q.  What did you do when you woke up and felt that pain?

5  A.  Well, I woke up and I sat back on the bench and I leveled

6  my arm with the ring and I started to go like this to try to

7  get circulation back to my arm.  But every time I wave and

8  try to open my hand, it would hurt.

9  Q.  How long did that last?

10  A.  I don't know, sir.

11  Q.  Did you ever, during the time that you were in that room,

12  try to lay down like that again?

13  A.  No, sir.

14  Q.  Did you try to sleep again while you were in that room?

15  A.  Yes, sir.

16  Q.  Can you tell the jury how you tried to sleep after

17  that?

18  A.  I will sit straight up and have my hand, of course, on

19  the ring and I will try to lean and go to sleep.  And every

20  time I would notice I was sleeping is because I was hitting

21  my head on the wall.

22  Q.  Do you know how long you were able to fall asleep at a

23  time like that?

24  A.  No, sir; and I know it wasn't that long.

25  Q.  Was that sleep restful for you?

1  A.  No, sir.

2  Q.  Was it restorative in any way?

3          MR. DiCIANNI:  Objection.

4          THE COURT:  Basis of objection?

5          MR. DiCIANNI:  Restorative, it's vague and

6  speculative.

7          THE COURT:  I'll sustain the objection.

8  BY MR. KANOVITZ:

9  Q.  Did you feel rested when you woke up from sleeping in

10  that way?

11  A.  No, sir.

12  Q.  Did you recall at one point while you were in the room

13  hearing Sophie's voice outside of the room?

14  A.  Yes, sir.

15  Q.  What do you recall about that?

16  A.  I can remember her -- I don't know what she was saying

17  but I know I recognized her voice.

18  Q.  Was she trying to talk to you as far as you could tell?

19  A.  I believe she was like talking as she was walking past

20  the door, like talking to one of the detectives or something

21  like that.

22  Q.  Do you know how long you had been in custody when you

23  heard her voice?

24  A.  No, sir.

25  Q.  Do you know how long it had been since you had slept when

1  at that time?

2  A.  No, sir.

3  Q.  Did you know that your grandmother was not in the room?

4  A.  I knew she wasn't there but I don't know why I was still

5  talking to her.

6  Q.  Did you retain the ability to control your own thoughts

7  at that point?

8  A.  No, sir.

9  Q.  Can you explain what you mean?

10 A.  I couldn't -- I couldn't even put my ideas in place.  I

11 couldn't even think straight.  And every time I would, like,

12 say something, I would tell myself man, you know, I didn't

13 shoot that little boy and then a voice will click in and say

14 yeah, you did shoot him.

15 Q.  Can you describe this voice?

16 A.  It was -- I know it wasn't no girl voice or nothing like

17 that.  It was just some voice that was coming from the back

18 of my head just kept telling me yeah, you did shoot him.  So

19 after awhile me fighting against that voice, it just came

20 true.  I was like you know what, I started to believe that I

21 did shoot her.

22 Q.  Okay.  Was this a voice that was inside of your head or

23 did you hear it coming from outside?

24 A.  Inside my head, sir.

25 Q.  Okay.  Had you ever heard a voice like that before?

1  A.  Never in my life, sir.

2  Q.  Was it frightening when you heard that voice?

3  A.  Frightening, yes.  And at the same time, I was like whoa

4  because this ain't ever, ever happened to me in my life.

5  Q.  What did you think that voice was?

6  A.  I don't know.

7  Q.  Did you -- was it in -- when you heard that voice, did it

8  sound like your own thoughts or did it sound like something

9  else?

10        MR. DiCIANNI:  I'll object to lack of foundation for

11  that.

12        THE COURT:  I'll sustain the objection.  Your own

13  thoughts -- I mean, he testified he heard something deep

14  inside him.

15  BY MR. KANOVITZ:

16  Q.  The voice you heard, was that the same voice that you

17  hear when you hear yourself talking or was it someone else's

18  voice?

19  A.  I know --

20        MR. DiCIANNI:  Same objection.

21        THE COURT:  Okay.  One second.

22        MR. DiCIANNI:  Same objection.

23        THE COURT:  I'll allow you to ask the question if

24  the voice was his own voice.

25        MR. KANOVITZ:  Okay.

1   BY MR. KANOVITZ:

2   Q.   Was the voice your own voice?

3   A.   No, sir.

4   Q.   Okay.  Do you know how long it had been since you slept

5   at this point?

6   A.   No, sir.  At that point in time, I was actually losing my

7   marbles and I believe I was going crazy, sir.

8   Q.   Had you had anything to eat at this point, sir?

9   A.   No, sir.

10  Q.   Did you ever experience visual hallucinations while you

11  were in the room?

12  A.   Yes, sir.

13  Q.   Can you explain?

14  A.   I was sitting there for a while and after me crying so

15  much and trying to put thoughts all together, which wasn't

16  even going together, I was sitting looking at the wall and I

17  would feel like the wall was like coming in closer.  And as I

18  would feel it, it looked like it was coming in closer to

19  me.

20  Q.   Do you know how long that went on for?

21  A.   I don't know, sir.

22  Q.   Do you know how many times you saw that happening?

23  A.   I think it was happening every time I looked at the

24  wall.

25  Q.   How long had you been in custody at that point?

1  A.   I have no clue, sir, how long I was there.

2  Q.   Do you remember the night that you confessed to the

3  murder of the little boy?

4  A.   Yes, sir.

5  Q.   Describe how you were feeling physically at that point.

6  A.   I know my body was aching because, like I said, my arm

7  was already hurting.  My back was hurting.  My stomach was

8  hurting.  My eyes were hurting.  They were kind of swollen

9  already.  I had a hoarse throat from screaming, yelling,

10 talking to myself and I just felt exhausted.

11 Q.   How was your mind working at that point?

12 A.   It wasn't working at all.

13 Q.   Do you feel that you retained the ability to think

14 rationally at that point?

15 A.   No, sir.

16 Q.   Did you eventually have a conversation in that state

17 where a detective asked you if you were ready to confess?

18 A.   What you mean, in the conversation with one of the

19 detectives?

20 Q.   Yes.

21 A.   Yes, sir.

22 Q.   Okay.  And did you offer to confess or were you asked if

23 you were ready to confess?

24 A.   I don't remember if I offered or if I was asked.

25 Q.   Okay.  What detective did you have that conversation

1   with?

2   A.   Detective Jacobs, sir.

3   Q.   What did you tell him?

4   A.   Well, I didn't tell him nothing.  He kept telling me to

5   just confess and to just get it over with.  And after, like I

6   was saying, so long of me fighting myself telling me I didn't

7   do it, the voice was like overpowering me and kept telling me

8   I did do it so I honestly believe I did it so that's -- and I

9   told him I will confess.

10  Q.   At the time that you told him that you were ready to

11  confess, you in fact believed that you had done the murder?

12  A.   Yes, sir.

13  Q.   Did you tell him anything else at that time?

14  A.   Well, right before I told him I will confess, I was like

15  I'll talk to you if you can get a picture for -- no, a letter

16  or if I could talk to Sophie and that he insists that he can

17  get a letter for me.

18  Q.   What did you say to that?

19  A.   I said okay.

20  Q.   Did he eventually bring you a letter?

21  A.   Yes, sir.

22  Q.   And did he bring you a picture?

23  A.   Yes, sir.

24  Q.   What was the picture of?

25  A.   It was a picture of Sophia and her niece.

1  Q.  Okay.  And had you ever seen that picture before?

2  A.  No, sir.

3  Q.  And he brought you a letter?

4  A.  Yes, sir.

5  Q.  Did he leave you alone in the room with the letter?

6  A.  Yes, sir.

7  Q.  Did he tell you anything when he handed you the letter?

8  A.  No, sir.

9  Q.  Okay.  What did the letter say?

10  A.  She wrote on the letter that she loves me, she misses me

11  and she was going to be there until I get out and she was

12  pregnant.

13  Q.  Okay.  Did you know that she was pregnant at that

14  point?

15  A.  I had an idea but I wasn't sure.

16  Q.  Okay.  Did she tell you if she had gotten a test and

17  found out that she was pregnant?

18  A.  Yes, sir.

19  Q.  Do you know how long you had been in police custody at

20  that point when you read that letter?

21  A.  No, sir.

22  Q.  Do you know how long it had been since you had slept last

23  when you read that letter?

24  A.  No, sir.  I didn't know nothing.  At that time, like I

25  said, my mind was nowhere near my head.  My head wasn't even

1    on my body, I think.

2    Q.  Do you know if it was day or night?

3    A.  No, sir.

4    Q.  How long did it take you to read the letter?

5    A.  Not long.

6    Q.  Okay.  What did you do with the letter after you read

7    it?

8    A.  I put it in my pocket, sir.

9    Q.  What did you do with the picture?

10   A.  I broke the picture and I took one of them because there

11   was two pictures in there.  It was a key chain.  There was

12   two pictures in there.  I broke the plastic casing.  I put

13   the other picture in my pocket.

14   Q.  Why did you do that?

15   A.  Because there was two pictures in there and they said

16   they were going to take it back from me because I couldn't

17   keep the pictures with me so I broke it.  I took one and put

18   it in my pocket.

19   Q.  Okay.  What happened next?

20   A.  I believe Detective Jacobs came in and it was Delafont

21   with a state's attorney, sir.

22   Q.  And can you describe the state's attorney?

23   A.  She was a lady and she was pregnant.

24   Q.  And what happened next?

25   A.  I confessed, sir.

1    Q.    Did you respond to specific questions?

2    A.    I don't remember if they were asking me any questions.

3    Q.    Okay.  How did you know it was time to confess?

4    A.    Because she had came in with a notebook paper, a yellow

5    notebook pad and a pen so I figured it's time for me to

6    confess.  And plus, they already told me when they come back

7    that it was going to be time for me to confess.

8    Q.    Do you know how long it took you to confess?

9    A.    No, sir.

10   Q.    Do you remember what you told the state's attorney?

11   A.    I can't remember everything, sir, but I remember a little

12   bit.

13   Q.    Okay.  Did you know at the time that you were giving that

14   confession whether you were the murderer or not?

15   A.    Excuse me?

16   Q.    Did you believe that you had committed the murder at the

17   time that you gave that confession?

18   A.    I didn't believe it.  But like I said, that voice was

19   telling me that I did shoot him so in a way I was like, man,

20   I had "ifs" that I did shoot him.

21   Q.    Do you know why you decided to give the state's attorney

22   that confession?

23   A.    No.  I don't, sir.

24   Q.    Did any of the people in the room react while you were

25   giving that confession?

1  A.   No, sir.

2  Q.   Did anybody in the room say anything while you were

3  giving that confession?

4  A.   I don't remember if they were saying anything but I know

5  there was no reaction.

6  Q.   Okay.   What happened after -- what happened after you

7  finished giving your confession to the state's attorney?

8  A.   Well, all three of them left out of the room and it was

9  kind of harder on me because I seen that the lady was

10  pregnant and I had just found out that my girl was actually

11  pregnant so it kind of made it worse.   It was like throwing

12  another 200 pounds on my back.

13          MR. DiCIANNI:   I'm sorry.   I didn't hear that last

14  comment.

15          THE COURT:   It kind of felt like 200 pounds on his

16  back.

17  BY MR. KANOVITZ:

18  Q.   Where did you get the details of the story that you gave

19  to the state's attorney?

20  A.   From Detective Jacobs coming in and asking me are you

21  sure you weren't in this place at this time.

22  Q.   Okay.   Were you playing games with the police when you

23  gave that confession?

24  A.   No, sir.

25  Q.   Were you trying to cover up for somebody when you gave

1  that confession?

2  A.  No, sir, because I didn't know nobody or anything.  I

3  didn't have no clue about nothing.  All I knew is what they

4  told me.

5  Q.  Did you have any idea who had committed this murder at

6  the time that you gave that confession?

7  A.  No.

8  Q.  Did you think that when you gave that confession that

9  you'd be allowed to leave the room?

10  A.  I wasn't sure what was going to happen afterwards.  All I

11  figured out is that maybe they were going to take me down to

12  lockup already and send me to the county.

13  Q.  Okay.  Do you know what time of day it was when you

14  finished giving the confession?

15  A.  No, sir.

16  Q.  Had you had anything to eat when you gave that

17  confession?

18  A.  No, sir.

19  Q.  Were you handcuffed to the hook when you gave that

20  confession?

21  A.  Yes, sir.

22  Q.  Where were you sitting when you gave that confession?

23  A.  On the bench, sir.

24  Q.  Where did the -- where did Jacobs, Delafont and the

25  state's attorney sit while you were giving that confession?

1   A.   Right in front of me.

2   Q.   Did they bring chairs into the room?

3   A.   Yes, sir.

4   Q.   Did they leave the chairs in the room after they left?

5   A.   No, sir.

6   Q.   Were those chairs padded?

7   A.   I don't remember if those chairs were padded or not.

8   Q.   How long were you alone in the room after you

9   confessed?

10  A.   I'm not sure how long I was there.

11  Q.   What happened next?

12  A.   I remember Detective Jacobs coming back in.  He was kind

13  of mad at me saying that I was a liar and everything I told

14  him was a lie.  So he took the letter and the picture away

15  from me saying that I don't deserve to be a father and that

16  Sophie should have an abortion.

17  Q.   What did you say to him?

18  A.   I told him that I don't think she's going to have an

19  abortion and I didn't shoot nobody, that's why obviously my

20  story didn't match.

21  Q.   Did he tell you what it was about your story that didn't

22  match?

23  A.   No, sir.

24  Q.   Did he tell you that your story, in fact, did not

25  match?

1   A.   Yes, sir.

2   Q.   Did anyone bring you food after you gave that

3   confession?

4   A.   I'm not sure what detective it was but I know they brang

5   me a bologna sandwich.

6   Q.   Did they bring you anything to drink?

7   A.   Yeah.  A little juice.

8   Q.   Do you know how long it was between the time that you

9   gave the confession to the state's attorney and the time that

10   they brought you food?

11   A.   No, sir.

12   Q.   Did you ever see the pregnant state's attorney again?

13   A.   No, sir.

14   Q.   Did she ever tell you her name?

15   A.   I don't remember if she even -- I don't remember if she

16   even talked to me or anything.

17   Q.   After you finished giving her the confession, did she ask

18   you to sign anything?

19   A.   No, sir.

20   Q.   Do you know how much longer you stayed in that room after

21   you gave the confession?

22   A.   No, sir.  I had no recollection of no time or any date of

23   any time.

24   Q.   After you gave that confession, did a detective ever come

25   and tell you that someone had signed a statement against

1   you?

2   A.  Yes, sir.

3   Q.  Okay.  Do you remember how long it was after you

4   confessed?

5   A.  No, sir.

6   Q.  Do you know how long it had been since you had slept at

7   that point?

8   A.  No, sir.

9   Q.  Do you know if it was night or day at that point?

10  A.  No, sir.  I didn't even know if I was still in the same

11  day or where I was at.

12  Q.  Okay.  What did they tell you about the signed

13  statement?

14  A.  They said --

15          MR. DiCIANNI:  Objection.  Can I have a foundation

16  as to when or who he was talking to?

17          THE COURT:  Okay.  "When," he's testified

18  consistently that he didn't know when anything happened.

19          MR. DiCIANNI:  But who is he.

20          THE COURT:  But who is he, I'll allow that.

21  BY MR. KANOVITZ:

22  Q.  Who was it that told you that there had been a statement

23  signed against you?

24          MR. DiCIANNI:  And who is present.

25          THE COURT:  One second.  Let counsel ask the