**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THOMAS DUNN, DENNY ROBINSON, and VERONICA IMPERIAL, on behalf of themselves and a class of others similarly situated, and LEONARD KIMBALL, individually, | ) ) ) ) | No. 04 CV 6804 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | JUDGE GETTLEMAN |
| | ) | |
| CITY OF CHICAGO, | ) | Magistrate Schenkier |
| | ) | |
| Defendant. | ) | JURY TRIAL DEMANDED |

**DEFENDANT CITY OF CHICAGO'S ANSWER, DEFENSES
AND JURY DEMAND TO PLAINTIFF'S SECOND AMENDED COMPLAINT**

Defendant City of Chicago, ("City") by Mara S. Georges, Corporation Counsel for the City

of Chicago for its answer defenses and jury demand to plaintiff's amended complaint, states:

**Introduction**

1.      This is a class action pursuant to 42 U.S.C. Section 1983 challenging the Chicago Police Department's ("CPD" or "'Department'") inhumane and unlawful system for detaining persons under the Department's control.

ANSWER:      The City admits that plaintiffs have filed a purported class action under 42 U.S.C.

§1983 and Fed. R. Civ. P. 23(b)(3).  The City denies the remaining allegations in paragraph 1 and

denies that plaintiffs, or any putative class, are entitled to any award of money damages or any other

relief.

2.      As is explained in detail below, the CPD has engaged, for decades, in a repeated pattern of detaining citizens *incommunicado* within its police departments, holding them for

unconstitutional lengths of time and subjecting them to torture in order to accomplish unjust ends. Plaintiffs bring this case in order to finally put an end to this institutionalized system of police torture in Chicago.

ANSWER:     The City denies the allegations contained in paragraph 2.


3.     The CPD's detention system routinely violates several fundamental constitutional protections guaranteed to all Americans.  One such protection is the right to prompt judicial review of the Department's justification for detaining a citizen in the first place.  This requirement serves to ensure that citizens are not arrested unless the police have a proper justification for interfering in their liberties and to prevent overreaching while the citizen is detained behind closed station house doors.

ANSWER:     The City admits that, upon the charging of an arrestee with a crime, standard CPD

practice is to promptly transfer custody of the arrestee to the Cook County Department of

Corrections, which entity takes them to the probable cause hearing.  The City denies the remaining

allegations contained in paragraph 3.


4.     As explained below, however, the Department routinely flouts this requirement for prompt judicial review by keeping citizens secreted inside its police departments while it attempts to develop grounds that would "justify" detaining them  after the fact.

ANSWER:     The City lacks knowledge or information sufficient to form a belief as to the vague

and non-specific terms "secreted" and "justify" and therefore denies the allegations contained in

paragraph 4.


5.     Another stunning example concerns the failure to provide counsel for those being interrogated during these detentions. It is a bedrock principal of American criminal procedure that police may not interrogate a suspect in their custody if that suspect requests to have an attorney present, unless and until an attorney has been provided.  Although this constitutional mandate is absolutely clear, the CPD literally maintains no policy or directive for obtaining a lawyer if a detainee requests one, leaving its officers no choice but to ignore the requests.

ANSWER: The City maintains the practice of suspending questioning of arrestees if those individuals request an attorney. Plaintiffs misstate the correct legal standard for the appointment of counsel for arrestees. The City denies the remaining allegations contained in paragraph 5.

6.      This monumental failure by Department policymakers results in consistent violations of the Fifth Amendment during custodial interrogations of CPD detainees and communicates to CPD officers that they may violate the constitution in order to obtain a confession. The result is that numerous confessions obtained by the CPD in the course of such detentions have been subsequently proven to be false. In the meantime, the damage is done to those who have been coerced to confess and the true criminals have been left at large to strike again.

ANSWER:      The City denies the allegations contained in paragraph 6.

7.      Further, detentions under the CPD's system often last many days during which the detainees' basic human needs for food, sleep and access to sanitation and hygiene are ignored. Indeed, the system exploits these needs in a manner consistent with tactics of "soft torture" used to extract involuntary confessions in other parts of the world.

ANSWER:      The City denies the allegations contained in paragraph 7.

8.      Charles Gruber, a former president of the International Association of the Chiefs of Police who consults with the United States Department of Justice in its investigations of police forces, evaluated the unlawful detentions and the conditions of confinement complained of herein and concluded in an expert opinion as follows:

> In my 35 years of policing and visiting police departments around the country, I have not seen a more blatant failure to promptly process and humanely care for arrested individuals. ... So outrageous is the conduct on the part of the Chicago Police Department in constructing unlawful, unconstitutional, and inhumane policies and practices for extended detentions . . . that it manifests deliberate indifference.

ANSWER:      The City denies that Mr.Gruber is qualified to present an expert opinion on any

3

practice or procedure undertaken by the CPD.

9.     Supervisors and policymakers at the highest level have known of these inhumane conditions and illegal detentions  for many years but they shrink from changing this system because it is an entrenched means of doing business in the CPD.

ANSWER:     The City denies the allegations contained in paragraph 9.

## Jurisdiction and Venue

10.     This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1331.  Venue is proper under 28 U.S.C. § 1391 (b).  Defendant, City of Chicago, is a municipality physically situated in this judicial district, and the events giving rise to the claims in this case all occurred here.

ANSWER:     The City admits that this Court has jurisdiction and that venue is proper.

## Interrogation Room Detentions:
## The Use of "Soft" Torture In Chicago's Detective Divisions

11.     Many persons who are detained by the CPD for extended periods are held in Detective Division interrogation rooms -- small, bare rooms, approximately ten feet in length and eight feet in width.

ANSWER:     The City lacks knowledge or information sufficient to form a belief as to the vague

and non-specific terms "small" and "bare" and therefore, denies the allegations containing those

terms.  The City admits that arrestees are, at times, questioned in interview rooms located within the

Detective Division Areas.

12.     The rooms contain only a four foot by ten inch metal bench.  There is no place to sleep or to relieve oneself and no access to running water.  Because the rooms are wholly inadequate to meet the detainee's basic needs, it is inhumane and cruel to hold a detainee in these rooms for extended periods of time.  Illinois law recognizes this fact by placing an eight hour cap on detentions in such rooms.

ANSWER:     The City admits that the interview rooms located in the Detective Division Areas do not have bathroom facilities, including toilets and sinks, located within the rooms themselves.  The City denies the remaining allegations contained in paragraph 12.

13.     The CPD, however, maintains no policies regarding the length of time a detainee may be held in these rooms.  It is not uncommon for a detainee to be kept in such rooms for several days while CPD detectives interrogate them and attempt to extract a confession.

ANSWER:     The City admits that the CPD complies with the law as stated in *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991).  The City denies the remaining allegations contained in paragraph 13.

14.     Exacerbating the torturous conditions, CPD policies and procedures require that all suspects held in an interrogation room be shackled -- arm to a ring on the wall or to a bar on the bench, for the entire time they are detained in the room.

ANSWER:     The City denies the allegations contained in paragraph 14.

15.     During these detentions, the very officers who are charged with building a case against the detainees and attempting to obtain a confession from them have absolute control over their access to food, water, and a restroom.  The investigating detectives control all circumstances of the detainees' detention, even whether the light in the room is turned off at night allowing them to attempt to rest.

ANSWER:     The City denies the allegations contained in paragraph 15.

16.     If a suspect needs food or water, he/she can only get it if the detectives bring some. There is no scheduled food service for persons detained in these rooms.  If a person needs to use the bathroom, they are at the whim of the detectives to unshackle them, let them out of the room and escort them to a restroom.  It is not uncommon for persons detained in the interrogations rooms for extended periods to urinate or defecate on themselves or on the floor.

ANSWER:     The City denies the allegations contained in paragraph 16.

17.     These interrogation room detentions are not only physically torturous, they are psychologically disorienting in a manner that can lead to increased suggestibility for the suspect being interrogated and, ultimately, to false confessions.  These very conditions are recognized world-wide as a means of psychological torture to overcome a human being's reason and will.

ANSWER:     The City denies the allegations contained in paragraph 17.

## Excessive Detentions Under The CPD'S System

18.     The CPD detention practices challenged herein directly contravene additional, well-established rights and safeguards inherent in the United States Constitution.

ANSWER:     The City denies the allegations contained in paragraph 18.

19.     First, CPD policy and practice allows its officers to hold citizens in its police stations (both interrogation rooms and lock-up cells) without the benefit of judicial review for unconstitutional periods of time.

ANSWER:     The City denies the allegations contained in paragraph 19.

20.     This practice directly contravenes the Fourth Amendment which requires either an arrest warrant or prompt review by a judge of the CPD's supposed justification for depriving an arrestee of his/her liberty.  However, the CPD does not honor this right to judicial review.

ANSWER:     The City denies the allegations contained in paragraph 20.

21.     Rather, the CPD allows its officers to hold arrestees for extended periods of time in

6

order to forestall this very judicial scrutiny while they attempt to develop grounds to justify the arrest. CPD officers can and routinely do rely on the extended detentions as a tool which allows them to make arrests for unconstitutional reasons, such as mere hunches or even animus, and then justify them after the fact by developing sufficient supposed evidence during the period of illegal detention. All too often the "justifications" CPD officers develop during these illegal detentions consist of fabricated evidence and coerced confessions.

ANSWER:     The City denies the allegations contained in paragraph 21.


22.     This very practice was documented forty-five years ago in a publication by the American Civil Liberties Union, entitled <u>Secret Detention by the Chicago Police</u>. That report, as well as multitudinous criminal and civil cases over the years and more recent media attention have all put the policymakers of the City of Chicago on notice of these routine violations. However, the policymakers have not remedied the system.

ANSWER:     The City denies the allegations contained in paragraph 22.


## Other Inhumane Conditions Inflicted By The CPD's System


23.     In addition to the above, the CPD's system fails to accommodate for the basic human needs of those who are being detained.

ANSWER:     The City denies the allegations contained in paragraph 23.


24.     The Department has an obligation to ensure, at a minimum, that detainees' basic needs for sustenance, hygiene and sleep are met while they are in the Department's charge. However, many of the hundreds of thousands of citizens arrested in the City of Chicago each year are systematically deprived of these basic needs. As a general and widespread practice and policy:

a.     The CPD holds detainees in oppressive conditions;

b.     The CPD furnishes no mattress or other bedding for overnight detentions. Despite the fact that overnight detentions are foreseeable and multi-day detentions are commonplace, the CPD maintains no bedding in its facilities and has no policies requiring that its employees furnish appropriate means of sleep to those who are subjected to extended detentions;

c.     The CPD provides wholly inadequate access to restrooms and means of personal hygiene; and

d.     The CPD furnishes detainees little if any food or drink during extended detentions. Even when the CPD does furnish food to those in its custody, it is always limited to a pork bologna sandwich, which, as the final policymakers. of the CPD well know, violates the religious beliefs of many of its detainees, and is inedible to them.

ANSWER:     The City denies the allegations contained in paragraph 24, including sub-parts (a) through (d).

25.   These failures violate well-established constitutional and state law requirements to provide for the basic human needs of those in custody.  Indeed, the CPD has been cited by the Illinois Department Of Corrections for its widespread failure to provide proper bedding, nutrition and access to sanitation for those in its custody.  However, the final policymakers of the CPD consistently treat these serious problems with callous indifference.

ANSWER:     The City denies the allegations contained in paragraph 25.

26.     Although there is absolutely no legitimate law enforcement purpose for the foregoing policies and practices, the CPD has refused, and continues to refuse, to change.

ANSWER:     The City denies the allegations contained in paragraph 25.

**Facts Concerning The Named Plaintiffs and Mr. Kimble**

27.     At approximately noon on February 24, 2004, Named Plaintiff Leonard Kimble came to the CPD police station after being told that police wanted to learn if he had information about an unspecified crime.

ANSWER:     The City admits the allegations contained in paragraph 27.

28.     Immediately upon arrival, Mr. Kimble was stripped of his shoestrings, searched, and imprisoned in an interrogation room. His wrist was shackled to a ring on the wall.

ANSWER:     The City denies the allegations the allegations contained in paragraph 28.

8

29.     Chicago police detectives began questioning him about a murder that had occurred in March 2003.  Mr. Kimble had no knowledge of the victim or the circumstances of his death and communicated this fact to the officers.

ANSWER:     The City admits that detectives questioned Mr. Kimble about a murder that had

occurred and lacks knowledge or information sufficient to form a belief as to the truth of the

remaining allegations contained in paragraph 29.

30.     Nevertheless, the detectives continued to question Mr. Kimble about the crime.

ANSWER:     The City lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 30.

31.     The detectives detained Mr. Kimble's in the interrogation room for approximately 65 hours, from noon on February 24 to the early morning of February 27.  The only times Mr. Kimble was allowed out of the interrogation room was to take a lie detector test on the first day of his detention, to appear in a line-up on the third day, and one time to use the bathroom.

ANSWER:     The City lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 31.

32.     At no time during this entire period did Mr. Kimble receive any judicial determination of probable cause or bail.  He was not allowed to use the telephone.  He was not given any food to eat. The only liquids he received were from the faucet on the sink during his lone trip to the bathroom.  He could not sleep properly as he was sitting upright on the small metal bench with his wrist chained to the wall.

ANSWER:     The City lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 32.

33.     On October 20, 2000, at approximately 9 a.m., Named Plaintiff Denny Robinson was at work as a mail carrier for the United States Postal Service.  While he was sorting mail in an area

9

closed to the public, Mr. Robinson was approached by a Chicago Police Officer, Detective Downs.

ANSWER: The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 33.

34. Detective Downs told him that he had an arrest warrant out for him, but Downs never showed him a warrant or indicated on his arrest report that he was arrested pursuant to a warrant. On information and belief there was no such warrant.

ANSWER: The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 34.

35. Downs handcuffed Mr. Robinson but did not tell Mr. Robinson why he was being arrested. Thereafter, Mr. Robinson was transported to the police station, placed in a small interrogation room, and chained to a ring on the wall.

ANSWER: The City admits that Mr. Robinson was arrested and transported to a police station where he was placed in an interview room. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 35.

36. Mr. Robinson was held in the room for three days and two nights and was interrogated during this time. The room contained only a small metal bench.

ANSWER: The City denies that Mr. Robinson was held in the room for three days and two nights and denies that the room contains only a small metal bench, but admits that he was asked questions.

37. Mr. Robinson could not sleep properly due to his arm being suspended above him and chained to the wall. He was furnished no mattress, blanket nor pillow. In addition, the bare lightbulb illuminating the room remained on all night and Plaintiff could not switch it off.

10

ANSWER:     The City admits that interview rooms contain no mattress, blanket or pillow.  The

City lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations contained in paragraph 37.


38.     On the third day of his captivity, Mr. Robinson was taken from the interrogation room, booked, and placed in a lock-up cell where he was held until the following day.  The holding cell was slightly bigger than the interrogation room, but also contained no accommodations for sleeping.

ANSWER:     The City denies that lock-up cells contain no accommodations for sleeping and

admits that Mr. Robinson was transferred to lock-up on the morning of October 22, 2000 where he

was held until he was taken to Court and that the lock-up cell is similar in size to the interview room.


39.     During his entire four-day detention, the only food provided to Mr. Robinson was three baloney sandwiches, one on each of the first three days of his confinement.  He was often thirsty while locked in the interrogation room.  When he asked for something to drink, detectives told him to "be patient," or words to that effect, rather than bring him water.  Mr. Robinson was not able to sleep properly during the three nights he spent in police custody.

ANSWER:     The City denies that Mr. Robinson was given only three bologna sandwiches in his

time in detention, and denies that he was detained for four days.  The City lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations contained in

paragraph 39.


40.     At no time during this four day ordeal did Mr. Robinson receive a judicial hearing to determine whether there was probable cause to detain him or to set a bail for his release.

ANSWER:     The City admits that Mr. Robinson received a probable cause hearing on October 23,

2000.

11

41.     Mr. Robinson was finally transferred to the Cook County Jail on October 23, 2000, and was ultimately acquitted of all charges pending against him.

ANSWER:     The City admits that Mr. Robinson was transferred to the Cook County Department

of Corrections on October 23, 2000.  The City admits that Mr. Robinson was acquitted after a trial.

42.     On July 29, 2003, Named Plaintiff Thomas Dunn was arrested by CPD officers for a crime he did not commit.

ANSWER:     The City admits that Thomas Dunn was arrested on July 26, 2003, and that he was

convicted of two counts of Aggravated Battery for the incident for which he was arrested on that

date.

43.     The officers placed Mr. Dunn in a CPD holding cell where he spent the next three nights.

ANSWER:     The City admits that Mr. Dunn was placed in a cell in lock up where he was held until

his initial Court appearance on July 29, 2003.

44.     During his detention, Mr. Dunn was not provided with any sheets, blankets, or pillows and was not able to obtain adequate sleep during this detention.

ANSWER:     The City admits that Mr. Dunn was not provided with any sheets, blankets, or pillows

and lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations contained in paragraph 44.

12

45.     The only food Mr. Dunn received were pork bologna sandwiches.  The only fluids he had to drink were from the tap of the sink in his cell.

ANSWER:     The City denies that Mr. Dunn received pork bologna sandwiches.  The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 45.


46.     On the morning following his third night in the cell, Mr. Dunn was finally transferred to court for a probable cause and bail hearing.

ANSWER:     The City admits that Mr. Dunn received a probable cause hearing on July 29, 2003.


47.     On or about 9 a.m. on April 30, 2003, Plaintiff Veronica Imperial was arrested at her home without an arrest warrant and forced to accompany three detectives.

ANSWER:     The City admits that Ms. Imperial was arrested based upon probable cause on or about May 1, 2003 at approximately 1 p.m.


48.     They took her to a detective division interview room and handcuffed her to a ring on the wall.  The room contained only a small metal bench.


ANSWER:     The City admits that Ms. Imperial was placed in an interview room when she arrived at the police station.  The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 48.


49.     She was held in this room for approximately two days.  During that time she was repeatedly questioned regarding an assault of which she was innocent.  In response to the questioning she consistently told the detective questioning her that she did not wish to speak with police.  Despite her refusal to speak, this same detective periodically came into the room to questioned over the entire period of her detention, telling her that witnesses were implicating her

in an attempted murder and that she should speak with him to save herself.

ANSWER:    The City admits that Ms. Imperial was questioned but denies the remainder of the

allegations in paragraph 49.


50.    During much of this interrogation, Ms. Imperial was shackled to the ring on the wall. This detective did not unshackle her until an attorney hired by her family came to the police station to try to intervene on her behalf.

ANSWER:    The City denies the allegations in paragraph 50.


51.    Ms. Imperial was fed only once during the entire detention in that room. In order to relieve herself she had to bang on a door until someone came to escort her to the restroom. Often she would have to bang for long periods of time.

ANSWER:    The City denies that Ms. Imperial was fed only once while detained in the interview

room, but admits that she did have to leave the room to use the restroom. The City lacks sufficient

information to form a belief as to the truth of the remainder of the allegations in paragraph 51.


52.    There was no bed or bedding for Ms. Imperial to sleep in the room. She was forced to sleep on the floor to the extent that she could.

ANSWER:    The City admits that interview rooms do not contain bedding or beds.   The City

denies that she was forced to sleep on the floor.


53    Ms. Imperial was charged in connection with the alleged assault and taken to a lock-up facility where she spent another night. There was no bed or bedding furnished to her in the lock-up facility either.

ANSWER:    The City denies that there was no bed furnished to Ms. Imperial in the lock-up

facility. The City admits that there was no bedding furnished to Ms. Imperial in the lock-up facility.

14

54.    Ms. Imperial was acquitted of all charges in November 2003.

ANSWER:    The City admits that Ms. Imperial was found not guilty after a trial.


55.    Each of the foregoing actions and failures to act by CPD employees affecting the Named Plaintiffs were taken pursuant to policies, customs and longstanding widespread practices of the CPD of which the Department's policy makers were aware.

ANSWER:    The City denies the allegations contained in paragraph 55.


## Class Allegations

56.    The Named Plaintiffs seek to pursue claims both for themselves and for a class of others similarly situated.  Named Plaintiffs believe that the class should be organized into three subclasses as follows.

ANSWER:    The City admits that plaintiffs seek to represent a class of persons, but denies this

action is a proper class action under the Federal Rules of Civil Procedure or that plaintiffs are

entitled to any relief.


57.    Named Plaintiff Imperial seeks to represent Class I.  Class I consists of:

All persons detained in a CPD interrogation room for more than eight hours in a 24 hour period at any time form October 21, 2002 to the date of the order granting certification in this case.

ANSWER:    The City admits that plaintiff seeks to represent a class of persons, but denies that the

defined class is a proper class under the Federal Rules of Civil Procedure.

15

58.     The individuals in the Class I are so numerous that joinder of all members is impractical.  The Named Plaintiffs estimate that Class I numbers in at least the thousands.

a.   On information and belief, at least 200,000 persons have been arrested by the CPD each year since 1999;

b.   The CPD maintains no policy, directive or procedure limiting the amount of time that an arrestee may be kept in an interrogation room.  Indeed, Chicago police personnel, testifying as representatives of the Chicago Police Department and the CITY OF CHICAGO, have stated under oath that there is no policy or practice of the CPD which limits the length of time an arrestee can be held in an interview room, making it likely that this unconstitutional condition of detention occurs again and again; and

c.   Chicago police personnel, testifying as representatives of the Chicago Police Department and the CITY OF CHICAGO, have stated under oath that it is not uncommon for arrestees to be held in interrogation rooms for up to 72 hours or more.

ANSWER:     The City denies the allegations contained in paragraph 58.  The City admits that in 1999, the CPD made 268,132 arrests and that it averaged approximately 257,844 arrests (including arrests for felonies, misdemeanors, and petty offenses) over each of the last four years.  The City's polices and practices comport with the law as stated in *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991).  The City denies that paragraph 50( c) accurately states the testimony of CPD personnel.

59.     There are questions of law and fact common to the claims of Class I.  Among these common questions are:

a.      Whether it is unconstitutional to hold detainees in an interrogation for extended periods of time;

b.      Whether it is unconstitutional to shackle persons to a wall in an interrogation room for extended periods of time;

c.      Whether the conditions of confinement in the interrogation rooms deprive detainees of acceptable means of sleep in an unconstitutional manner;

d.      Whether CPD policy allows the misuse of interrogations rooms for extended detentions in the manner alleged herein;

16

e.      Whether there is a custom or practice within the CPD of misusing interrogation rooms in the manner alleged herein;

f.      Whether CPD final policymakers have condoned or been deliberately indifferent to the misuse of interrogations rooms for extended detentions in the manner alleged herein; and

g.      Whether extended detentions in the interrogation rooms violate detainees' rights under state law.

ANSWER:      The City denies the allegations contained in paragraph 59, including each

subparagraph.

60.  Plaintiffs claims are typical of the claims of Class I.  Ms. Imperial was detained in a CPD interrogation room in excess of eight hours in a twenty-four hour period, she was  shackled to the wall in the interrogation room for long periods of time, she was deprived of meaningful sleep as a result of the lack of a bed or bedding, she seeks to prove that the deprivations she suffered were inflicted as a result of CPD policy, custom, practice and/or the deliberate indifference of CPD policy makers.

ANSWER:      The City denies the allegations contained in paragraph 60, except that it admits that

plaintiff purports to allege unlawful detention, but denies these allegations.

61.  Plaintiff Imperial will fairly and adequately represent the interests of the Class I. Plaintiff has retained skilled counsel with experience in constitutional and class action litigation to represent the Class.

ANSWER:      The City denies the allegations contained in paragraph 61.

62 .  The questions of law and fact common to the Class I, as described in paragraph 43 above, predominate over any individual issues.

ANSWER:      The City denies the allegations contained in paragraph 62.

63.    Named Plaintiffs Dunn and Robinson seek to represent Class II. Class II consists of:

All persons detained in a CPD lock-up or detective division facility between the hours of 10 p.m. and 6 a.m. at any time form October 21, 2002 to the date of the order granting certification in this case.

ANSWER:    The City admits that plaintiffs seek to represent a class of persons, but denies that the

defined class is a proper class under the Federal Rules of Civil Procedure.


64.    The individuals in the Class II are so numerous that joinder of all members is impractical. Named Plaintiffs Dunn, Kimble and Robinson estimate that Class II numbers in at least the thousands.

a. On information and belief, at least 200,000 persons have been arrested by the CPD each year since 1999. A sizeable percentage of these persons are detained between the hours of 10 p.m. and 6 a.m. as persons arrested by the CPD in the afternoon are rarely if ever taken to court until the following morning;

b. The CPD maintains no policy, directive or procedure requiring the provision of minimally appropriate sleeping accommodations to those in its custody, including the provision of a mattress, blanket or pillow. The CPD in fact maintains no such bedding;

c. CPD employees testifying as official representatives of the City of Chicago testified that the CPD has never maintained any such policies or facilities to the best of their knowledge. One of these representatives testified that detainees are expected to sleep on the floor or on the four foot by ten inch metal bench, and that this expectation applies even to those who are detained by the CPD for several days; and

d. The CPD has been cited multiple times by Illinois state officials for failing to maintain any bedding for detainees.

ANSWER:    The City denies the allegations contained in paragraph 64. The City admits that

approximately 200,000 individuals have been arrested (including arrests for felonies, misdemeanors,

and petty offenses) for each of the years from 1999 through 2003. The City lacks knowledge or

information sufficient to form a belief as to the meaning of the vague and non-specific terms

"sizeable percentage" and "rarely if ever" and therefore, denies the remaining allegations contained

18

in paragraph 64(a). The City denies that paragraph 64( c) accurately states the testimony of CPD personnel. The City lacks knowledge or information sufficient to form a belief as to the meaning of the vague and non-specific term "cited" and therefore, denies the remaining allegations contained in paragraph 64(d).

65 . There are questions of law and fact common to the claims of Class II. Among these common questions are:

a. Whether it is unconstitutional to hold detainees overnight without furnishing them sleeping facilities such as a mattress, blanket or pillow;

b. Whether it is a violation of state law to hold detainees overnight without furnishing them sleeping facilities such as a mattress, blanket or pillow;

c. Whether CPD policy allows and/or encourages the alleged constitutional deprivations;

d. Whether there is a custom or practice within the CPD that allows and/or encourages the alleged constitutional deprivations;

e. Whether CPD final policymakers have condoned or been deliberately indifferent to the alleged constitutional deprivations; and

f. Whether CPD final policymakers have been deliberately indifferent in failing to maintain minimally adequate sleeping accommodations for overnight detainees.

ANSWER: The City denies the allegations contained in paragraph 65.

66. Plaintiffs' claims are typical of the claims of Class II. Mr. Dunn was detained over several nights in a CPD lock-up cell. During that entire time he received no accommodations for sleeping, no mattress, blanket or pillow. Messrs. Kimble and Robinson were each detained in CPD interrogation rooms over several nights and neither received any accommodations for sleeping, nor any mattress, blanket or pillow. Each of the Named Plaintiffs seeks to prove that the deprivations he suffered were inflicted as a result of CPD policy, custom, practice and/or the deliberate indifference of CPD policy makers.

ANSWER:     The City denies the allegations contained in paragraph 66, except that it admits that

plaintiff purports to allege unlawful conditions of confinement, but denies those allegations.

67.     The Named Plaintiffs will fairly and adequately represent the interests of Class II.
Plaintiffs have retained skilled counsel with experience in constitutional and class action litigation
to represent the Class.

ANSWER:     The City denies the allegations contained in paragraph 67.

68.     The questions of law and fact common to Class II predominate over any individual
issues.

ANSWER:     The City denies the allegations contained in paragraph 68.

69.     Named Plaintiffs Dunn and Robinson seek to represent Class III.  Class III consists
of:

>   All persons arrested without an arrest warrant and detained by the CPD in excess of
>   48 hours without a judicial determination of probable cause at anytime from March
>   15, 1999 until the date of the order granting certification in this case.

ANSWER:     The City admits that plaintiffs seek to represent a class of persons, but denies that the

defined class is a proper class under the Federal Rules of Civil Procedure.

70.     The individuals in Class III are so numerous that joinder of all members is
impractical.  Named Plaintiffs Dunn, Kimble and Robinson estimate that Class III numbers in at
least the thousands.

a.  On information and belief, at least 200,000 persons have been arrested by the CPD each
year since 1999.  A sizeable percentage of these persons were detained in excess of 48 hours without

any judicial determination of probable cause;

b.     The CPD maintains or maintained a policy, custom and/or widespread practice permitting officers to detain suspects in excess of 48 hours without obtaining a judicial determination of probable cause and for reasons which do not amount to exigent circumstances;

c.     The CPD has a long history of detaining persons in excess of 48 hours without a judicial probable cause determination.  Most or a substantial portion of CPD officers believe that they may detain a suspect for 72 hours or longer without obtaining judicial approval;

d.     Numerous individual and class action civil rights cases as well as criminal cases dating back to 1986 and before have challenged that the CPD fails to obtain probable cause determinations within 48 hours of arrest;

e.     The CPD did not adopt a policy even purporting to ban detentions in excess of 48 hours without judicial approval until August of 2003.  Moreover, on information and belief, based on the fact that detentions in excess of 48 hours are an ingrained and long standing CPD practice, and based on the fact that Mr. Dunn was detained for 56 hours without a judicial determination of probable cause in 2004, the new policy has not been properly implemented;

f.     CPD employees testifying as representatives of the City of Chicago testified that during the class period it was not uncommon for arrestees to be held for 72 hours or more without a judicial determination of probable cause; and

g.     An analysis of data obtained from the Cook County States Attorneys Office and the Cook County Circuit Court indicates that at least approximately 1400 people were detained in excess of 48 hours by the CPD without a judicial determination of probable cause from March 15, 1999 through May of 2004.

ANSWER:     The City denies the allegations contained in paragraph 70.  The City denies that paragraph 70(f) accurately states the testimony of CPD personnel and states that the City's polices and practices comport with the law as stated in *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991).

71.  There are questions of law and fact common to the claims of Class II.  Among these common questions are:

a.     Whether it violates the constitution to detain warrantless arrestees in excess of 48 hours without obtaining judicial approval of probable cause for the detention;

b.      Whether it violates state law to detain warrantless arrestees in excess of 48 hours without obtaining judicial approval of probable cause for the detention;

c.      Whether the CPD maintained a policy, custom and/or widespread practice allowing the detention of warrantless arrestees in excess of 48 hours without obtaining a judicial determination of probable cause for the detention;

d.      Whether the CPD maintains a custom and/or widespread practice allowing the detention of warrantless arrestees in excess of 48 hours without obtaining a judicial determination of probable cause for the detention; and

e.      Whether CPD officials have been deliberately indifferent to the need for training, enforcement, discipline, and/or policy changes regarding the length of detention of arrestees in the absence of a judicial determination of probable cause.

ANSWER:      The City denies the allegations contained in paragraph 71.


72.      Plaintiffs' claims are typical of the claims of Class III.  Each of the Named Plaintiffs was detained by the CPD in excess of 48 hours without receiving a judicial determination of probable cause.  Each of the Named Plaintiffs seeks to prove that the deprivations he suffered were inflicted as a result of CPD policy, custom, practice and/or the deliberate indifference of CPD policy makers.

ANSWER:      The City denies the allegations contained in paragraph 72, except that it admits that

plaintiffs purport to allege unlawful detention, but denies these allegations.


73.      The Named Plaintiffs will fairly and adequately represent the interests of Class III. Plaintiffs have retained skilled counsel with experience in constitutional and class action litigation to represent the Class.

ANSWER:      The City denies the allegations contained in paragraph 73.


## The Robinson and Lopez Cases

74.      The CPD's policy of permitting extended detentions of arrestees in the absence of a judicial determination of probable cause has been challenged in at least two class actions.

ANSWER:      The City admits the allegations contained in paragraph 74.

75.     In the case of <u>Robinson v. Chicago</u>, 638 F.Supp. 186 (N.D. 111. 1986), rev'd 868 F.2d 959 (7th Cir. 1989), the trial court determined that the practice of holding detainees for excessive periods without obtaining judicial approval violated the Fourth Amendment, and the court awarded an injunction against the practice. In appealing that decision, Defendant City of Chicago essentially conceded the Fourth Amendment violation but represented to the Seventh Circuit that it had abolished the policy allowing such detentions. The Seventh Circuit reversed the award of the injunction on standing grounds.

ANSWER:     The City admits that the Court declared unconstitutional Paragraph C-2 of CPD

General Order 78-1, which expressly permitted the CPD to detain arrestees without a probable cause

hearing until the CPD had completed its investigation, and that the City informed the Seventh

Circuit that it had rescinded the policy embodied in Paragraph C-2. Further answering, the City

states that it has in fact rescinded the policy at issue in *Robinson*.

76.     However, the CPD completely failed to enact any policies forbidding the challenged detentions or to take other appropriate steps to cease the detentions.

ANSWER:     The City denies the allegations contained in paragraph 76.

77.     As a result, extended detentions without judicial approval remained the widespread norm in the CPD for the next 15 years. CPD final policymakers were deliberately indifferent to these detentions.

ANSWER:     The City denies the allegations contained in paragraph 77.

78.     In June of 2002, representatives testifying on behalf of the City of Chicago admitted under oath that the CPD continues to allow detentions in excess of 48 hours without judicial approval of probable cause. On the basis of these admissions another class action was pursued against the CPD, styled <u>Lopez v. City of Chicago</u>.

23

ANSWER: The City denies that paragraph 78 accurately states the testimony of CPD representatives. The City admits that a class action was filed in *Lopez* but further answers that this class was never certified and denies that this class was proper under the Federal Rules of Civil Procedure.

79. *Lopez* was brought by a named plaintiff who was detained for five days in an interrogation room under the circumstances identified above. Like *Robinson*, *Lopez* challenged CPD polices and procedures allowing the detention of arrestees in excess of 48 hours without a judicial probable cause review. *Lopez* also gave the City of Chicago notice that a large class of people were being subjected to unconstitutional conditions while detained in CPD police departments including being detained in torturous interrogation room conditions, deprived of accommodations for sleeping, adequate nutrition and adequate access to sanitation.

ANSWER: The City admits that the allegations of paragraph 79 describe generally the allegations of the Lopez plaintiff.

80. In direct response to the challenge in *Lopez*, the CPD modified its directive for processing arrestees to forbid detentions in excess of 48 hours in the absence of judicial approval or extraordinary circumstances.

ANSWER: The City denies the allegations contained in paragraph 80. The City's policy and practice comport with the law as stated in *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991).

81. The modification was enacted by the CPD's final policymaker or makers. The modification became effective in August of 2003.

ANSWER: The City admits that it enacted General Order 03-02 and amended it, effective August

2003. The City states that its policy and practice prior to the enaction of General Order 03-02 comported with the law as stated in *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991).

82. The final policymakers of the CPD remain deliberately indifferent despite their having adopted the modification. Ignoring the allegations in Lopez of torturous conditions of confinement during CPD detentions, the final policymakers enacted no directive or modification to limit the amount of time a detainee may be held in an interrogation room other than the 48 hour general limitation on all detentions. Neither was a directive modified or adopted to require adequate accommodations for sleeping or adequate provision of nutrition or sanitation.

ANSWER:     The City denies the allegations contained in paragraph 82.

83. The modification was adopted solely as a litigation response to the pressure of the Lopez suit.

ANSWER:     The City denies the allegations contained in paragraph 83.

84. The modification was not implemented in a genuine manner that would actually change the CPD' s widespread practice of unlawful detentions. The modification has not been subject of adequate dissemination, training and/or enforcement, and violations of the 48 hour requirement have not been adequately investigated and disciplined.

ANSWER:     The City denies the allegations contained in paragraph 84.

85. Rather, the final policymakers of the City of Chicago have been and remain deliberately indifferent to the widespread practice of detaining arrestees in excess of 48 hours without judicial approval. As a result, such detentions remain widespread practice in the CPD.

ANSWER:     The City denies the allegations contained in paragraph 85.

86.     The court in Lopez approved a class limitations period beginning on March 15, 1999 based on the fact that the suit, filed as an individual action on March 15, 2001, provided notice of the widespread violations contained of herein.

ANSWER:     The City states that plaintiff's motion for class certification was withdrawn prior to

any ruling on class certification and further denies that this class was proper under the Federal Rules

of Civil Procedure.

87.     The class representative in Lopez withdrew his request for class certification on March 20, 2004. All claims asserted herein were tolled at least until that time by virtue of the Lopez case. Additional tolling is provided under Illinois's single re-filing rule.

ANSWER:     The City denies the allegations contained in paragraph 87.

88.     Based on the CPD's representations in Robinson that the policy allowing extended detention without judicial approval had been revoked and the fact that the CPD thereafter allowed the detentions through a widespread practice with which private citizens had no reason to be familiar, the Named Plaintiffs did not learn and could not have learned through reasonable diligence that the CPD maintained a policy, custom and/or widespread practice allowing detentions in excess of 48 hours without judicial approval until they learned of this through the Lopez case.

ANSWER:     The City denies the allegations contained in paragraph 88.

89.     Mr. Robinson learned of this fact in or about August of 2003. Messrs. Dunn and Kimble learned of this fact in or about June of 2004.

ANSWER:     The City lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 89.

90.     As private citizens, Named Plaintiffs have no reason to be familiar with the policies, failures of policy, widespread practices and/or customs of the CPD with regard to detentions in interrogation rooms. Named Plaintiffs did not learn and could not have learned through the exercise of reasonable diligence that the CPD permits unconstitutionally extended detentions in interrogation rooms as a matter of custom, widespread practice and/or the deliberate indifference of CPD final

policymakers.

ANSWER:     The City denies the allegations contained in paragraph 90.

91.     Mr. Robinson learned of this fact in or about August of 2003.  Messrs. Dunn and Kimble learned of this fact in or about June of 2004.  Ms. Imperial learned of this fact in November 2005.

ANSWER:     The City lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 91.

92.     As private citizens, Named Plaintiffs have no reason to be familiar with the policies, failures of policy, widespread practices and/or customs of the CPD with regard to providing constitutionally adequate sleeping accommodations to overnight detainees.  Named Plaintiffs did not learn and could not have learned through the exercise of reasonable diligence that the CPD permits unconstitutional conditions of confinement regarding sleep as a matter of custom, widespread practice and/or the deliberate indifference of CPD final policymakers.

ANSWER:     The City denies the allegations contained in paragraph 92.

93.     Mr. Robinson learned of this fact in or about August of 2003.  Messrs. Dunn and Kimble learned of this fact in or about June of 2004.   Ms. Imperial learned of this fact in November 2005.

ANSWER:     The City lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 93.

**COUNT I - 42 U.S.C. § 1983 Claim for**
**Unlawful Interrogation Room Detentions**

94.     Plaintiffs reallege each of the forgoing paragraphs as if fully stated herein.

ANSWER:     The City repeats and incorporates its answers to each of the foregoing paragraphs as

its answer to paragraph 94 as though fully set forth.

95.     As described more fully above, Plaintiff Kimble, Named Plaintiff Imperial and the other members of the Class I have been detained in CPD interrogation rooms for lengths of time which violate federal constitutional and state law. Among other violations, Defendant contravened the Fourth Amendment reasonableness requirement and the Fourteenth Amendment due process requirement. Holding detainees in an interrogation room for long periods is unreasonable given the conditions in those rooms. Further, after eight hours of detention, the class members had an entitlement under 20 IL ADC 720.50 to a cell with a toilet, a bed, and running water (conditions absent from the interrogation rooms). Defendant deprived the class members of this entitlement without due process of law.

ANSWER:     The City denies the allegations contained in paragraph 95.

96.     The City of Chicago caused this deprivation of rights and is liable for these Plaintiffs' and the Class Members' damages, *inter alia*, because the City of Chicago maintains unconstitutional policies, customs and widespread practices that caused these violations. Moreover, the City of Chicago fails to adequately train and discipline its officers in a manner that causes such violations. Further, the City of Chicago has been deliberately indifferent to the need for different policies, training and discipline. Also, the City of Chicago has failed to act to remedy the patterns of misconduct described in the preceding paragraphs, despite actual knowledge of the same, thereby causing the types of injuries alleged here.

ANSWER:     The City denies the allegations contained in paragraph 96.

### COUNT II - 42 U.S.C. § 1983 Claim For
### Deprivation of Adequate Accommodations For Sleep

97.     Plaintiffs reallege each of the forgoing paragraphs as if fully stated herein.

ANSWER:     The City repeats and incorporates its answers to each of the foregoing paragraphs as its answer to paragraph 97 as though fully set forth.

98.     As described more fully above, Named Plaintiffs Dunn, Robinson, and Imperial, Plaintiff Kimble, and other members of the Class II have been detained in CPD facilities overnight and have not been furnished minimally adequate accommodations for sleeping as required by federal constitutional and state law. Among other violations, Defendants contravened the Fourth Amendment reasonableness requirement and the Fourteenth Amendment Due Process requirement. It is unreasonable not to furnish bedding to these detainees. Further, the class members had an entitlement under 20 IL ADC 720.60 to bedding. Defendant deprived them of this entitlement without due process of law.

28

ANSWER:     The City denies the allegations contained in paragraph 98.

99.     The City of Chicago caused this deprivation of rights and is liable for Plaintiffs' and the Class Members' damages, inter alia, because the City of Chicago maintains unconstitutional policies, customs and widespread practices that caused these violations.  Moreover, the City of Chicago fails to adequately train and discipline its officers in a manner that causes such violations. Further, the City of Chicago has been deliberately indifferent to the need for different policies, training and discipline.   Also, the City of Chicago has failed to act to remedy the patterns of misconduct described in the preceding paragraphs, despite actual knowledge of the same, thereby causing the types of injuries alleged here.

ANSWER:     The City denies the allegations contained in paragraph 99.

## COUNT III - 42 U.S.C. § 1983 Claim For Excessive Detention

100.     Plaintiffs reallege each of the forgoing paragraphs as if fully stated herein.

ANSWER:     The City repeats and incorporates its answers to each of the foregoing paragraphs as

its answer to paragraph 100 as though fully set forth.

101.     As described more fully above, Named Plaintiffs Dunn and Robinson, Plaintiff Kimble, and the members of the Class III have been detained in CPD facilities for over 48 hours following arrest without a judicial determination of probable cause.

ANSWER:     The City denies the allegations contained in paragraph 101.

102.     The City of Chicago caused this deprivation of rights and is liable for Plaintiffs' and the Class Members' damages, inter alia, because the City of Chicago maintains unconstitutional policies, customs and widespread practices that caused these violations.  Moreover, the City of Chicago fails to adequately train and discipline its officers in a manner that causes such violations. Further, the City of Chicago has been deliberately indifferent to the need for different policies, training and discipline.  Also, the City of Chicago has failed to act to remedy the patterns of misconduct described in the preceding paragraphs, despite actual knowledge of the same, thereby causing the types of injuries alleged here.

ANSWER:     The City denies the allegations contained in paragraph 102.

## COUNT IV - Respondeat Superior

103.     Plaintiffs reallege each of the forgoing paragraphs as if fully stated herein

ANSWER:     The City repeats and incorporates its answers to each of the foregoing paragraphs as its answer to paragraph 103 as though fully set forth.

104.     By all of the above employees of the City of Chicago subjected Named Plaintiffs Dunn, Robinson and Imperial, Plaintiff Kimble and the members of the Classes I-III to excessive detentions and unlawful conditions of confinement in a manner which violates Illinois law.

ANSWER:     The City denies the allegations contained in paragraph 104.

105.     These employee's actions and omissions were taken within the scope of their employment for the CPD. Named Plaintiffs, Plaintiff Kimble, and the members of Classes I-III have suffered damages as a result.

ANSWER:     The City denies the allegations contained in paragraph 105, except that it admits that it employs police officers and those police officers who were interacting with the named plaintiffs while those individuals were in the custody of the CPD were doing so within the scope of their employment with the City.

WHEREFORE, the City prays for judgment in its favor, and against plaintiffs, including its costs, and for any further relief that the Court deems proper and just.

**AFFIRMATIVE DEFENSES**

1.      The City is not liable to plaintiffs on any state law claim if the individual officers are not found liable to plaintiff on such claim.  *See* 745 ILCS 10/2-109.

2.      The City is not liable to plaintiffs because it did not act with malice and without probable cause.  *See*, 745 ILCS 10/2-109; 745 ILCS 10/2-208.

3.      The City is not liable for any of the alleged acts or omissions constituting plaintiffs' state law claims because the individual officers did not act in a willful and wanton manner in executing and enforcing the law.  *See* 745 ILCS 10/2-202.

4.      The City is not liable for any alleged acts or omissions constituting plaintiffs' state law claims because the individual officers were discharging discretionary decisions for which they are immune from liability.  *See* 745 ILCS 10/2-201.

5.      Any award obtained by plaintiffs must be reduced to the extent that plaintiff has failed to discharge his duty to mitigate his damages, commensurate with the degree of failure to mitigate attributed to plaintiffs by the jury in this case.

6.      Any award obtained by plaintiffs must be reduced to the extent that any injuries or damages claimed by plaintiffs were proximately caused, in whole or in part, by any wrongful conduct on the part of the plaintiffs, commensurate with the degree of fault attributed to plaintiffs by the jury in this case.

7.      Plaintiffs' claims are barred by the doctrine of equitable estoppel.

8.      Plaintiffs' claims are barred by the doctrine of unclean hands.

9.      Plaintiffs' claims are barred by the doctrine of laches.

10.      Plaintiffs' claims are barred by the applicable statutes of limitations.

31

**JURY DEMAND**

The City Demands a trial by jury.

Respectfully submitted,

MARA S. GEORGES,
CORPORATION COUNSEL
CITY OF CHICAGO

By:    s/Stephen P. Baker
STEPHEN P. BAKER
Assistant Corporation Counsel

30 N. LaSalle St., Suite 1720
Chicago, Illinois 60602
(312) 744-8369
Attorney No.  06274505

32