## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS DUNN, DENNY ROBINSON, and VERONICA IMPERIAL, on behalf of themselves and a class of others similarly situated, and LEONARD KIMBALL, individually, | ) ) ) ) ) | |
| | ) | **Case No. 04-CV-6804** |
| Plaintiffs, | ) ) | |
| | ) | **Judge Gettleman** |
| v. | ) ) | |
| CITY OF CHICAGO, | ) ) | **Magistrate Judge Schenkier** |
| Defendant. | ) ) ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT**
**MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.     Factual and Procedural Background ............................................................................1

     A.     The Litigation.................................................................................................1

     B.     Settlement and the Settlement Agreement ...................................................3

     C.     Preliminary Approval and Notice to the Class .............................................4

     D.     Class Members' Response/Claims Processing ..............................................8

II.     Argument ....................................................................................................................8

     A.     The Proposed Settlement is Fair, Reasonable and Adequate and Should be Finally Approved..............................................................................8

     B.     The Notice Provided to Class Members Meets Due Process................................18

     C.     The Court Should Grant Final Certification of the Three Settlement Classes ..........................................................................20

     D.     The Court Should Award the Named Plaintiffs The Agreed Incentive Awards ............................................................................21

Conclusion ......................................................................................................................22

**TABLE OF AUTHORITIES**

*Armstrong v. Bd. of Sch. Dirs. of Milwaukee*, 616 F.2d 305 (7th Cir. 1980) .............................8, 9

*Carnegie v. Household Intern., Inc.*, 376 F.3d 656 (7th Cir. 2004)................................................12

*De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225 (7th Cir.1983).......................................20

*Dunn v. City of Chicago*, 231 F.R.D. 367 (N.D. Ill. 2005)............................................................12

*E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884 (7th Cir. 1985) .........................................9

*Felzen v. Andreas,* 134 F.3d 873 (7th Cir. 1998).............................................................................8

*Gautreaux v. Pierce,* 690 F.2d 616 (7th Cir. 1982) .........................................................................9

*Isby v. Bayh*, 75 F.3d 1191 (7th Cir.1996)..................................................................................8, 9

*Lopez v. City of Chicago*, 464 F.3d 711 (7th Cir. 2006).............................................................2, 11

*Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277 (7th Cir. 2002)............................................10, 11

*Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992) .....................................................................20

*Philips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985)...................................................................18

*Synfuel Technologies, Inc. v. DHL Express (USA), Inc.*,
        463 F.3d 646 (7th Cir. 2006) ........................................................................................ 9-11

After years of litigation, and over 40 court-mediated settlement conferences, Plaintiffs and the Defendant have reached a Settlement Agreement that resolves this six year-old case.  The Court preliminarily approved the parties' agreement on May 14, 2010, and now the parties jointly seek an order from the court granting its final approval.  *See* Joint Motion for Final Approval of Class Action Settlement.  The Settlement provides great value to the three Classes. It makes $16.5 million dollars available to pay class members -- many of whom are entitled to claim thousands of dollars.  By reaching an agreement, the parties also avoided what would almost certainly have been a "ground war" of individual damages trials in the event that Plaintiffs prevailed on liability and avoided contentious litigation on the issue of liability for two of the three classes.  Failing to settle would have added years to the litigation.

In short, the Settlement Agreement satisfies all the requirements for Court approval; it is fair, reasonable and adequate.  Most importantly, the Settlement provides fair consideration to the Class Members.  The decision to settle rather than to fight on for the sake of fighting, is, undoubtedly, in the best interests of the class.   Moreover, considering the range of possible outcomes and the estimated value of continued litigation, the Settlement confers a far greater benefit on Class Members with its certain, fair payment than would years of protracted litigation with no guarantee of a better outcome.  Accordingly, Plaintiffs request that the Court approve the settlement and order the Claims Administrator to make payments from the Settlement Fund to the class member claimants.

## I.      Factual and Procedural Background

### A.     The Litigation

On October 21, 2004, Plaintiffs filed this class action lawsuit, on behalf of themselves and all those similarly situated, alleging that the City engaged in repeated patterns that detained

citizens for unconstitutional lengths of time, subjected citizens held in interview rooms to unreasonable conditions of confinement and ignored detained citizens' basic human needs for food, sleep and access to sanitation. *See* Second Amended Complaint (Dkt. 131). The City contested all Plaintiffs' allegations and vigorously defended against Plaintiffs' claims.

As described more fully in Plaintiffs' Memorandum in Support of Petition for Attorneys' Fees and Costs ("Petition for Attorneys' Fees"), two years into the litigation, Plaintiffs' position improved when the Seventh Circuit held that the Fourth Amendment's "reasonableness" standard applied to Class I and III. *Lopez v. City of Chicago*, 464 F.3d 711, 718 (7th Cir. 2006). With that same decision, the Seventh Circuit also denied the City's position that only nominal damages were available for detentions in excess of 48 hours where a court later found probable cause, and further denied that the City's felony review process constituted an "extraordinary circumstance" that justified unconstitutionally long detentions. *Id.* at 722.[1]

The discovery conducted in this case was extensive and laborious. Plaintiffs had to prove that the City caused classwide violations through its common policy and practice under the high legal hurdles of *Monell* liability. In this effort, Plaintiffs reviewed thousands of documents, interviewed class members, conducted depositions, and engaged in the lengthy process of developing comparable data from the practices of other police departments.

In order to litigate this case, Plaintiffs obtained the arrest data, analyzed it, and quickly learned that important pieces of data were missing or inaccurate. *See* Declaration of Michael Kanovitz, attached to Petition for Attorneys' Fees as Exhibit A at ¶28. As a result, Plaintiffs undertook a massive project to have 1.4 million paper arrest records data-entered so that they

---

[1] For further description of the above, please see Plaintiffs' Memorandum in Support of Petition for Attorneys' Fee and Costs. (Dkt. 348).

could be properly analyzed with respect to Plaintiffs' claims. *Id.* This work required both parties to engage and rely heavily on the analysis of data experts as well.[2]

The parties' summary judgment briefing was extensive and included cross-motions with each of the parties filing their respective Local Rule 56.1 statements, Defendant's motion to strike Plaintiffs' expert, and Plaintiffs' motion to strike certain exhibits to Defendant's motion and expert opinion. For Plaintiffs' part, it was crucial to prove that each of the classes' injuries resulted from the City's widespread policies and practices, a particularly daunting task given the nature of some of the claims. By way of example only: Plaintiffs faced the difficulty of proving common practices even though interview room practices were not inherently the same for each class member of Class I. Class II's claims required building a detailed record, including documentation of the practices of other police departments nationwide, a difficult task for someone outside law enforcement to accomplish. And, for Class III, Plaintiffs had to prove that all of the detentions resulted from a flawed policy or from deliberate indifference to a widespread practice. None of these were easy propositions and all required marshalling substantial evidence.

### B.     Settlement and the Settlement Agreement

After several years and forty-five court-mediated settlement conferences, the parties were able to reach this agreement. The path to settlement entailed numerous battles and the agreement we finally reached is very much the product of an adversarial process.

First, the parties disagreed with respect to payments to class members and they prepared to conduct sample damage trials to come to a resolution on damages. The parties developed protocols to select class members and then hired an accounting firm to do the selection (Crowe

---

[2]       In an effort to avoid repeating ourselves and in consideration of this Court's time, the details of this project and the parties' discovery endeavors is described in greater detail in Plaintiffs' Fee Petition at pages 9-10.

Chizek) and a mediator to preside over them (former Cook County Chancery Judge Bernetta Bush).  Kanovitz Decl. at ¶30.

The parties also spent considerable time analyzing the available data to determine estimates of class size.  The parties exchanged positions on class size, consulted their experts, critiqued each others' estimates, formulated revised estimates in response, and then engaged in several rounds of responsive briefing.   Eventually, the parties were able to reach an accord on all of these issues, which is reflected in the Settlement Agreement.[3]

The Settlement Agreement establishes a Settlement Fund of up to $16.5 million dollars out of which payments to eligible class members are paid, as well as, class notice and Claims Administration fees, Named Plaintiff Incentive Awards of $25,000 for each named Plaintiff, and Attorneys' Fees.  The Settlement Agreement provides that all persons in the three defined classes who submit timely, verified claim forms will be compensated for each instance of qualifying detention during the class period.  Members of Class I will receive up to $2,000 per detention; members of Class II up to $90; and members of Class III up to $3,000.  If the total value of all the timely, verified claims submitted exceeds the amount provided for class claims, each claim will be reduced accordingly on a pro rata basis.   On the other hand, if the claims and fees do not exhaust the Settlement Fund, any remaining amount will revert to Defendant.

The Parties further agreed that Class Counsel would not seek a fee award in excess of $5 million nor reimbursement of costs in excess of $70,000, subject to this Court's approval.

C.     **Preliminary Approval and Notice to the Class**

On May 14, 2010, the Court preliminarily approved the Settlement Agreement and ordered that individual mailed notice be sent to potential class members.  (Dkt. 342, 343).  The

---

[3]     The Plaintiffs wish to thank Judge Schenkier for the patience and intelligence he provided to guide the parties through this lengthy settlement process.

4

Court also approved the parties' Notice Plan, Published Notice and Claim Form, and preliminarily approved the following classes for settlement purposes:

> Settlement Class I:
>
>> All persons held in a Chicago Police Department interrogation or "interview" room for more than 16 hours in a 24-hour period at any time from October 21, 2002 to the date of preliminary approval.
>
> Settlement Class II:
>
>> All persons detained in a CPD lock-up or detective facility from 10:00p.m.(or earlier) on a given day and not released until 6:00a.m. (or later) of the following day, at any time from October 21, 2002 to the date of preliminary approval.
>
> Settlement Class III:
>
>> All persons arrested on suspicion of a felony without an arrest warrant and who were detained by the CPD and were not released and did not receive a judicial probable cause hearing within 48 hours of arrest, at any time from March 15, 1999 to February 10, 2008.

The Court's order further provided that individuals had until August 10, 2010, to submit an objection and until September 9, 2010 to exclude themselves from this settlement. The final date by which a claim must be submitted was set as October 25, 2010.

As a result of the Court's order, notice was mailed to 427,538 individuals on June 11, 2010.[4] Confirmed class members were mailed a "pre-populated" claim form, which only required a signature and notarization to be valid and payable. Approximately, 238,132 pre-populated claim forms were sent to confirmed members of Class II and 6,807 pre-populated

---

[4]      While most of the Individual Mailed Notices were sent on June 11, 2010, approximately 40,815 were mailed on the following Monday, June 14, 2010, because of an issue with the Claims Administrator's printer. Niemiec Aff. at ¶8.

claim forms were sent to confirmed members of Classes II & III.[5]  Niemiec Aff. at ¶9.  In an

effort to be as inclusive as possible, an additional 182,599 general claim forms were sent to

persons who could not be definitively ruled out based on available data.  *Id.*  The Notice was sent

after Rust first researched, through LexisNexis, whether the address was the last known address

and updated the mailing addresses for those for whom more recent addresses could be found.  *Id.*

at ¶7.  Thus, the Notice that was mailed to 427,538 individuals was provided to the last known

address.  For any Notices returned with a forwarding address, Rust re-mailed the Notice to the

provided address.

Despite these measures, 204,086 mailed Notices were returned as undeliverable.

Niemiec Aff. at ¶13.  This result was not entirely unexpected given the age of the Classes and the

demographic of Class Members, which includes a much higher percentage of transient

individuals than encountered in other types of class actions like securities, insurance, or even

consumer class demographics.  Further, given that the name and address information came from

arrest records, it is not surprising that alias names and addresses may have been provided at the

time of arrest.  Although the Notice that the Court approved was constitutionally adequate to

meet the standards of due process, as discussed further below in Section II.B., the parties worked

to try to find updated addresses for as many of the individuals whose notice was returned as

possible.  *See* Declaration of Heather Lewis Donnell attached to Petition for Attorneys' Fees as

Exhibit B at ¶19-25.

After researching data available from various state agencies, the parties were able to find

current addresses through the Illinois Department of Corrections ("IDOC") and IDOC's Parole

Division for many Class Members.  *Id.*  The parties apprised Judge Schenkier of these efforts.

---

[5]    Insufficient data existed in the City's arrest records to provide pre-populated Claim Forms to
members of Class I.

6

The first of these mailings was sent on August 30, 2010, to 16,694 class members who Plaintiffs were able to determine were in the current population held at IDOC facilities. Niemiec Aff. at ¶11. The period for filing an objection or exclusion for these individuals was extended until September 24, 2010. *Id.* at ¶31. A second supplemental mailing was sent to 1,230 individuals on September 24, 2010 for whom Plaintiffs were able to locate current addresses working in conjunction with the IDOC's Parole Division. *Id.* at ¶12. After seeking Judge Schenkier's, who in turn communicated with the Court, the period for filing an exclusion was extended until October 25, 2010. *Id.* at ¶30. The other dates remained the same for the two supplemental mailings, meaning they have until October 25, 2010 to return their claims to the Claims Administrator.

In addition, Published Notice was provided twice in the *Sun Times*, *Prison Legal News*, *Chicago Defender*, and *La Raza*. *Id*. at ¶15. The *Sun Times* published the notice on June 18 and July 21, 2010; *Prison Legal News* on July 15 and August 15, 2010, *Chicago Defender* on June 16 and July 21, 2010; and *La Raza* on June 18 and July 16, 2010. *Id.* and Exhibit 4, attached to Niemiec Aff. Moreover, each Published Notice was in the main body of these publications, as opposed to in the classified section.

The City also posted the Notice in its Police Departments. On September 16, 2010, notice was posted in all 25 police districts in both the front desk area of the district for the general public to see and the back of the district in the lockup areas for arrestees to see. *See* Declaration of Mark Harmon attached hereto as Exhibit 1. The City posted the Notice in both English and Spanish. The City also made copies of the Notice available to persons who asked for a copy to take with them. *Id.* at ¶4-7.

For its services in providing Notice and claims processing described above, Rust agreed that they would be paid a "not to exceed" cap of $510,000. They have incurred only a small amount of additional costs that were out of scope. Niemiec Aff. at ¶4. Rust's Capped fee for their service has resulted in significant value to the claimants.

### D.    Class Members' Response/Claims Processing

The response to the Individual Mailed Notice and Published Notice has been significant. As of September 23, 2010, approximately 35,394 total distinct claims have been filed. Niemiec Aff. at ¶33. And, as of the date of this filing, there remain another 26 days in which individuals may file claims.

In light of the large class size and significant response, there have been relatively few objections and exclusions. *Id.* at ¶30 and ¶32. Only thirteen objections have been filed to the settlement, which are addressed in greater detail below in Section II.A.3. (According to the Claims Administrator, only eight objectors are believed to be *Dunn* class members.[6]) Seventy-six individuals have requested exclusion from the settlement. *Id.* at ¶30. Of these, according to the Claims Administrator, 17 appear to be Class Members. *Id.*

## II.    Argument

### A.    The Proposed Settlement is Fair, Reasonable and Adequate and Should be Finally Approved

The Court should finally approve the proposed settlement because it is fair, reasonable and adequate.

"Federal courts naturally favor the settlement of class action litigation." *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir.1996); *see also Armstrong v. Bd. of Sch. Dirs. of Milwaukee*, 616 F.2d 305, 313 (7th Cir. 1980), *overruled on other grounds by Felzen v. Andreas,* 134 F.3d 873 (7th

---

[6]    One objector who is a confirmed Class II Class Member filed his objection after September 9, 2010. Whether timely or not, all substantive objections are addressed in Section II.A.3.

Cir. 1998) ("Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources."). To finally approve a class action settlement, the Court "must determine whether a proposed decree is lawful, fair, reasonable, and adequate." *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985) (citing *Gautreaux v. Pierce*, 690 F.2d 616, 631 (7th Cir. 1982)). In its review, the Court considers the facts "in the light most favorable to the settlement" and evaluates the fairness of the settlement viewing it in its entirety, rather than its component parts. *Isby*, 75 F.3d at 1199 (quoting *Armstrong v. Board of School Directors, Etc.*, 616 F.2d 305, 315 (7th Cir. 1980)). The Seventh Circuit has "admonished [the district courts] 'to refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights . . . .'" *Id.* at 1196-97 (quoting in part *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir.1985), *cert. denied*, 478 U.S. 1004).

To make its fairness determination, the Court considers the following factors: (1) the strength of plaintiffs' case compared to the amount of defendants' settlement offer; (2) an assessment of the likely complexity, length and expense of the litigation; (3) an evaluation of the amount of opposition to settlement among affected parties; (4) the opinion of competent counsel; and (5) the stage of the proceedings and the amount of discovery completed at the time of settlement. *Synfuel Technologies, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006), *quoting Isby*, 75 F.3d at 1199. Of these factors, the most important factor for the Court's analysis is the strength of Plaintiffs' case compared with the Defendant's settlement offer. *Isby*, at 75 F.3d at 1199 ("The district court properly recognized that the first factor, the relative strength of plaintiffs' case on the merits as compared to what the defendants offer by way of

settlement, is the most important consideration."); *see also Armstrong*, 616 F.2d at 314 (same). Under the Seventh Circuit's approach to this factor, the Court must "quantify[] the net expected value of continued litigation to the class." *Synfuel Technologies, Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646, 653 (7th Cir. 2006), *quoting Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 284 (7th Cir. 2002). To do so, the Court should "estimat[e] the range of possible outcomes and ascrib[e] a probability to each point on the range." *Id.* Although "[a] high degree of precision cannot be expected in valuing a litigation," the Court should determine a "ballpark valuation." *Id.*

Applying the foregoing factors here strongly supports approval of the settlement as fair, reasonable and adequate. Most significantly, the "ballpark" expected value of continued litigation to the class is within range of the actual settlement, which demonstrates the fairness of the City's $16.5 million dollar settlement offer.

1.      The Strength of Plaintiffs' Case is Appropriately Balanced with
        Defendant's Settlement Offer

Both parties spent years litigating the merits of their respective positions and tenaciously fought to win. Plaintiffs believe that they would prevail on liability for most or all of their claims. Of course, the City also believes that it would prevail on most of these claims too. The reality is that no side is guaranteed complete victory. While Plaintiffs have entered into this agreement with the perspective that they would win, they have also weighed the incremental value of proceeding and the risks incumbent in any litigation. In particular, Plaintiffs have considered the risks of appeal on liability and Class certification, as well as the extraordinary delay from individual damage trials and the range of awards that may result. Once the City agreed to put forth an offer that would guarantee that class members would receive meaningful

10

payments, it was clear that the certainty of payment outweighed the benefit of proceeding, particularly given that individuals would receive payment for each qualifying arrest.

Through this Settlement Agreement, the City has agreed to fund a $16.5 million dollar Settlement Fund that will promptly provide Class Members payment for each qualifying detention. Members of Class I are eligible for up to $2,000, Class II up to $90, and Class III $3,000. The total Settlement Fund amount and the allocations to the classes are fair in light of the strength of Plaintiffs' case.

Without the benefit of a looking glass, Plaintiffs provide the following possible outcomes and verdicts, along with their probabilities to estimate a ballpark range of outcomes were the case not to settle.[7] Before proceeding, however, it is worth noting that the estimates provided below do not account for the outliers; those individuals whose experiences were so extreme as to merit a substantial jury award. The Settlement Agreement provides protection for the outliers as well because they are able to exclude themselves from the settlement and pursue an individual action.

First, under the most optimistic possible outcome, Plaintiffs would win and win big. Under this scenario, Plaintiffs estimate that all three classes would prevail on liability. For Class I's claim, a jury would find for Plaintiffs on the Monell prong and decide that it was unreasonable and the City had a practice of detaining Plaintiffs handcuffed in interview rooms for more than 16 hours, denying them access to food, water or even the bathroom. Similarly, it is also likely that the jury would find that the City was unreasonable in denying Plaintiffs access to bedding if they were detained overnight. Finally, Plaintiffs are certain of a judgment in their favor of Class III claims.

---

[7] Plaintiffs engaged in the foregoing analysis in light of the Seventh Circuit's instruction in *Synfuel* and *Reynolds*, that courts estimate the net expected value of continued litigation to the class. *See Synfuel*, 463 F.3d at 653 (quoting *Reynolds*, 288 F.3d at 284).

While the "high" outcome has a fairly good probability because the law is favorable to Plaintiffs' claims after the Seventh Circuit's decision in *Lopez*, any honest lawyer would be a fool to estimate a greater than 40% chance of ultimately prevailing across the board in a civil rights class action when properly weighing all of the variables such as liability, appeals, and class certification.

As to the range of damages, Plaintiffs estimate that the damage trials would result in average juries awarding between $500 and $ 10,000 for Class I; $25 and $300 for Class II; and $1,100 and $7,500 for Class III. The problem with these figures is that they would likely be a long time coming for most Class Members. Plaintiffs would have presented the Court with a plan for trying damages on a classwide basis, but there is no guarantee the Court would have accepted it. *See Carnegie v. Household Intern., Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (noting that court may need to decertify class actions following a liability ruling if damages are not settled); *Dunn v. City of Chicago*, 231 F.R.D. 367, 378 (N.D. Ill. 2005) ("Plaintiffs concede that the assessment of damages 'is the only issue which presents any serious questions of individualized proof,' but this does not preclude class treatment."). Assuming the Court rejected the plan, the only route would have been individual damage trials.

Based on these ranges of outcomes, the likelihood of success, and the concerns about individualized damage trials, the City's settlement offer here fairly accounts for net value in continued litigation to class members.

2.      Continued Litigation Would be Lengthy, Complex and Costly

As demonstrated by the lengthy litigation that preceded this settlement, to continue litigating would certainly be lengthy, complex and expensive.

This case involves three separate classes alleging constitutional violations under a *Monell* theory of liability.  These are complicated legal issues.  For starters, with respect to Class I, Plaintiffs would have to have a trial with respect to liability.  This would entail considerable work analyzing the class and its claims, as well as, developing evidence to support proof of City's liability for its patterns and practices surrounding use of interview rooms.  Plaintiffs would also have to wait through an appeal process no matter which side prevailed at trial.  Assuming Plaintiffs are ultimately meritorious, Plaintiffs would engage experts and conduct statistical damages discovery to attempt to present damages classwide.   If the Court did not approve this method, then individual trials would be necessary.

Assuming Class II prevailed at Summary Judgment, they would still need to go through an appeal.  Class Members would also be required to wait during the appeals process.  With respect to damages, Plaintiffs would put forth their best effort to reduce the number of trials, particularly given that the estimated size of this class is at least 500,000 individuals.  Were individual trials necessary, Class Members would likely wait for a further period of time while the Court accommodated individual trials.

Finally, with respect to Class III, Plaintiffs would attempt to try the damage case classwide as with Class I.  Realistically, the discovery and expert work for this attempt would take in excess of a year; all with no guarantee that it would ultimately advance the case.

With respect to individual damages trials, Plaintiffs would need to engage experts to opine on the damages individuals suffered and conduct discovery of the individuals, their damages, witnesses, and any rebuttal witnesses.  Considering the remaining work to be done, it is clear that making the awards available to Class Members now far exceeds the incremental possible amounts that may result if the case were to continue.

13

3.    There is Only *De Minimis* Opposition to the Settlement Agreement

Given the large size of the class and the number of individual notices that were mailed, the thirteen objections filed are essentially *de minimis*.   More importantly, the substance of these objections is readily addressed.

The objections fall into the following four categories.   First, four individuals objected to the allocation of $90 provided to Class II.   *See* Exhibit 9 attached to Niemiec Aff. ("Exhibit 9") at pp. 8-9 (Objection filed by Ms. Karsten Schuh); pp. 10-11 (Objection filed by Mr. Maurice Jones); pp. 12-13 (Objection filed by Ms. Iris Wilson); p. 63 (Objection filed by Mr. Ron Haddad).   Second, one objector, who is also a class member in *Vodak v. City of Chicago*, No. 03 C 2463, filed an objection based on her misinterpretation of the scope of the release in the Settlement Agreement as potentially affecting class members' claims in that case, which it does not.[8]   Third, one objector raised an objection to limiting class member eligibility based on only the CPD's arrest data, which is not an issue since claims that are unable to be validated in the CPD arrest data will be manually researched at the Circuit Court of Cook County's records. That same objector also objected to limiting membership to only those individuals arrested on certain felony charges for Classes I and II.   First, Class II is not limited by charges.   With regard to Class I, the limitation to certain felony charges was agreed to based on the CPD's policies regarding use of interview rooms and, in fact, constitutes a great benefit to the Class because many individuals would otherwise be unable to prove their membership.   Class III is limited to

---

[8]    The *Vodak* objection was filed on behalf of five other individuals who are *Vodak* class members, however, these five individuals do not appear to be *Dunn* class members.   *See* Exhibit 9 at 1, 23-28.

those arrested on suspicion of a felony because the City's felony review process is the common policy uniting the Class.[9]

With regard to the objectors who raised a concern regarding the allocation to Class II, Plaintiffs respond that Class II's allocation may appear relatively small standing alongside the much larger payments available to members of Classes I and III. However, Class II's allocation is fair based on the nature of the bedding class's claim, the risk of pursuing this claim on appeal, and proof of the injuries sustained as a result. As discussed in the preceding section, there is also a certain amount of risk that a jury would find in favor of the City with respect to liability and/or award no damages for this particular class.

In response to the scope of release objection raised by the individual who is also a class member in *Vodak*, the release provided in this case will not impact her claims in that litigation. Both parties agree that Paragraph 41 of the Settlement Agreement limits the scope of release to only those claims that arise out of or pertain to the claims alleged in the Second Amended Complaint. *See* Joint Motion at ¶3; Second Amended Compl. (Dkt. 131). In summary, these claims are: (1) a wrongful detention of those citizens arrested on suspicion of a felony without an arrest warrant who are held in excess of 48 hours before a probable cause determination is made by a court; (2) conditions of confinement claim for individuals held in interview rooms in excess of 16 hours; and (3) a conditions of confinement claim specific to the lack of bedding for those citizens held overnight. This objection mistakenly cites to very summary language in the Notice and not to the Settlement Agreement, the former of which is not the legally operative document with respect to the release of claims. Moreover, even relying on the language from the Notice does not preclude claims in *Vodak*.

---

[9] Two additional objections are not addressed above because the basis of their objections were not discernable. *See* Exhibit 9 at pages 3-7 Objection filed by Mr. Richard Walker and 21-22 Objection filed by Mr. Gary Oliphant.

Specifically, this objection misinterprets the following phrase in the Notice that summarized the release as meaning that "you can't sue, continue to sue, or be part of any other lawsuit against the City of Chicago *about the legal issues in this case*." Exhibit 9 at page 24 citing Notice at page 4. The objector's concern is that the phrase "legal issues in this case" encompasses the false arrest and malicious prosecution claims at issue in *Vodak*. The basis of this objection is unfounded. In no way can the Second Amended Complaint be interpreted to include a false arrest or malicious prosecution claims.

In response to the third objection regarding the eligibility for payments outlined in Paragraph 30(d)(i)-(iii) of the Settlement Agreement, claim validation is not limited to only the CPD's arrest records. Indeed, Paragraph 30 of the Settlement Agreement specifically contemplates that the parties will review the Circuit Court of Cook County's records to provide additional information to validate claims where the CPD records and data are incomplete. This objection lacks a factual basis given the claims validation process specifically provided for in the Settlement Agreement. In fact, the issue this objection raises is one that Plaintiffs also raised in the context of settlement negotiations after years of analyzing the City's data. We addressed this concern by building in a provision for using other data sources to validate claims where CPD data is missing. Plaintiffs are well-aware that simply relying on the CPD's records would be insufficient to determine class membership and ensured that this issue was provided for in the Settlement Agreement.

Finally, an objection was raised to limiting class membership to only those individuals arrested on certain felony charges. First, only Classes I and III are limited to those charged with certain felonies or all felonies respectively. Plaintiffs agreed to the Class I limitation because the phenomenon of holding people in these rooms for more than 16 hours occurs almost exclusively

when the arrest involves suspicion of a serious felony. The City's records are simply not sufficient to evaluate the elapsed time for each claimant with any certainty. Therefore, we agreed with the City to pay claims by persons with these charges. The City's willingness to agree to these presumptions to pay claims is a great benefit to most of the Class I members who would find it difficult or impossible to establish their entitlement for payment based on the available records. Accordingly the limitation is in the best interests of the Class. With respect to Class III, the class definition was limited to only those arrested on suspicion of a felony because City's "felony review process" was the common practice that unified the class. In sum, these limitations were reasonable in light of the City's practices affecting class members of these two classes.

The small number of objections to this settlement relative to the large class size further demonstrates the fairness of this settlement. Indeed, all but the four objections regarding the allocation to member of Class II, are actually non-issues because the scope of release does not impact the *Vodak* litigants, records other than CPD's arrest records will be used to verify claims for those whose claims are unverifiable in the CPD's arrest data, and limiting membership in Class I to certain felonies and Class III to all felonies was reasonable in light of the City's arrest records and practices.

4. Class Counsel Supports This Settlement Agreement

Plaintiffs' counsel, Loevy & Loevy, is an experienced civil rights law firm with more than sufficient experience to formulate a reasoned assessment of the settlement. We continued negotiating over years to achieve the result which we believed would be fair to class members.[10] In other words, the decision to settle this case was made only after careful consideration

---

[10] Class Counsel has continued to work on behalf of Class Members after attorneys' fees were capped.

weighing the City's offer with the prospect of proceeding to trial and the benefit each option would confer on the class. Because the City's settlement offer would provide significant payment to class members without further delay or risk, counsel determined that settlement would provide the best benefit for class members.

> 5. This Settlement was Negotiated Only After Significant Discovery and Litigation

As recounted in greater detail in Plaintiffs' Motion for Attorneys' Fees and Costs (Dkt. 346) and above in Section I.A., this Settlement Agreement was only negotiated after years of hard-fought litigation, including summary judgment briefing and expert discovery, as well as significant document discovery of the City's arrest records. This is not a class action that was poised for settlement before it got started as the docket clearly demonstrates with its nearly 400 entries.

**B.    The Notice Provided to Class Members Is Constitutionally Adequate**

The Notice that was provided Class Members satisfies due process as the "best practicable, reasonably calculated under the circumstances to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Philips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985). Indeed, the constitutional requirement was exceeded here where the parties went to great lengths to be over-inclusive by sending Individual Mailed Notice to all individuals for which there was data in the CPD records indicating they may be class members. Donnell Decl. at ¶19-25. In other words, individual notice was mailed to an additional 182,599 individuals who could not be excluded as Class Members. Moreover, even though the constitutionally sufficient notice was mailed to the last known addresses of 427,538 confirmed and potential class members, the parties went to additional lengths to find current addresses for as many individuals as possible whose Notice Packet was returned as

18

undeliverable. As a result, an additional 17,924 individuals located in IDOC facilities or within IDOC's Parole Division were mailed notice on August 30, 2010 and September 24, 2010. Niemiec Aff. at ¶11-12. The individual notice provided here certainly was the best practicable, and even more.

Furthermore, the Published Notice provided here was designed to reach as many potential class members accounting for the particular challenges of the class demographic. The Published Notice provided here included publication of notice in the *Sun Times*, *Chicago Defender*, *La Raza* and *Prison Legal News*. Niemiec Aff. at ¶15. These publications were intentionally selected to include those publications for incarcerated individuals and in a Spanish language publication. In addition, the Notice was also made available in Spanish, and made available on a designated website. www.dunnsettlement.com. Also made available on the website, were the Settlement Agreement and all other preliminary approval documents. Finally, the City, beginning on September 16, 2010, posted the Notice in its 25 police districts. Harmon Decl. at ¶4, 7.

The Individual and Published Notice described above satisfies the requirements of due process because it achieved the goals of providing interested parties with notice of the settlement, the terms of the agreement, their right to object to the settlement and be heard at a fairness hearing and their right to opt-out of the settlement. The Notice provided individuals with all the information needed to reach an informed decision regarding their rights and the Settlement Agreement. Both Parties agreed that the provided notice was the best practicable in consideration of all the factors at issue for this class of individuals. *See* Joint Motion for Final Approval of Class Action Settlement at ¶4.

19

### C.     The Court Should Grant Final Certification of the Three Settlement Classes

Each of the three Settlement Classes meets the requirements of Federal Rule of Civil Procedure 23 for the Court to finally certify the Settlement Classes.  Indeed, the Court has already preliminarily certified the Settlement Classes in its Order Granting Preliminary Approval.  *See* Dkt. 342, 343.[11]

The Settlement Classes support certification under FED. R. CIV. P. 23(b)(3).  First, the Settlement Classes meet the four prerequisites of FED. R. CIV. P. 23(a) of numerosity, commonality, typicality and adequacy of representation.  The Settlement Classes are each individually and collectively so numerous that joinder of all members is impracticable.  Over 427,000 individuals are potential members of at least one of the Settlement Classes.  The Settlement Classes satisfy Rule 23(a)(2) because the factual and legal questions at issue are common among the class members and arise from the common set of facts related to CPD's procedures and practices pertaining to detained citizens.  *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) ("A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)").  The requirements of Rule 23(a)(3) are met because the claims or defenses of the representative parties are typical of the claims or defenses of the class.  In this case, the complaint alleges common constitutional violations arising from CPD's allegedly common practice of alleged unlawful lengths of detention and alleged denial of food, water or sanitation.  *De La Fuente v. Stokely-Van Camp, Inc*.  713 F.2d 225, 232 (7th Cir.1983).  Finally, the representative Class Members and Class Counsel adequately represent

---

[11]     Furthermore, the Court certified substantially similar classes in the litigation under Fed. R. Civ. P. 23(b)(3).  *See* Dkt. 46 (certifying a class substantially similarly to Settlement Class II by agreement and Settlement Class 3 under FED. R. CIV. P. 23(b)(3)) & Dkt. 102 (certifying a class substantially similar to Settlement Class I under FED. R. CIV. P. 23(b)(3)).

the interests of Settlement Class Members. Indeed, the Court has already found that these classes satisfy the prerequisites in its order preliminarily approving this settlement. Dkt. 343.

The Settlement Classes also meet the requirements for certification under FED. R. CIV. P. 23(b)(3) because common questions predominate over questions affecting only individual members and class resolution is superior to individual lawsuits. As this Court explained in its Order certifying classes in the litigation, "[i]f it is unlawful to hold detainees for prolonged periods in interrogation rooms without a toilet, bed, or regular meal service, it is unlawful as to each class member regardless of factual variations in their actual experiences while in custody." Dkt. 46 at 18. And, class action is superior because class members' claims arise from CPD's alleged common practice that allegedly resulted in prolonged detentions without food, water or sanitation. As this Court previously explained, "[r]equiring each class member to bring a separate action would be a waste of time and money." *Id.* at 19-20. Moreover, many individuals would abandon their claims because of the "expense and complexity of litigating" a claim against a municipality. *Id.* at 20. For the above-stated reasons, this Court should finally certify the three Settlement Classes under FED. R. CIV. P. 23(b)(3).

### D. The Court Should Award the Named Plaintiffs The Agreed Incentive Awards

The Court should approve the Incentive Awards for the three Named Plaintiffs representing the three respective Settlement Classes. Subject to the Court's approval, the Parties negotiated that Thomas Dunn, Veronica Imperial and Denny Robinson are each "eligible to receive an Incentive Award not to exceed $25,000." Settlement Agreement at ¶ 30(b). Messrs. Dunn and Robinson and Ms. Imperial should be granted the full amount of these awards because they have assisted Class Counsel in pursuing this litigation, including appearing for their depositions, consulting on facts, and consulting in the settlement process. They are each also

21

surrendering their individual claims against the City and giving releases which are broader than

class members' releases.  If the Court grants these amounts, the named Plaintiffs "will not be

permitted to make any further claims on the Settlement Fund."  *Id.*


## Conclusion

For all the reasons described above, Plaintiffs respectfully request that the Court finally

approve this class action settlement, certify the three Settlement Classes and grant named

Plaintiffs their incentive awards, and enter an order finally approving this class action settlement

and finally certifying the Settlement Classes.


Respectfully submitted,


/s/  Michael Kanovitz

September 29, 2010

Arthur Loevy
Michael Kanovitz
Jon Loevy
Roshna Bala Keen
Heather Lewis Donnell
LOEVY & LOEVY
312 North May, Suite 100
Chicago, Illinois  60607
Tel: (312) 243-5900
Fax: (312) 243-5902

*Attorneys for Named Plaintiffs and Settlement Classes*

**CERTIFICATE OF SERVICE**

I, Michael Kanovitz, an attorney, certify that on September 29, 2010, I filed with the Court's CM/ECF filing system a copy of PLAINTIFFS' MEMORANDUM IN SUPPORT OF JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, and thereby served a copy via email on all counsel of record.


/s/  Michael Kanovitz